## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| CYBERCODERS, INC., a California Corporation;<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>CHARLES COOKE, an individual, and NICOLAS BENEDETTO, an individual;<br><br>　　　　　　Defendants. | CIVIL ACTION<br><br>Case No. _____ |

## VERIFIED COMPLAINT

CyberCoders, Inc. (d/b/a CyberCoders) ("CyberCoders", "Company", or "Plaintiff"), by and through its undersigned counsel, files this Verified Complaint against Defendants Charles Cooke ("Cooke") and Nicolas Benedetto ("Benedetto") (collectively "Defendants"). In support thereof, CyberCoders states as follows:

## INTRODUCTION

1.　　This action is brought by CyberCoders to prevent two long-term former high-level employees, Cooke and Benedetto from establishing a competing business, soliciting customers, and continuing to solicit employees from CyberCoders in brazen breach of their contractual duties and fiduciary obligations to CyberCoders.

2.　　CyberCoders is a leading recruiting firm that has spent more than 23 years and millions of dollars developing a recruiting network to match qualified candidates with job opportunities across the United States.

3.　　CyberCoders employed Cooke for more than 16 years and Benedetto for nearly 10 years devoting years and substantial time and expense into their training and development in the

1

agency recruiting industry, including all "sides" of the industry, i.e., recruiting candidates, placing candidates, and servicing clients. At the time of his resignation, Cooke was employed as one of six (6) Recruiting VPs and was in charge of one of CyberCoders' six (6) Recruiting Divisions, which consisted of 39 CyberCoders' employees and six (6) teams, one of which Cooke led. Benedetto was a Director of Recruiting and team leader of 10 employees within Cooke's Division, and they both had significant access to CyberCoders' confidential, proprietary information and trade secrets.

4.      While still employed by CyberCoders, Defendants set up a competing business and executed a premeditated and coordinated unlawful raid of at least ten (10) CyberCoders' employees—who worked within Cooke's Division and as such, Cooke knew their revenue production—to join Defendants in this competing venture, before simultaneously and abruptly resigning without notice on February 17, 2025.

5.      On the same day as Defendants' resignations, two (2) employees from Cooke's Division also resigned—one even resigned _**before**_ Benedetto resigned indicating that the employee had advance knowledge of Defendants' competing firm. Then, the very next day, CyberCoders received near simultaneous resignations from another eight (8) employees who worked within Cooke's Division to join Defendants' new, competing business venture. The blatant similarities between the departed employees' resignation emails/letters demonstrate that this "lift out" was coordinated and timed by Defendants.

6.      Cooke admitted during his resignation that he and Benedetto were starting their own competing recruiting firm, and they "notified" their team members that morning prior to Defendants' resignations that they were opening their own firm.  However, shortly after his resignation, Cooke changed his story and stated that Defendants actually announced their

resignations to Cooke's Division _**after**_ Cooke resigned and had notified "some" of their team members about their plans to open a competing company prior to the day of their resignations.

7.     This action is based upon Defendants' (1) breaches (and threatened, imminent breaches) of contract; and (2) breaches of fiduciary duty and the duty of loyalty.

8.     CyberCoders seeks the relief described herein, including temporary and preliminary injunctive relief, to enforce its contractual rights and prevent Defendants from unlawfully competing with CyberCoders and continuing to solicit and recruit CyberCoders' customers, candidates, and employees, to prevent Defendants from causing further irreparable harm to CyberCoders, and to recover damages inflicted by Defendants on CyberCoders's business and operations.

## THE PARTIES

9.     CyberCoders is a leading nationwide recruiting firm that specializes in contract, contract-to-hire, and full-time direct-hire roles.

10.     CyberCoders is a California corporation with its principal place of business in Irvine, California.

11.     Defendant Charles Cooke is an adult individual who resides in Jupiter, Florida.

12.      Cooke is a resident and citizen of the state of Florida.

13.     At the time of his resignation from CyberCoders, Cooke was employed as VP of Recruiting.

14.     At the time of his resignation from CyberCoders, Cooke worked for CyberCoders remotely, primarily from his home in Jupiter, Florida.

15.     Defendant Nicolas Benedetto is an adult individual whose resides in Palm Beach Gardens, Florida.

16.      Benedetto is a resident and citizen of the state of Florida.

17.      At the time of his resignation from CyberCoders, Benedetto was employed as Director of Recruiting.

18.      At the time of his resignation from CyberCoders, Benedetto worked for CyberCoders remotely, primarily from his home in Palm Beach Gardens, Florida.

## JURISDICTION AND VENUE

19.      This Court has original jurisdiction over this action because complete diversity exists between CyberCoders and Defendants and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.

20.      Venue is proper in this District because the wrongful acts described in this Complaint occurred primarily in Florida, specifically the actions taken by Defendants alleged herein occurred in this District. Furthermore, both Defendants are residents of this District, and the parties contractually consented to venue in this district.

21.      This Court has personal jurisdiction over Defendants as residents of Florida.

22.      Additionally, this Court has personal jurisdiction over Defendants because they breached their contractual obligations to Defendants in Florida, violated their duties of loyalty to Defendants in Florida, and the parties contractually consented to jurisdiction in this district.

## FACTUAL ALLEGATIONS

A.      **CyberCoders' Business**

23.      For over 23 years, CyberCoders has been a leading, award-winning nationwide recruiting firm that helps businesses find top talent for recruiting, staffing, assignment or placement of temporary, temporary-to-hire, and permanent/direct hire employees.

24.      Put simply, CyberCoders works to find the best candidates to fill open positions for its customers.

4

25.     Over two decades, CyberCoders has built a nationwide recruiting structure that specialized in the following industries: Accounting & Finance; Biotech & Pharma; Construction; Engineering & Manufacturing; Legal; and Tech & IT.

26.     Additionally, CyberCoders has developed proprietary recruiting technology, Cyrus, to assist in matching applicants to the best job opportunities more efficiently.

27.     CyberCoders has helped over 73,000 job seekers find permanent, full-time positions.

**B.      Cooke's Employment with CyberCoders**

28.     On or about January 5, 2009, CyberCoders hired Cooke as its Director, Recruitment Services.

29.     On or about March 4, 2015, CyberCoders changed Cooke's position to Director of Recruiting.

30.     On January 1, 2019, CyberCoders promoted Cooke to VP of Recruiting and was assigned one of CyberCoders' four (4) Recruiting Divisions.

31.     At CyberCoders, the VP of Recruiting drives revenue growth and provides Divisional leadership. This role is part of the Senior Leadership Team and contributes to the sustainable growth of the company.  The VP of Recruiting's core responsibilities are:

a.      Revenue Growth & Profitability: Lead revenue growth by deploying effective data-driven recruiting strategies across the division, increasing productivity, and achieving consistent year-over-year growth.

b.      Divisional Development: Foster a high-performing recruitment Division by providing mentorship, training, and clear performance expectations to leaders within the Division and direct reporting individual contributors.  Maintain a future Division plan which includes plans for revenue growth, career paths, retention, and future leaders.

c.      Strategic Partnership: Serve as a member of the Senior Leadership Team. Foster collaboration to drive  innovation and success with various business leaders by sharing ideas, strategies, and support.  Practice data driven problem identification, which supports all leaders' ability to create effective solutions.

d.      Market Insight and Adaptability: Stay informed about industry shifts, market trends, and talent demands.

e.      Maintain Personal Full Desk & Direct Report Team Production: Continue to maintain mastery in recruiting, insights on market trends, recruiting tactics, and recruiting software.

32.     On July 1, 2019, Cooke relocated to Florida.

33.     CyberCoders also opened an office in West Palm Beach, Florida that Cooke had responsibility over.

34.     To give Cooke additional support, CyberCoders offered to relocate Cooke's brother-in-law to Florida to be the assigned trainer for Cooke's Division.  CyberCoders changed his role to Lead Regional Trainer/Sr. Executive Recruiter with a base salary of $70,000 (which was $20,000 over the standard base salary for all non-managerial recruiter roles) and a quarterly bonus for training new hires.  No other Recruiting Division had their own trainer.  Additionally, he received relocation bonuses/reimbursements.

35.     With his relocation to Florida, in July 2019, Cooke entered into a Confidentiality, Non-Solicitation, and Non-Competition Agreement with CyberCoders.

36.     On October 1, 2019, CyberCoders promoted Cooke to VP of Recruiting, Southern Region.

37.     With this promotion, CyberCoders compensated Cooke handsomely, including:

    a.      $250,000 annualized base salary (nearly double the normal rate paid to VPs of Recruiting);

    b.      Relocation Reimbursement – $50,000 in relocation expenses, which was nearly three (3) times CyberCoders' normal relocation expenses for managers (other managers who relocated received up to $18,750);

    c.      Cell phone and auto allowances;

    d.      25% individual commission rate;

    e.      Management Commission Rates

        i.      10/1/2019 – 6/30/2020: 4%
        ii.     7/1/2020 – 6/30/2022: 3%;

    f.      Tower Bonus;

    g.      Referral Bonuses;

    h.      Management Bonuses

        i.      Team Management Bonus – this bonus was different than all other managers
        ii.     Division Bonus – different setup than all other managers.
        iii.    VP of Recruiting, Southern Region Incentive Supplemental Bonus – other VPs were not eligible for this bonus.

38.     Effective January 1, 2021, CyberCoders closed the Florida office, and Cooke became fully remote working out of his home in Florida.

39.     In February 2025, at the time of his resignation, Cooke was still in charge of one of the now six (6) CyberCoders' Recruiting Divisions that consisted of 39 CyberCoders' employees, including Benedetto, and six (6) teams.

40.     Each Recruiting Division has teams.  At the time of his resignation, Cooke's Division consisted of six (6) teams:

    a.      Glades of Glory – Led by Cooke with four (4) team members

    b.      Crocodile Done Deals – Led by Benedetto with 10 team members.

c.      Saved by the Belle – Led by Recruiting Manager I Ivelisse "Belle" Arriaga with four (4) team members, including an Associate Manager Keith Shuler.

d.      Show Me the Money – Led by Recruiting Manager I Delano Williams with four (4) team members.

e.      A1 Armibillos – Led by Recruiting Manager I Jon Quickel with six (6) team members.

f.      Maple Leaf Money Makers – Led by Recruiting Manager II Kyle Westhorpe with six (6) team members, including an Associate Manager, James Rowland.

41.     In the last five (5) years of his employment with CyberCoders, Cooke received over $5.5 million in total compensation, including salary, commissions, incentives, allowances, bonuses, and the value of vested restricted stock:

- 2019 - $753,533.20

- 2020 (COVID-19 year) - $963,648.65

- 2021 - $1,077,834.50

- 2022 - $959,521.37

- 2023 - $944,665.55

- 2024 - $807,611.55

- 2025 - $41,996.52 (through February 17, 2025)

42.     On the morning of February 17, 2025 and without advanced notice, Cooke abruptly resigned from CyberCoders.

**C.     Benedetto's Employment with CyberCoders**

43.     On or about November 7, 2016, CyberCoders hired Benedetto as an Executive Recruiter.

44.     On or about October 1, 2017, CyberCoders promoted Benedetto to Senior Executive Recruiter.

45.     On or about April 1, 2018, CyberCoders promoted Benedetto to Lead Recruiter.

46.     On or about July 1, 2019, CyberCoders promoted Benedetto to Recruiting Manager I, and Benedetto relocated with Cooke to Florida.

47.     With that promotion and relocation, Benedetto entered into the same Confidentiality, Non-Solicitation, and Non-Competition Agreement with CyberCoders as Cooke.

48.     As part of his relocation to Florida, CyberCoders paid Benedetto $16,292.22 in relocation expenses, relocation bonuses totaling $189,425.70 from 2020-2022, and a grant of Restricted Stock Units on December 16, 2019, which vested a total of $29,841.19.

49.     On or about January 1, 2021, CyberCoders promoted Benedetto to Recruiting Manager II.

50.     Effective January 1, 2021, CyberCoders closed the Florida office, and Benedetto became fully remote working out of his Palm Beach Gardens, Florida home.

51.     On or about October 1, 2021, CyberCoders promoted Benedetto to Director of Recruiting.  As a Director of Recruiting, Benedetto had the following responsibilities:

a.     Tower Revenue Growth & Productivity: Drive performance by effectively setting and managing performance metrics for direct reports to achieve quarterly team goals, while also meeting individual Tower Revenue goals.

b.     People Management: Foster a high-performing recruitment team by providing mentorship, training, clear performance expectations, and holding direct reports accountable to team and company standards.

      c.      Cultivate Culture: Create a team culture of excellence through recognizing achievements, fostering innovation and creativity, empowering autonomy, and promoting a sense of belonging and inclusivity for all.

      d.      Operational & Strategic Planning: Build plans and strategies to support scaling a recruiting team. Ensure all tasks, workflows, and behaviors adhere to company policies, best practices, and procedures.

      e.      Identify & Develop Future Leaders: Identify future leaders for management roles and provide opportunities to support developing management skills.  Manage and develop Associate Managers.

52.     Benedetto also led a team within Cooke's Division called "Crocodile Done Deals".

53.     Benedetto managed 10 employees assigned to the Crocodile Done Deals team.  As leader of this team, Benedetto developed and built goodwill with his team members.  Benedetto also had access to his team members' revenue production.

54.     In February 2025, at the time of his resignation, Benedetto reported directly to Cooke and was a part of Cooke's Division.

55.     In the last five (5) years of his employment with CyberCoders, Benedetto received nearly $4 million in total compensation, including salary, commissions, incentives, allowances, bonuses, and the value of vested restricted stock:

- 2019 - $309,939.87

- 2020 (COVID-19 year) - $444,105.23

- 2021 - $768,785.52

- 2022 - $1,002,122.38

- 2023 - $637,200.53

- 2024 - $541,941.29

- 2025 - $77,830.05 (through February 17, 2025)

56.     On the morning of February 17, 2025 and without advanced notice, Benedetto abruptly resigned from CyberCoders.

**D.      CyberCoders Entrusted Defendants with its Proprietary, Confidential Information and Trade Secrets**

57.     More than anything else, the recruiting industry is a business about people.  The success of a recruiting firm is directly dependent upon the goodwill and relationships it builds with its customers and with the candidates it places with customers.  These relationships are cultivated over years and CyberCoders' employees are the key to building and maintaining these relationships and goodwill.

58.     Over the years and at significant expense, CyberCoders has cultivated enduring relationships with its customers and candidates.  By virtue of their job duties, Defendants were provided access to confidential information about CyberCoders' customers and prospective customers and their staffing needs, and to confidential information about candidates' skills, qualifications, work history, preferences, location, benefits and compensation requirements.

59.     CyberCoders has developed and maintains proprietary intellectual property – Cyrus – to marshal its institutional knowledge and trade secrets to enable CyberCoders' employees to effectively fulfill customer needs.

60.     Cyrus contains competitively sensitive information about CyberCoders' customers and prospective customers, such as: the identity and contact information for their key decision-makers and actual buyers of CyberCoders' services; customer preferences; a history of the previous needs (job orders) fulfilled by CyberCoders; the identities, resumes, portfolios, desired salaries and contact information of the job-seekers that have been placed there; pricing information

and information about current and projected staffing needs; a history of the sales calls and correspondence with those customers; and key performance data for CyberCoders' recruiters.

61.     The information contained within Cyrus represents the aggregation of years of data from numerous internal and external sources at substantial expense to Cyrus. The information aggregated in Cyrus includes information that CyberCoders has purchased from multiple external sources and aggregated and cross referenced in a way that is not commercially available, as well as information that CyberCoders employees have input through their tenure working for CyberCoders.

62.     CyberCoders created Cyrus to function as the backbone of its business model, providing CyberCoders employees with all the information they need to succeed in the current recruiting landscape.

63.     The information contained in Cyrus is unique – it is not publicly available or easily ascertainable, and would be extremely valuable in the hands of a competitor.

64.     CyberCoders takes steps to protect the trade secrets contained in Cyrus, only allowing employees of CyberCoders and its affiliates to access the platform and requiring those employees to execute confidentiality agreements. Restricting access to internal personnel means that only individuals who have entered into confidentiality agreements (such as those entered into by Defendants) and who have agreed to preserve the confidentiality of CyberCoders' trade secrets, are able to view the information contained in Cyrus.

65.     Even within Cyrus, CyberCoders takes steps to restrict information regarding active customers, including information regarding the identity and contact information of key individuals at CyberCoders' active customers, to those employees with a business need to have access to that information. Generally, full access to information for active customers is only granted to those

employees assigned to that account, and to employees in the management chain above the assigned employee.

66.     Given their management-level positions with CyberCoders, Defendants had access to large amounts of critical data housed in Cyrus. Cooke had access to the entirety of the data for all 39 of his Division members, including all of the information regarding their customer contacts as well as the complete history of the business relationship with each of the customers. Benedetto had access to the same information for his 10-employee team.

67.     Given their management-level positions with CyberCoders, Defendants had access to CyberCoders' business strategies for customers who worked with anyone within the employees they supervised/managed, including pricing strategies, negotiation practices and thresholds, and prior concessions to customers.

68.     In connection with their employment with CyberCoders, Defendants spent a large amount of their time and effort developing relationships and building goodwill with CyberCoders' customers. These customer relationships are one of the most critical aspects of CyberCoders' business, and are essential to successfully making placements.

69.     Additionally, Cooke was a member of CyberCoders' Senior Leadership Team.  As part of his role, Cooke regularly attended meetings with other CyberCoders' Recruiting VPs, where he was privy to strategy discussions regarding the Company's growth areas, targets, pain points, and plans.

**E.     Defendants Executed Confidentiality, Non-Solicitation, and Non-Competition Agreements with CyberCoders.**

70.     In July 2019, and for valuable consideration including their continued employment with CyberCoders, valuable training, and access to the Company's confidential, proprietary information and trade secrets, Cooke entered into a Confidentiality, Non-Solicitation and Non-

Competition Agreement with CyberCoders on July 6, 2019 ("Cooke Agreement"), and Benedetto entered into the same Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on July 8, 2019 ("Benedetto Agreement" with the Cooke Agreement, the "Agreements").  A copy of the Cooke Agreement is attached as **Exhibit A**.  A copy of the Benedetto Agreement is attached as **Exhibit B**.

### 1.     <u>Non-Compete Provision</u>

71.     Section 2.2(a) off the Agreements prohibits Defendants from competing with CyberCoders within the applicable territory during their employment with the Company and for a period of twelve (12) months following the termination of their employment:

> During the term of Employee's employment with the Company, and for a period of twelve months after the termination of Employee's employment for any reason, Employee will not, directly or indirectly, do any of the following:
>
> (i) work in a Competing Position for a Competing Business within the Restricted Territory; or (ii) own, maintain, operate or have any ownership interest in a Competing Business within the Restricted Territory;

Ex. A-B, § 2.2(a)

72.     The Agreements define Competing Business to mean "any person, business, or subdivision of a business which provides products or services that are the same as or substantially similar to, and competitive with, the Company Business or which is actively planning to engage in the Company Business."  Ex. A-B, § 1.1(b).

73.     The Agreements define Restricted Territory:

> "Restricted Territory" means a fifty (50) mile radius around any office of the Company, including Employee's office in their personal residence, if applicable, as to which, during the last twenty-four (24) months of their employment with the Company: (i) Employee was assigned, or (ii) Employee had supervisory, managerial or administrative responsibilities.

Ex. A-B, § 1.1(g).

## 2.      Non-Solicitation Provisions

74.      Defendants agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or indirectly:

> (i) solicit, seek to employ, or seek to retain the services of any person whose identity Employee learned while employed by the Company, who is at that time or was within the previous twelve (12) months providing services to the Company as an employee or independent contractor, for the purpose of providing services to a Competing Business; or (ii) solicit or seek to place any temporary employee, candidate for employment, or independent contractor candidate, who, in the twelve (12) months prior to Employee's separation of employment with Company, was directly or indirectly placed by Employee or sought to be placed by Employee or whose identity Employee learned in carrying out Employee's job duties, which placement is for or on behalf of any Competing Business; or (iii) persuade, induce or attempt to persuade or induce any such person referenced in this subsection 2.2(b) to leave his or her employment or temporary employment or to refrain from providing services to the Company[.]

Ex. A-B, § 2.2(b).

75.      Defendants agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or indirectly:

> (i) solicit or seek to provide services to any customer or potential customer of the Company with whom Employee had Material Contact, which solicitation is for or on behalf of any Competing Business; or (ii) persuade, induce or attempt to persuade or induce any such customer or potential customer to alter or reduce its use of services from the Company.

Ex. A-B, § 2.2(c).

76.      The Agreements define "Material Contact" as:

> contact between Employee and any Company customer or potential
> customer within twenty-four (24) months prior to Employee's
> termination or resignation in which Employee either (i)
> communicated directly with such customer or potential customer on
> behalf of the Company; or (ii) obtained Confidential Information
> about such customer or potential customer in the ordinary course of
> business as a result of Employee's association with the Company;
> or (iii) received compensation, commissions, or earnings based on
> customer's receipt of products or services from the Company.

Ex. A-B, §  1.1(f).

### 3.  <u>Other Terms of the Agreements</u>

77.    Defendants agreed to refrain from disclosing any confidential information of CyberCoders, and to protect CyberCoders' trade secrets.  Ex. A-B, § 1.2.

78.    The Agreements require the return of all Company information in Defendants' possession, including electronic copies saved to a portable device or web or cloud-based storage, or emailed to a personal email account.  Ex. A-B, § 1.2(c).  Defendants further agreed "that compliance with this paragraph may require that data be removed from Employee's personal computer equipment or electronic devices" and that the Company will be permitted to access such equipment for that purpose.  *Id.*

79.    Defendants agreed to devote their entire business time and attention to the Company, and to avoid any conflicts of interest:

> During the term of Employee's employment with the Company,
> Employee will devote Employee's best efforts and entire business
> time and attention to the Company's business, and Employee will
> not, directly or indirectly, operate, engage in, assist, be employed
> by, or have any interest in any business activity of or for the benefit
> of any person or entity other than the Company, or have any
> ownership interest in any business that does business with the
> Company, or whose ownership would otherwise create a conflict of
> interest, except as otherwise approved in writing by the Company,
> which approval the Company may in its absolute discretion
> withhold.

Ex. A-B, § 2.1.

80.     Defendants have agreed "For a period of twelve (12) months after the termination of Employee's employment, Employee will promptly inform Employer in writing of any employment, consulting engagements, contract work or other business affiliations that Employee has with any Competing Business or with a Company Customer."  Ex. A-B, § 2.3.

81.     Defendants acknowledged and agreed that the restrictions contained in the Agreements are "necessary to protect the proprietary and related interests of the Company, and that the limitations . . . are reasonable with respect to duration, geographical area and scope of activities, and do not impose a greater restraint than is necessary to protect the Confidential Information, goodwill, and other business interests of the Company."  Ex. A-B, § 7.2.

82.     Section 7.3 of the Agreements states the Agreements "will be governed by the laws of the state shown in the Company records as the Employee's current primary office location, without giving effect to the state's conflict of law rules."

> **4.      The Agreements Are Necessary To Protect CyberCoders Legitimate Business Interests.**

83.     CyberCoders is engaged in the highly competitive market of recruiting for the modern workforce to meet the needs of various customers.

84.     CyberCoders has developed sophisticated processes to meet the needs of its customer and developed substantial information regarding its customer base and their needs at great expense to CyberCoders, including the information contained in Cyrus.

85.     CyberCoders' confidential, proprietary information and processes are trade secrets because they derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use.

86.     CyberCoders takes reasonable measures to maintain the secrecy of and protect its trade secrets, including limiting access to them and preventing anyone from accessing such information who is not subject to non-disclosure obligations.

87.     In addition to its trade secrets, CyberCoders has other valuable confidential business information which it makes available to its employees to enable CyberCoders to effectively operate as a recruiting firm, including, but not limited to, information about compensation, performance, and business-generating details for employees under their supervision, which constitutes valuable confidential business information.

88.     CyberCoders' trade secrets and confidential business information are a legitimate business reason for CyberCoders' restrictive covenants with Defendants.

89.     CyberCoders also devotes significant time and resources to the development of substantial goodwill and relationships with prospective and existing customers – entities who hire CyberCoders to place job applicants.

90.     Management-level employees such as Defendants have access to detailed information regarding CyberCoders' customers and their needs.

91.     CyberCoders substantial relationships with their prospective and existing customers are a legitimate business reason for CyberCoders' restrictive covenants with Defendants.

92.     Finally, CyberCoders also devotes significant time and resources to the development of goodwill with its employees, candidates, and independent contractors.

93.     CyberCoders develops this goodwill through its employees, including high-level employees such as Defendants.

94.     CyberCoders employee, candidate, and independent contractor goodwill is a legitimate business reason for CyberCoders' restrictive covenants with Defendants.

**F.      Defendants Establish a Competing Business in Violation of Their Obligations to CyberCoders**

95.     At least as early as January 2025, Defendants were working to establish a business to compete with CyberCoders.

96.     Defendants took concrete steps to compete with CyberCoders prior to notifying CyberCoders of their intent to resign.

97.     On January 21, 2025, Cooke submitted articles of incorporation to the Florida Secretary of State for a new corporation: SOULEVER PARTNERS INC.

98.     Cooke did not disclose this new business venture to CyberCoders.

99.     That same date, on January 21, 2025, Benedetto submitted articles of incorporation to the Florida Secretary of State for a new corporation: OPULENZA INC.

100.    Benedetto did not disclose this new business venture to CyberCoders.

**G.      Defendants "Lift Out" 10 CyberCoders' Employees from Their Team in Blatant Violation of Their Agreements**

101.    On February 17, 2025, Defendants resigned from their employment with CyberCoders.

102.    Cooke informed CyberCoders' President Ben di Grazia ("di Grazia") that he and Benedetto were resigning in order to start a new, competing business.

103.    As admitted by Cooke, this new business venture is a recruiting firm, and is a "Competing Business" under the definition in the Agreements.

104.    Defendants' new business venture is located in Florida, and is within the "Restricted Territory" as defined by the Agreements because their new businesses addresses are

located at their homes, which is the exact same location where they worked for Plaintiff at the time of their resignation.

105.    Upon information and belief, Defendants' work for their new business venture is also based in Florida out of their respective residences, and therefore is within the "Restricted Territory" as defined by the Agreements.

106.    Defendants' 10-employee "lift out" began on the very same day they resigned.

107.    During his February 17 resignation call with di Grazia, Cooke told di Grazia he first informed his 39-employee Division earlier that morning that Defendants were opening a competing business.

108.    About a week later, Cooke **changed his story** and told di Grazia he actually notified his team that Defendants were leaving and opening their own firm *after* Cooke resigned but also admitted that he had told "some" of his team members about Defendants' competing business prior to February 17.

109.    Whichever story is true, the fact of the nearly simultaneous resignations over two days clearly demonstrates that Defendants informed certain, chosen subordinates of their competing firm and intentions to depart prior to informing CyberCoders' management of their plans.

110.    On Monday, February 17, 2025 at approximately 10:52 a.m. EST, Cooke informed di Grazia that he was resigning, effective immediately.

111.    On Monday, February 17, 2025 at 11:50 a.m. (even before Benedetto resigned), Ivelisse "Belle" Arriaga (Recruiting Manager I and leader of a 5-person team within Cooke's Division) resigned from her employment with CyberCoders via email "effective today."

112.     On Monday, February 17, at 1:12 p.m., Benedetto emailed his immediate resignation.

113.     On Monday, February 17, at 1:24 p.m., Ricardo Miranda (Recruiter) announced via email "Today, 2/17/25, I will be officially resigning from CyberCoders."

114.     Then, the next day, and within about 2 hours of each other, seven more employees resigned effective immediately.

a.     On February 18, 2025 at 8:23 a.m., Keith Shuler (Associate Manager) announced his resignation via email "effective immediately".

b.     On February 18, 2025 at 8:56 a.m., Kyle Westhorpe (Recruiting Manager II and leader of a 7-person team within Cooke's division) submitted his resignation via email "effective Tuesday, February 18th."

c.     On February 18, 2025 at 9:30 a.m., Sean Westhorpe (Executive Recruiter and a member of Benedetto's 10-person team) announced his resignation via email "effective immediately".

d.     On February 18, 2025 at 10:09 a.m., Delano Williams (Recruiting Manager I and leader of a 5-person team within Cooke's division) resigned from his employment with CyberCoders via letter "effective February 18th, 2025[.]"

e.     On February 18, 2025 at 10:13 a.m., Alexandra Higgins (Lead Recruiter) resigned from her employment with CyberCoders via email "effective immediately (2/18/25)."

f.     On February 18, 2025 at 10:20 a.m., Alexandria Acevedo (Executive Recruiter) resigned from her employment with CyberCoders via email "effective immediately."

g.     On February 18, 2025 at 10:34 a.m., James Rowland (Associate Manager) announced via email "I am writing to formally resign."

115.    Two hours later, another employee from Cooke's Division resigned.  On February 18, 2025 at 12:41 p.m., John O'Grady (Lead Recruiter) announced his resignation via email "effective February 19th, 2025".

116.    Upon information and belief based on the coordinated timing of the resignations, these employees (the "Poached Employees") resigned from their employment with CyberCoders to work for Defendants and/or their new competing business venture(s).

117.    The Poached Employees were all assigned to Cooke's Division, which consisted of six (6) teams.  Cooke had full access to all the Poached Employees' revenue production during his employment with CyberCoders.

118.    While Defendants each had their own teams, the Poached Employees include three of the remaining four leaders of those teams.

119.    Together, Defendants and the Poached Employees' were responsible for approximately $11 million in business at CyberCoders.

120.    Based on Cooke's comments to di Grazia and di Grazia's understanding of the business, it is very likely that Defendants informed and successfully solicited the Poached Employees from Cooke's Division to join their competing business at least weeks and likely months in advance of February 17, 2025, which violated their common law fiduciary duties of loyalty and non-solicitation obligations in the Agreements.

121.    Defendants were prohibited, both during and for 12 months after their employment with CyberCoders, from soliciting the Poached Employees to work for a competing business.

122.    Defendants' unlawful solicitation of the Poached Employees has decimated one of CyberCoders' six (6) Recruiting Divisions.

123.    Defendants' unlawful solicitation of the Poached Employees has harmed CyberCoders, resulting in the simultaneous departure of ten employees, which cumulatively represent the investment of millions of dollars of CyberCoders into its workforce.

124.    The cost to replace the Poached Employees cannot be calculated in monetary terms. From January 1, 2019 to present, CyberCoders hired 1,071 people in recruiting.  Of those hired, only eight (8) were Associate Managers and one was a re-hire Recruiting Manager I.  CyberCoders does not hire typically hire outside managers and instead trains and develops internally.  This is demonstrated by the fact that none of the eight external Associate Managers hired since 2019 are still employed by the Company.  Since five of the 10 Poached Employees were Manager-level employees, they will take years and significant monetary investment to replace.

125.    CyberCoders will suffer a significant disruption of business, and certainly a decrease in revenue as a result of Defendants' unlawful actions because Defendants and the Poached Employees were responsible for approximately $11 million in business.

126.    CyberCoders will suffer additional irreparable harm unless Defendants are immediately enjoined from soliciting more of CyberCoders' employees.

127.    Defendants' conduct is tantamount to the misappropriation of an entire business unit despite clear contractual provisions prohibiting such conduct.

128.    Not only are Defendants violating their non-competes, but they have gotten an unfair "head start" using CyberCoders' capital, employees, and financial capital.

129.    The Poached Employees each have restrictive covenants of their own, and upon information and belief, Defendants are tortiously interfering with CyberCoders' contractual agreements with the Poached Employees.

130.     Further, given Defendants' brazen unlawful activity to date, there is a significant and immediate threat that Defendants' will violate their customer and candidate non-solicitation obligations.

131.     Therefore, CyberCoders will suffer irreparable harm unless Defendants are immediately enjoined from soliciting CyberCoders' customers or potential customers and candidates.

**H.     Defendants Have Failed to Substantively Respond to CyberCoders' Outreach**

132.     On February 18, 2025, counsel for Plaintiff sent letters to Defendants requesting the return of information and property and certain assurances that Defendants have not and will not violate their Agreements.  Counsel for Plaintiff requested a response from Defendants by February 20, 2025.

133.     On February 21, 2025, counsel for Defendants emailed counsel for Plaintiff noting counsel has been engaged by Defendants, confirming Plaintiff's courier picked up the Company's laptops, docking stations, and power cords, and explaining that they are reviewing the letters with Defendants and "will be in touch."

134.     That same day, counsel for Plaintiff responded by relaying this is a time-sensitive, urgent matter and requesting a date for when to expect to receive a response.

135.     On February 24, 2025, counsel for Plaintiff wrote another email to counsel for Defendants asking when Plaintiff can expect a response.  True and correct copies of the foregoing letters (excluding the attachments) and emails are attached and incorporated at **Exhibit C**.

136.     On February 27, 2025, Cooke left a voicemail for di Grazia.  Di Grazia returned Cooke's call and discussed with Cooke the importance of Defendants' attorneys responding to CyberCoders' counsel.  Cooke responded that he would have Defendants' attorneys respond.

137.    To date, Defendants have failed to substantively respond to Plaintiff's letters and follow-up emails.

**CLAIMS**
**COUNT I: BREACH OF CONTRACT (Non-Solicit)**
**(Against Cooke)**

138.    CyberCoders incorporates by reference the allegations of the paragraphs 1-136 as if the same were set forth at length herein.

139.    The Cooke Agreement is an enforceable contract between Cooke and CyberCoders.

140.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Cooke Agreement that it was required to perform, and Cooke's performance of his obligations under these agreements was not excused.

141.    Cooke breached the Cooke Agreement by soliciting CyberCoders' employees to work for him on a competing business venture, including as set forth above.

142.    Cooke breached the Cooke Agreement by soliciting the Poached Employees to work for him on a competing business venture, including as set forth above.

143.    As a direct and proximate result of Cooke's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

144.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Cooke is not enjoined from further violation of his contractual obligations to CyberCoders.

145.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for Cooke's breaches without injunctive relief.

## COUNT II: BREACH OF CONTRACT (Non-Compete)
### (Against Cooke)

146.    CyberCoders incorporates by reference the allegations of the paragraphs 1-145 as if the same were set forth at length herein.

147.    The Cooke Agreement is an enforceable contract between Cooke and CyberCoders.

148.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Cooke Agreement that it was required to perform, and Cooke's performance of his obligations under these agreements was not excused.

149.    Cooke breached the Cooke Agreement by establishing a competing business venture during his employment with CyberCoders.

150.    Cooke breached the Cooke Agreement by working for, owning and operating a competing business venture within 12 months of the end of his employment with CyberCoders and in the Restricted Territory.

151.    As a direct and proximate result of Cooke's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

152.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Cooke is not enjoined from further violation of his contractual obligations to CyberCoders.

153.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for Cooke's breaches without injunctive relief.

## COUNT III: BREACH OF FIDUCIARY DUTY & DUTY OF LOYALTY
### (Against Cooke)

154.    CyberCoders incorporates by reference the allegations of the paragraphs 1-145 as if the same were set forth at length herein.

155.    As a VP and senior-level employee of CyberCoders, Cooke owed CyberCoders fiduciary duties, including a duty of loyalty.  As a result, he was obligated to act with the utmost good faith and in the best interest of CyberCoders.

156.    CyberCoders was entitled to place its trust and confidence in Cooke and was entitled to expect Cooke to act with the utmost good faith toward it in carrying out the business of CyberCoders.

157.    Cooke also contractually agreed to devote his entire business efforts to and for the benefit of CyberCoders.

158.    CyberCoders relied on Cooke's loyalty and integrity and faithful performance of his job duties and responsibilities.

159.    Through the actions set forth above, including his establishment of a competing entity and soliciting CyberCoders' employees to join that entity while still employed by CyberCoders, Cooke knowingly and willingly breached his fiduciary duties to CyberCoders.

160.    This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to CyberCoders.  Rather, it is predicated on Cooke 's deceit and breach of his duties of loyalty.

161.    As a direct and proximate result of Cooke's breach of his duties, CyberCoders has been and is being harmed and faces irreparable injury.

162.    CyberCoders is entitled to damages, in an amount to be determined at trial, as well as disgorgement by Cooke of the salary, benefits and other forms of remuneration paid to him during the time that he was, in secret, being disloyal to CyberCoders , and all profits he and/or his

new employer received as a result of his disloyalty, in an amount to be determined at trial. CyberCoders is further entitled to injunctive relief against Cooke to remedy his past improper conduct and prevent further irreparable harm to CyberCoders.

163. Cooke's actions were done with malice, fraud, oppression, and reckless disregard of the above-described rights of CyberCoders. Therefore, CyberCoders seeks and is entitled to recover punitive damages from Cooke.

## COUNT IV: BREACH OF CONTRACT (Non-Solicit)
### (Against Benedetto)

164. CyberCoders incorporates by reference the allegations of the paragraphs 1-145 as if the same were set forth at length herein.

165. The Benedetto Agreement is an enforceable contract between Benedetto and CyberCoders.

166. CyberCoders has satisfied all of its obligations under the terms and conditions of the Benedetto Agreement that it was required to perform, and Benedetto's performance of his obligations under these agreements was not excused.

167. Benedetto breached the Benedetto Agreement by soliciting CyberCoders' employees to work for him on a competing business venture, including as set forth above.

168. Benedetto breached the Benedetto Agreement by soliciting the Poached Employees to work for him on a competing business venture, including as set forth above.

169. As a direct and proximate result of Benedetto's breaches, CyberCoders has suffered damage, in an amount to be proven at trial.  Further, CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Benedetto is not enjoined from further violation of his contractual obligations to CyberCoders.  CyberCoders does not have an adequate remedy at law and will not be fully compensated for Benedetto's breaches without injunctive relief.

## COUNT V: BREACH OF CONTRACT (Non-Compete)
### (Against Benedetto)

170.    CyberCoders incorporates by reference the allegations of the paragraphs 1-145 as if the same were set forth at length herein.

171.    The Benedetto Agreement is an enforceable contract between Benedetto and CyberCoders.

172.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Benedetto Agreement that it was required to perform, and Benedetto's performance of his obligations under these agreements was not excused.

173.    Benedetto breached the Benedetto Agreement by establishing a competing business venture during his employment with CyberCoders.

174.    Benedetto breached the Benedetto Agreement by working for, owning, and operating a competing business venture within 12 months of the end of his employment with CyberCoders.

175.    As a direct and proximate result of Benedetto's breaches, CyberCoders has suffered damage, in an amount to be proven at trial.  Further, CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Benedetto is not enjoined from further violation of his contractual obligations to CyberCoders.  CyberCoders does not have an adequate remedy at law and will not be fully compensated for Benedetto's breaches without injunctive relief.

## COUNT VI: BREACH OF FIDUCIARY DUTY & DUTY OF LOYALTY
### (Against Benedetto)

176.     CyberCoders incorporates by reference the allegations of the paragraphs 1-145 as if the same were set forth at length herein.

177.     As an employee of CyberCoders, Benedetto owed CyberCoders fiduciary duties, including a duty of loyalty.  As a result, he was obligated to act with the utmost good faith and in the best interest of CyberCoders.

178.     CyberCoders was entitled to place its trust and confidence in Benedetto and was entitled to expect Benedetto to act with the utmost good faith toward it in carrying out the business of CyberCoders.

179.     Benedetto also contractually agreed to devote his entire business efforts to and for the benefit of CyberCoders.

180.     CyberCoders relied on Benedetto's loyalty and integrity and faithful performance of his job duties and responsibilities.

181.     Through the actions set forth above, including his establishment of a competing entity and soliciting CyberCoders' employees to join that entity while still employed by CyberCoders, Benedetto knowingly and willingly breached his fiduciary duties to CyberCoders.

182.     This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to CyberCoders.  Rather, it is predicated on Benedetto's deceit and breach of his duties of loyalty.

183.     As a direct and proximate result of Benedetto's breach of his duties, CyberCoders has been and is being harmed and faces irreparable injury.

184.     CyberCoders is entitled to damages, in an amount to be determined at trial, as well as disgorgement by Benedetto of the salary, benefits and other forms of remuneration paid to him during the time that he was, in secret, being disloyal to CyberCoders, and all profits he and/or his

new employer received as a result of his disloyalty, in an amount to be determined at trial. CyberCoders is further entitled to injunctive relief against Benedetto to remedy his past improper conduct and prevent further irreparable harm to CyberCoders.

185.    Benedetto's actions were done with malice, fraud, oppression, and reckless disregard of the above-described rights of CyberCoders. Therefore, CyberCoders   seeks and is entitled to recover punitive damages from Benedetto.

**PRAYER FOR RELIEF**

WHERFORE, CyberCoders respectfully requests this Court enter an Order with the following relief:

a.    Temporarily, preliminarily, and permanently enjoining and restraining Defendants, and anyone acting in concert with them, from directly or indirectly owning, maintaining, operating, or working for any recruiting or staffing firm within fifty (50) miles of Defendants' personal residences and any office of the Company that Defendants were assigned to or had supervisory, managerial, or administrative responsibilities over.

b.    Temporarily, preliminarily, and permanently enjoining and restraining Defendants, and anyone acting in concert with them, from directly or indirectly soliciting, seeking to employ, seeking to retain the services of, persuading, inducing, or attempting to persuade or induce any person whose identity Defendants learned while employed by CyberCoders, who is at that time or was within the previous twelve (12) months providing services to CyberCoders as an employee or independent contractor, for the purpose of providing services to any recruiting or staffing firm.

c.    Temporarily, preliminarily, and permanently enjoining and restraining Defendants, and anyone acting in concert with them, from directly or indirectly soliciting, seeking to place, persuading, inducing, or attempting to persuade or induce any temporary employee, candidate for employment, or independent contractor candidate, who, in the twelve (12) months prior to Defendants' separation of employment with CyberCoders, was directly or indirectly placed by Defendants or sought to be placed by Defendants or whose identity Defendants learned in carrying out Defendants' job duties, which placement is for or on behalf of any recruiting or staffing firm.

d.    Temporarily, preliminarily, and permanently enjoining and restraining Defendants, and anyone acting in concert with them, from directly or

indirectly (i) soliciting or seeking to provide services to any customer or potential customer of CyberCoders with whom Defendants had Material Contact (as defined in the Agreements) for or on behalf of any recruiting or staffing firm or (ii) persuading, inducing, or attempting to persuade or induce any such customer or potential customer to alter or reduce its use of services from CyberCoders.

e. Temporarily, preliminarily, and permanently enjoining and restraining Defendants, and anyone acting in concert with it, from directly or indirectly violating the Agreements.

f. Tolling Defendants' restrictive covenants based on their violations of their Agreements.

g. Requiring Defendants to preserve all documents, electronically stored information and other information relevant to the factual allegations and claims contained within this Verified Complaint, including any communications, text messages, WhatsApp messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Defendants (or any of the other Poached Employees); between Defendants and any CyberCoders employee; and between Defendants and any CyberCoders customer or prospective customer.

h. Requiring Defendants to return all copies of all CyberCoders documents in their possession, custody, and control, and a forensic examination of Defendants' devices and accounts (including cloud storage accounts, such as Google Drive). In order to do so, the Order should require Defendants to, at Defendants' expense: (i) stipulate to and agree with counsel for Plaintiff on a non-party forensic vendor; (ii) jointly submit to the Court a forensic protocol to accomplish the return and remediation of CyberCoders' documents from the Defendants' possession (i.e., to permanently remove the documents from the Defendants' possession), and disclosure of communications concerning Defendants' solicitation of CyberCoders employees and of CyberCoders customers, with Defendants bearing all costs of the return and remediation; and (iii) require sworn declarations from Defendants and the non-party forensic vendor attesting to the return and remediation of all CyberCoders-related documents and communications on Defendants' devices.

i. Awarding CyberCoders damages for Defendants' wrongful conduct, according to proof at trial.

j. Awarding disgorgement of any profits, commissions or monies earned by Defendants as a result of their unlawful conduct.

k. Awarding compensatory, consequential and punitive damages.

l. Awarding prejudgment interest.

      m.     Awarding CyberCoders its reasonable attorneys' fees, costs, and expenses, as well as pre-and post-judgment interests.

      n.     Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated:  March 6, 2025                 LITTLER MENDELSON P.C.

                               */s/ West A. Holden*
                               Tyler A. Sims, Esq.
                               Florida Bar No. 1048908
                               tsims@littler.com
                               West A. Holden, Esq.
                               Florida Bar No. 0113569
                               wholden@littler.com
                               111 North Orange Avenue, Suite 1750
                               Orlando, FL 32801.2366
                               Tel:     407.393.2900
                               Fax:     407.393.2929
                               *Attorneys for Plaintiff*

## VERIFICATION

I, Ben Di Grazia, verify that I am the President of CyberCoders, Inc., Plaintiff in this proceeding, and that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief, except (1) where expressly stated to be based upon information and belief, in which case, I believe them to be true, and (2) legal conclusions, for which I expressly defer to Plaintiff's counsel.

I understand that false statements herein are subject to the penalties of 28 U.S.C. § 1746 relating to sworn declarations to authorities.

Dated: March _6_, 2025

_____
BEN DI GRAZIA