# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### CASE NO. 25-80320-CIV-CANNON

**CYBER CODERS, INC.**, a California
Corporation,

       Plaintiff,

  v.

**CHARLES COOKE**, an individual, and
**NICOLAS BENEDETTO**, an individual,

       Defendants.

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND TO <u>CONDUCT EXPEDITED DISCOVERY</u>

## I.        Introduction

This lawsuit never should have been filed.

Three thousand miles away from its place of business, California plaintiff CyberCoders, Inc. ("Plaintiff" or "CyberCoders") seeks to enjoin defendants Charles Cooke ("Cooke") and Nicolas Benedetto ("Benedetto") ("Defendants") from earning livelihoods anywhere in the State of Florida and beyond, including while working remotely in the Defendants' own homes, on the basis of restrictive covenants contained in two agreements executed in 2019 ("2019 Agreements"). Beyond the fact that those 2019 Agreements were governed by California law, which deems the post-termination restrictive covenants therein void, Plaintiff inexplicably fails to disclose to the Court in connection with its life-altering motion ("Motion") that both of those 2019 Agreements were "supersede[d]" in 2024 by new contracts that remove the restrictive covenants at issue from the Defendants' employment contracts.  In other words, not only is Plaintiff seeking to destroy the lives of its former employees on the basis of void contract provisions, but Plaintiff is not even being forthright about what the governing contracts are between the parties.  That is outrageous.

Specifically, the old 2019 Agreements include restrictive covenants beneath the words "**Employee Responsibilities and Restrictive Covenants**".  Complaint [ECF No. 1], Exh. A, p. 5. Under that header, both course-of-performance and post-termination restrictive covenants are blended together in paragraph 2.2, which begins by stating, "During the term of Employee's employment with the Company, and for a period of twelve months after the termination of Employee's employment for any reason, Employee will not, directly or indirectly, do any of the following: . . . ." *Id.*, ¶ 2.2.  What follows are the restrictive covenants underlying Plaintiff's four alleged breach-of-contract counts for which Plaintiff filed its Motion [ECF No. 5, p. 4, ¶ III.A], the post-termination variety of which have been void under California law since 1872.  *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (Cal. 2008); *see* Cal. Bus. & Prof. Code § 16600(a) ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."); no exceptions apply.

The choice-of-law provision in those 2019 Agreements resorts to extrinsic evidence to determine which state's laws are rebuttably presumed to apply, *i.e.*, the "Company records" that show each Defendant's then-"current primary office location" as of July 6 and 8, 2019,

respectively. Complaint [ECF No. 1], Exh. A, ¶ 7.3. Not only are those threshold "Company records" absent from the docket, but following a request therefor, Plaintiff's counsel was clear: "<u>we will not be</u> exchanging an exhibit list or <u>producing any documents you request prior to <em>or at the hearing</em></u>."[1] (Emphases added.) So, by all accounts, there is insufficient evidence for the Court to even determine whether Plaintiff has <em>any</em> likelihood of success on the merits, because there is insufficient evidence to even begin the analysis. To that end, the instant Motion is eerily similar to one disposed of by this Court two months ago in <em>Secret Consulting Inc. v. Fotohabadi</em>, Case No. 24-CV-81591-ROSENBERG, 2025 U.S. Dist. LEXIS 14724, 2025 WL 316355 (S.D. Fla. Jan. 28, 2025), and it is respectfully submitted the same result should obtain: the Motion should be denied.

Moreover, even if there were "Company records" before the Court from July 6 and 8, 2019 that showed Defendants' then-"current primary office location" was in Florida – and taking Cooke for example, that is <em>highly</em> unlikely as he signed his July 2019 Agreement in California before (i) travelling to Texas to build up an office for Plaintiff, then (ii) moving to Florida later that month – under Florida's conflict of laws rules, California law should <em>still</em> govern those Agreements.

Further still, assuming there is sufficient evidence to conduct the conflict-of-laws analysis, and assuming that evidence consists of "Company records" that reference Florida, and assuming the ensuing conflict-of-laws analysis renders Florida law applicable to the 2019 Agreements, and assuming the forward-looking restrictive covenants therein were otherwise enforceable under Florida law, <u>those Agreements were nevertheless amended</u> in 2024 to <em>remove</em> the restrictive covenants so that CyberCoders would (i) not violate section 16600.5 of the California Business and Profession Code, which became effective January 1, 2024, and (ii) get ahead of the then-projected Federal Trade Commission ("FTC") nationwide ban on noncompete agreements.

Specifically, effective January 1, 2024, California added section 16600.5 to the California Business and Professions Code to provide: "Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed. An employer or former employer shall <em>not</em> attempt to enforce a contract that is void under this chapter <u>regardless of whether</u> the contract was signed and <u>the employment was maintained outside of California</u>." <em>Id.</em>, § 16600.5(a)-(b) (emphases added). The statute operates directly on California employers, and its

---

[1] That e-mail is submitted pursuant Local Rule 7.7(b) as an exhibit necessary to relief Defendants seek.

obvious purpose was to confirm for California employers, like Plaintiff, who employed <u>out-of-state remote employees</u>, like Defendants, that post-termination non-compete provisions are void "regardless of whether . . . the employment was maintained outside of California."  *Ibid.*

That enactment was a topic of discussion amongst the higher-ups at CyberCoders in early 2024, as was the then-looming Federal Trade Commission ("FTC") proposal to ban non-competes nationwide.  To comply with California law and get ahead of the FTC, CyberCoders began rolling out new employment agreements in 2024, two of which were signed by Cooke (one in June 2024 and another in December 2024) and one of which was signed by Benedetto (December 2024) (collectively, the "2024 Agreements"). The 2024 Agreements were "offer[s] of employment" that "contain[] CyberCoders and [Defendants'] entire understanding regarding the at-will nature of your employment, your compensation, benefits, *and other terms as referenced herein*, and supersede[] any and all prior representations regarding such matters." *See* Declaration of Charles Cooke ("Cooke Dec."), Ex. A, p. 2. "[S]uch matters" were addressed beneath the words "**Obligations to CyberCoders**," which section includes only course-of-performance restrictions:

<u>**Obligations to CyberCoders and Prior Employers**</u>

> During your employment and to the maximum extent permitted by applicable law, you . . . shall not provide services to, be employed by or have any interest in any business activity of or for the benefit of any person or entity other than CyberCoders unless authorized by CyberCoders.  You also shall not have any interest in any business activity, entity, company or person that engages in or is planning to engage in CyberCoders' business, that does business with CyberCoders, or whose business dealings would otherwise create a conflict of interest, except as otherwise approved in writing by CyberCoders, which approval CyberCoders may in its absolute discretion withhold. . . .  [*Ibid.*]

As explained more fully below, one major purpose of the new agreements was to remove forward-looking restrictive covenants relating to noncompetition.  Further, Defendants and scores of others *relied on that* in deciding to leave for greener pastures.  Now CyberCoders comes before this Court, doesn't bother to mention the 2024 Agreements, and seeks to enjoin Defendants from working and providing for their families for the next year?  That is unjust.  This suit lacks merit.

Thus, while for the reasons that follow Plaintiff fails to establish the other three elements necessary for the extraordinary remedy of a preliminary injunction, the Motion fails because Plaintiff has no likelihood of success on the merits of claims based on void or nonexistent post-termination restrictive covenants.  As such, it is respectfully requested that the Motion be denied.

## II.   Temporary Restraining Order vs. Preliminary Injunction

The Court's March 7, 2025 Order [ECF No. 7] directed the parties to explain whether Plaintiff's pending Motion for a Temporary Restraining Order [ECF No. 5] should be treated as a Motion for a Preliminary Injunction.  The Motion should be treated as one for a Preliminary Injunction because (1) the Defendants received notice of the Motion; (2) the Court has scheduled an evidentiary hearing at which witnesses and exhibits can be presented, with the caveat that Plaintiff refused to exchange exhibit lists in advance of the hearing, which implicates Defendants' due process rights considering their liberty interests are at stake; and (3) the substantive standards governing the issuance *vel non* of a temporary restraining order or a preliminary injunction are similar.  *See Land-Cellular Corp. v. Zokaites*, 463 F. Supp. 2d 1348, 1356 (S.D. Fla. 2006) ("Courts may . . . treat a motion for temporary restraining order as a motion for preliminary injunction once notice is provided and an evidentiary hearing held on the motion").

## III.   Relevant Facts[2]

Defendant Cooke began his career as a recruiter in 1999 after graduating from college. Plaintiff, "a California corporation with its principal place of business in Irvine, California" [ECF No 1, ¶ 2] that is a "wholly-owned subsidiary of ASGN Incorporated," [D.E. 4] which has a mailing address for the "Chair of [its] Board" and "directors" located in "Calabasas, California,"[3] recruited (or in CyberCoders' words, poached) Cooke from a competitor to begin working for CyberCoders *pronto* in 2009.  Specifically, while residing in California, Cooke was hired to open an office for Plaintiff in Los Angeles, where he worked for four and a half years before transferring to Plaintiff's headquarters in Irvine, California, where he worked for about six years.  Defendant Benedetto also began working for Plaintiff in California in 2016 and where he stayed for three years.

---

[2] This section is supported by the declarations of Charles Cooke and Nic Benedetto dated March 21, 2025.
[3] https://s24.q4cdn.com/701880164/files/doc_financials/2023/ar/ASGN-Proxy-2024.pdf

By Plaintiff's own account, California laws are the "applicable state and local law[s]" governing Plaintiff's hiring of employees, like Defendants, "including but not limited to the Los Angeles County Fair Chance Ordinance, the San Francisco Fair Chance Ordinance, and the California Fair Chance Act."[4]   Further, when potential candidates interact with Plaintiff through its website, the resulting business relationship is "governed by the laws of the state of California," regardless of where Plaintiff's employees (like Defendants when they worked for Plaintiff) are located when they land a new candidate.[5]   That makes sense, because Plaintiff's operations are all based out of California.

### 2019 Agreements; Legal Landscape Surrounding Them

On or about July 6, 2019, while a resident of and physically located in California, Cooke signed his 2019 Agreement, a contract of adhesion bearing the words "Form Agreement—Multi-State" at the bottom that purports to be a non-solicitation and non-competition agreement. Benedetto signed a basically identical one on or about July 8, 2019.   When the 2019 Agreements were executed, California law provided (and continues to provide) as follows: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."   Cal. Bus. & Prof. Code § 16600.

Given that the 2019 Agreements did not sell ownership of a business or its goodwill, nor involve the dissolution of or dissociation from a partnership or limited liability company, any provisions in those agreements that seek to restrain Defendants from (1) soliciting employees of CyberCoders or (2) engaging in competitive business, were void *ab initio*.   *See id.* §§ 16601, 16602, 16602.5; *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 935-36 (Cal. 4th DCA 2018) (listing the above-mentioned exhaustive list of exceptions to § 16600, and holding that statute applies not only to competitive business but also voids "nonsolicitation of employee provision[s]" of contracts).   Nevertheless, the 2019 Agreements contained such void provisions, which Plaintiff is improperly attempting to enforce here.

The non-compete provision purports to restrain Defendants from working as recruiters for a year after separation within the "Restricted Territory," which is defined to include the "fifty (50)

---

[4] https://www.cybercoders.com/ (last accessed March 21, 2025).
[5] https://www.cybercoders.com/terms/

mile radius around <u>any office of the Company</u>, including the Employee's office in their personal residence, if applicable, as to which during the last twenty-four (24) months of their employment with the Company: (i) Employee was assigned, or (ii) Employee had supervisory, managerial or administrative responsibilities." [ECF No. 1, Exh. A, 2.2(a).]  Thus, if an employee supervised 50 subordinates, each of whom resided in a major city in a different state and worked from their home office, and the supervising employee left CyberCoders, the supervisor would be prohibited from working in any market in America for a year.  Similarly, the non-solicitation provision purports to restrain Defendants from seeking to employ any CyberCoders employee or work or on behalf of with anyone "whose identity Employee learned about" while at CyberCoders. *Id.* ¶ 2.2(b).

The 2019 Agreements also purport to have a choice of law provision: "Employer and Employee agree that this Agreement will be governed by the laws of the state shown in the Company records as the Employee's current primary office location, without giving effect to the state's conflict of law rules."  *Id.*, ¶ 7.3 (emphasis added).  Defendants do not possess the extrinsic evidence required to ascertain which state's laws enjoy the rebuttable presumption of governance, *i.e.*, the "Company records" that "show[] . . . [Defendants'] current primary office location" as of July 6 and 8, 2019, respectively, and Plaintiff's counsel declined to provide them.

### Plaintiff's Abandonment of Florida and its Employees Here When Covid Hit

Plaintiff temporarily opened a physical office in Palm Beach Gardens in or about July 2019.  CyberCoders shared the space with ASGN. It was operational for about 9 months, until the pandemic hit around April 2020.  From that point forward, CyberCoders' employees worked from home, and Plaintiff eventually closed its Florida office and left Florida in January 2021.

Since April 2020, CyberCoders employees have continued to work remotely about 99% of the time.  CyberCoders' systems, operations, technology, and polices, however, are all driven and operated out of California—hence, again, the parties' acknowledgement that the "[l]ocation of records and evidence" in California will adversely impact this case's proceedings if they are to continue in Florida.  [ECF No. 11.]  Thus, employees who work remotely out-of-state nevertheless work through California, because that is where CyberCoders' servers are located, and employees remotely log-in to those California-servers to access CyberCoders' systems.

Despite corporate abandonment, Defendants remained in Florida, working from home while trying to help cultivate a positive and collaborative work environment for their co-workers, navigate the transition to fully remote work, develop families, and begin to spread their Florida roots.  The recruiting industry was uniquely affected by the pandemic, because not only were recruiters themselves navigating the new frontier *vis-à-vis* their own employer, but their jobs require them to navigate those obstacles for every one of their clients and candidates.  The industry is normally volatile, because it generally operates with non-exclusivity: customers and candidates do not sign exclusivity agreements with recruiting firms, but instead, actively talk with and shop a half dozen to a dozen recruiting firms *simultaneously* while trying to start new employment opportunities.  But the entire recruiting industry became *extremely* volatile and unpredictable when Covid struck, which CyberCoders epitomized by closing its Florida office and retreating to its nucleus in California, leaving Defendants and their teams and divisions to figure out on their own how they were going to survive.  Couple that balancing act with whispers of corporate layoffs across CyberCoders seeping into day-to-day chatter, causing sincere worry throughout the company that it would be years before anything could be rebuilt, someone with their boots on the ground needed to step up and lead their teams before those teams, like their employer, left them.

And that's what Defendants did, and everybody knew it.  Swimming upstream, Defendants implemented innovative strategies that were more compassionate, hands-on, collaborative, and invigorating than the sterile, corporate, top-down approach CyberCoders was implementing from California.  The culture from the C-Suite of CyberCoders was changing, negatively and drastically, and it was palpable to the folks on the front lines.  That meant someone needed to step up where CyberCoders was failing, so Benedetto and Cooke did just that and changed things for the people they were working with, and everyone involved loved them for it—not just their teams and divisions, but CyberCoders corporate recognized it, too.  In fact, the Defendants were so successful at building team morale and achieving aspirational goals during the height of the pandemic that in 2020, CyberCoders named Cooke Executive of the Year and Benedetto Manager of the Year.

### CyberCoders' Lawsuits with gpac, LLP

In late 2021 through 2022, while the Defendants were rolling their sleeves up and grinding with their teams, Cybercoders was busy enthralling itself in at least nine lawsuits in which it was

alleged to be tortiously interfering with another recruiting firm's employees who were subject to noncompete provisions. In other words, CyberCoders was doing exactly what it alleges the Defendants did. What's more, in attempting to void the noncompete provisions, CyberCoders made the following representations, among many others, to the United States District Court for the District of South Dakota, expressly or by "adopt[ing] and incorporat[ing]" into its motion papers arguments made by the employee, including those "relating to the choice-of-law analysis":

- "regardless of any superficial choice-of-law provision contained" in an employment contract, if the employment contract is prepared by the employer and is "an adhesion contract presented on a 'take it or leave it' basis," the employment contract "should be construed against" the employer; and

- "[a]s remote work has increased to unprecedented levels in light of the COVID-19 pandemic, even more today than ever before a prohibition on an employee from working within a radius of any 'remote office' lacks any real specificity".[6]

It is anticipated that CyberCoders will argue the opposite to this Court. Importantly, the outcome of the *gpac, LLP v. Anderson & CyberCoders* case resulted in amendments to CyberCoders' employment agreements, as discussed below, and changed the way the legal department influenced CyberCoder's hiring of employees.

### **Di Grazia Takes Control; 2024 Agreements; CyberCoders Employees Leave en Masse**

California is a tech hub, and the State was and is actively regulating California employers who offer remote-based, out-of-state employment. Accordingly, effective January 1, 2024, California enacted the following statute that operates directly on California employers who have employees living and working remotely out-of-state: "Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed. An employer or former employer shall *not* attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California." Cal. Bus. & Prof. Code § 16600.5(a)-(b) (emphases added).

By January 2024, Ben di Grazia took the reigns of CyberCoders, or in his words from California in a company-wide video call, "this is my show now." Shortly after, he initiated discussions with the Vice Presidents of Sales (including Cooke) and Vice President of Human

---

[6] *See* Request for Taking of Judicial Notice ("RJN").

Resources, Jen Brink ("Brink"), regarding significant compensation changes to roll out over the course of 2024 (pay cuts). During these discussions, Brink often noted that due to recent legislative changes in California and anticipated changes at the FTC regarding bans on non-competes, new agreements were needed for new and current employees.

As a result of Brink's and di Grazia's collective efforts, the first roll outs of new agreements were made at the Vice President of Sales level in June 2024, which impacted Cooke. Accordingly, on June 26, 2024, just before the second quarter bonus period, di Grazia presented Cooke with a new employment agreement, which by its terms needed to be signed within three (3) days, which he did. That employment agreement implemented both Brink's proposals regarding removal of language relating to non-competes, and di Grazia's compensation cuts (which would be felt more severely the following year). The provisions relevant to this matter are in the covering offer letter:

### Obligations to CyberCoders and Prior Employers

> During your employment and to the maximum extent permitted by applicable law, you shall devote your best efforts and entire business time and attention to CyberCoders' business, and you shall not provide services to, be employed by or have any interest in any business activity of or for the benefit of any person or entity other than CyberCoders unless authorized by CyberCoders. You also shall not have any interest in any business activity, entity, company or person that engages in or is planning to engage in CyberCoders' business, that does business with CyberCoders, or whose business dealings would otherwise create a conflict of interest, except as otherwise approved in writing by CyberCoders, which approval CyberCoders may in its absolute discretion withhold. To the extent you have continuing obligations to prior employer(s), we also want you to know that, should such prior employer challenge your hire or employment with CyberCoders based on those obligations, we would not provide your defense (because that is an agreement between you and them), and we might have to terminate your employment. [Cooke Dec., Exh. A, p. 2.]

The rollouts continued into December 2024, with not only the VPs of Sales but also at the Director and Manager level, which impacted both Cooke and Benedetto. Accordingly, in December 2024, Cooke and Benedetto received virtually identical offer letters (though the resulting compensation and commission structures differed for them based on their respective positions in the company), which provided as follows:

In the beginning of 2025, the culture and the compensation were such that the prospect of continuing to work at CyberCoders – where Cooke had spent 15 years and Benedetto honed his craft – was quickly vanishing.  Accordingly, Cooke and Benedetto decided to leave the company. As they got ready to leave, Defendants said their goodbyes to their teams who they had worked with for upwards of 9 years so they wouldn't be blindsided.  What happened is what anyone might expect would happen: the people who built the division from the ground up with them were leaving; corporate was cutting paychecks; and post-termination restrictive covenants had vanished from their employment agreements.  Naturally, people wanted to leave with them.

Because (1) they're simply good people, and (2) they believed they were, and they in fact were, no longer bound by post-termination noncompete obligations, Cooke proactively informed Di Grazia that he and Benedetto were leaving the company in February and intended to continue working in the same industry.  Di Grazia wished them good luck, then CyberCoders sued them.

## IV.    Legal Argument

### A.  Standard of Review

The standard governing a motion for the "extraordinary remedy" of a preliminary injunction is "one of the highest standards in the law[.]"  *Secret Consulting*, 24-CV-81591-ROSENBERG, 2025 U.S. Dist. LEXIS 14724, 2025 WL 316355 (S.D. Fla. Jan. 28, 2025). That exacting standard requires Plaintiff to establish each and every one of the following factors: (1) that the Plaintiff has a <u>substantial</u> likelihood of success on the merits" of its claims at trial; (2) that the Plaintiff must show a "substantial threat of irreparable injury" if the injunction is not issued; (3) that "the threatened injury to the plaintiff outweighs the potential harm to the defendant[s] and (4) that the injunction will not disserve the public interest."  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (emphasis added).

### B.  Plaintiff Has No Likelihood of Success on the Merits.

Just about the only thing the parties agree on is that although the Plaintiff must establish each and every one of the above factors, the "[l]ikelihood of success on the merits is generally the most important of the four factors."  *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (quoting *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020)). For the following reasons, Plaintiff has no likelihood of success on the merits of its claims.

> **i.** **The 2024 Agreements Superseded the 2019 Agreements' Terms Relating to Defendants' Obligations to CyberCoders, Specifically Including Restrictive Covenants, Thereby Removing Forward-Looking Restrictive Covenants From The Scope of the Agreements**

Each of Defendants' 2024 Agreements was an "offer of employment" that expressly "contains CyberCoders and [Defendants'] entire understanding regarding the at-will nature of [Defendants'] employment, [Defendants'] compensation, benefits, *and other terms as referenced herein*, and supersedes any and all prior representations regarding such matters." Cooke Dec., Exh. A, p. 2. The terms of the 2024 Agreements that "supersede[d]" all other representations – *i.e.*, the 2019 Agreements – expressly included Defendants' "**Obligations to CyberCoders**," namely restrictive covenants relating to non-competition.

Specifically, both the 2019 and 2024 Agreements discuss *both* course-of-employment and post-termination non-competes. The difference is the 2024 Agreements (i) impose course-of-employment non-competes, (ii) discuss post-termination non-competes, but (iii) do not actually impose any post-termination non-compete obligations on Defendants, revealing clear indicia of mutual intent to remove post-termination non-competes from the scope of agreements:

> **Obligations to CyberCoders and Prior Employers**
>
> During your employment and to the maximum extent permitted by applicable law,[7] you shall devote your best efforts and entire business time and attention to CyberCoders' business, and you shall not provide services to, be employed by or have any interest in any business activity of or for the benefit of any person or entity other than CyberCoders unless authorized by CyberCoders. You also shall not have any interest in any business activity, entity, company or person that engages in or is planning to engage in CyberCoders' business, that does business with CyberCoders, or whose

---

[7]  The 2024 Agreements do not state which state's law (rebuttably) apply. That creates a question as to whether (i) the choice-of-law clause in the July 2019 Agreements rebuttably applies, which again is not capable of being ascertained because of Plaintiff's failure to produce the requisite extrinsic evidence, but assuming there was such evidence, we respectfully submit, as discussed below, the result would be California rather than Florida law applying; or, instead, (ii) either of the doctrines of *lex loci contractus* or *lex loci solutionis* apply to the 2024 Agreements, which would ultimately result in either California or Florida law applying to the 2024 Agreements. However, the specific issue of whether the 2024 Agreements superseded the 2019 Agreements as to any non-compete covenants and resultantly extinguished any post-termination non-compete covenants (which we submit were nevertheless void *ab initio*) is academic because there is no conflict between California and Florida law about the fact that the 2024 Agreements' words of "entire understanding" and "superse[ssion]" on the subject of non-competition obligations did, in fact, remove post-termination non-compete provisions from the scope of the agreement. *See* p. [], below.

business dealings would otherwise create a conflict of interest, except as otherwise approved in writing by CyberCoders, which approval CyberCoders may in its absolute discretion withhold.  [(Those are the course-of-employment non-competes.)] _To the extent you have continuing obligations to prior employer(s)_ [(a clear reference to post-termination non-competes)], we also want you to know that, should such prior employer challenge your hire or employment with CyberCoders based on those obligations [(like gpac, LLP had recently done)], we would not provide your defense (because that is an agreement between you and them), and we might have to terminate your employment. [Cooke Dec., Exh. A, p. 2 (emphasis and brackets added).]

No doubt, the language relating to prior employment was included in response to the gpac, LLP lawsuits.  Critically, the inclusion of that language shows the parties were specifically contemplating post-termination non-competes when the 2024 Agreements were entered – what else do the words "continuing obligations to prior employer(s)" reference – and they _intentionally_ did not impose any post-termination non-compete obligations on the Defendants.[8]

The ineluctable conclusion that flows from (1) the 2019 Agreements imposing both course-of-performance and post-termination non-compete obligations on the Defendants,[9] (2) the 2024 Agreements' express language of supersession and integration of matters described and referenced in the 2024 Agreements, (3) the 2024 Agreements' description of and reference to _both_ course-of-performance and post-termination non-compete obligations, and (4) the 2024 Agreements' imposition of only _course-of-performance_ non-competition restrictions on the Defendants, not any post-termination non-competition restrictions, is that as of June 27, 2024, Defendants were under no post-termination non-competition obligations with respect to CyberCoders.  The maxim _expressio unius est exclusio alterius_ is applicable, "[m]eaning the expression of one term" – the course-of-performance noncompetition _obligation_ – "implies the exclusion of other terms not mentioned" – any post-termination noncompetition _obligations_, which do not exist under and as a result of the 2024 Agreements.  _See City of Homestead v. Johnson_, 760 So.2d 80, 84 & n.6 (Fla.

---

[8] And there could be myriad reasons for that, for example, despite gpac, LLP winning the lawsuit against CyberCoders, there may have been adverse industry reaction to gpac, LLP.  As Mr. Cooke explains in his Declaration, and based on his 26 years of experience in the industry,

[9] We reiterate that such post-termination obligations were void under governing California law.

2000); *accord Stephenson v. Drever*, 16 Cal.4th 1167, 1175 (Cal. 1997) (applying the maxim "*[e]xpressio unius est exclusion alterius*" to a contract).

Accordingly, by virtue of the 2024 Agreements, Plaintiff has *no* likelihood of success on its non-competition claims underlying its breach of contract counts, which in turn underlie the instant Motion, and therefore, the Motion should be denied.

### ii. Even if the 2024 Agreements Did Not Remove Post-Termination Restrictions, They Are Void Under Applicable, California Law

Assuming *arguendo* the 2019 Agreements' post-termination restrictive covenants survived the 2024 Agreements, the restrictive covenants are nevertheless void under California law.

### 1. Forum State's Conflict of Laws Rules Apply

There is a conflict between the laws of California and Florida regarding the enforceability of non-competes; California says no, Florida says maybe. *Contrast* Cal. Bus. & Prof. Code § 16600 *with* Fla. Stat. § 542.335. Because Plaintiff invoked this Court's diversity jurisdiction, Florida's choice-of-law principles apply to resolve that conflict. *Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 881 (11th Cir. 2001). When the contract at issue includes a choice of law provision, there is a two-step analysis to determine which state's laws govern the dispute: the Court will rebuttably presume the chosen state's law applies, unless application of the chosen state's laws will frustrate the strong public policy of another state that has a materially greater interest in the dispute, in which case the other state's laws will apply. *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (quoting *Mazzoni Farms, Inc. v. E.I. Dupont De Nemours & Co.*, 761 So.2d 306, 311 (Fla. 2000)); *Shaps*, 244 F.3d at 881.

### 2. Plaintiff Failed to Satisfy Its Burden

The choice-of-law provision in the 2019 Agreements resorts to extrinsic evidence to determine which state's laws are rebuttably presumed to apply, *i.e.*, the "Company records" that show each Defendant's "current primary office location" as of July 6 and 8, 2019, respectively. *See* Complaint [ECF No. 1], Exh. A, ¶ 7.3. Not only are those threshold "Company records" absent from the docket, but following a request therefor, Plaintiff's counsel was clear: "we will not be exchanging an exhibit list or producing any documents you request prior to *or at the hearing*." (Emphases added.) So, by all accounts, there is insufficient evidence for the Court to even

determine whether Plaintiff has *any* likelihood of success on the merits, because there is insufficient evidence to even begin the analysis. To that end, the instant Motion is eerily similar to one disposed of by this Court two months ago in *Secret Consulting Inc. v. Fotohabadi*, Case No. 24-CV-81591-ROSENBERG, 2025 U.S. Dist. LEXIS 14724, 2025 WL 316355 (S.D. Fla. Jan. 28, 2025), and it is respectfully submitted the same result should obtain: the Motion should be denied.

Moreover, it is respectfully submitted that the Court should draw an adverse inference against Plaintiff based on its express refusal to "produc[e] . . . at the hearing" the "Company records" from July 2019 that state the "current primary office location" for each Defendant on the date each of them signed their respective 2019 agreements. *See, e.g.*, *Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The 'adverse inference' rule provides that 'when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.'") (quoting *International Union (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972)). This is critical as the Motion seeks to deprive the Defendants' of their constitutionally protected liberty interests in earning a livelihood, and due process at least requires production of evidence within Plaintiff's control that bears on the threshold issue of which state's laws have a rebuttable presumption of applicability. As such, it is respectfully submitted that the Court should infer the "Company records" on July 6, 2019 and July 8, 2019 reflected the "current primary office location" for each Defendant was in California, under whose laws the restrictive covenants at issue are void. *See* Cal. Bus. and Prof. Code §§ 16600, 16600.5.

### 3. Strong California Public Policy Overcomes Presumption

If (1) the Court does not draw an adverse inference against Plaintiff, and (2) Plaintiff produces the Corporate records in question at the hearing (which its counsel said it would not do), (3) someone competent to testify to their authenticity (who may not be included on the witness list) appears at the hearing, and (4) the records show Florida was the then-"current primary office location" for each Defendant on July 6 and 8, 2019, respectively, the question becomes whether application of Florida law's reasonableness test would "contravene[] strong public policy" of California. *See Mazzoni*, 761 So.2d at 311. Although there are four factors to consider in that analysis, which are discussed immediately below, "California courts 'have been clear in their expression that section 16600 represents a *strong public policy* of the state which should not be

diluted by judicial fiat.'" *Silguero v. Creteguard, Inc.*, 187 Cal.App.4th 60, 68 (Cal. 2d DCA 2010) (emphasis added) (quoting *Edwards*, 44 Cal. 4th, 949-50).

### i. Section 16600 is Not Fraught With Exceptions; it has Three, and Those Three Must Be Strictly Construed

The first factor to consider is "whether the statute evincing the policy is fraught with exceptions[.]" *See Mazzoni Farms*, 761 So.2d at 311. Section 16600, Cal. Bus. and Prof. Code, originally enacted in 1872 elsewhere in California's statutory code, is not fraught with exceptions and has basically been the same law for 150 years. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1151 (Cal. 2020).  Specifically, "unless a contractual restraint falls into one of section 16600's *three* statutory exceptions (§§ 16601 [sale of goodwill or interest in a business], 16602 [dissolution of a partnership], or 16602.5 [dissolution or sale of limited liability company]), it ostensibly is void." *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 935 (Cal. 4th DCA 2018).  The prohibitions on non-competes "shall be read broadly, in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter.").  Cal. Bus. and Prof. Code, § 16600(b)(1).  This factor heavily favors California law.

### ii. The Statute is Not Frequently Amended and Does Not Reflect a Flexible Policy

The second factor is whether the statute is frequently amended and thus reflects a flexible policy. *Mazzoni Farms*, 761 So.2d at 311. Section 16600 is not frequently amended; it has been a ban since 1872. *Ixchel Pharma*, 9 Cal. 5th at 1151.  The most recent amendments strengthened its grip. Cal. Bus. and Prof. Code, §§ 16600(b), 16600.5.  This factor heavily favors California law.

### iii. California's Policy is fundamental to the legal system

The third factor is whether the policy is fundamental to California's legal system. *Mazzoni Farms*, 761 So.2d at 311. Yes, it is. *Silguero v. Creteguard, Inc.*, 187 Cal.App.4th 60, 67 (Cal. 2d DCA 2010) ("[§] 16600 provides such a legislative declaration of a fundamental public policy").

### iv.  The Statutes Have a Huge Impact on the Contract

The fourth and final factor is whether the statute has a limited or large impact on the contract, thus showing whether the public policy strongly or weakly affects the contract.  *See Burroughs Corp. v. Suntogs of Miami, Inc.*, 472 So.2d 1166, 1168 (Fla. 1985).  The statutory effect, especially since Defendants have left CyberCoders, is incredibly impactful on the contract, as the post-termination covenants are all that's left tethering the parties together.  Thus, this factor, like all others, favors application of California law.  Therefore, California law should apply.

### 4.  The Restrictive Covenants are Void Under California Law

Having established that California law should govern the 2019 Agreements, it is clear that the restrictive covenants were void *ab initio* under California law.  Cal. Bus. & Prof. Code § 16600(a) ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.").[10] Section 16600.5 provides: "Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed.  An employer or former employer shall *not* attempt to enforce a contract that is void under this chapter <u>regardless of whether</u> the contract was signed and <u>the employment was maintained outside of California</u>." *Id.*, § 16600.5(a)-(b) (emphases added). The statute operates directly on California employers, and its purpose was to confirm for California employers, like Plaintiff, who employed <u>out-of-state remote employees</u>, like Defendants, that post-termination non-compete provisions are void "regardless of whether . . . the employment was maintained outside of California." *Ibid.*  Accordingly, under California law, the post-termination restrictive covenants relating to noncompetition and non-solicitation are <u>void</u>, and Plaintiff has no likelihood of success on the merits of its claims.

### 5.  The Restrictive Covenants Are Unenforceable Under Florida Law

Assuming *arguendo* (i) there is sufficient evidence to conduct the conflict-of-laws analysis, (ii) that evidence consists of "Company records" that reference Florida, (iii) someone is competent to testify and authenticate them at the hearing, (iv) the ensuing conflict-of-laws analysis renders Florida law applicable to the 2019 Agreements, and (v) forward-looking restrictive covenants

---

[10]  As discussed, none of the exceptions apply.

therein were not superseded by the 2024 Agreements, the 2019 Agreements' forward-looking restrictive covenants are *still* unenforceable under Florida law.

### a.  Florida Framework

Section 542.335(1), Florida Statutes, governs the enforceability of noncompete covenants. "To be enforceable, a restrictive covenant must be reasonable with regard to 'time, area, and line of business'" and "involve a legitimate business interest as defined by statute to be enforceable." *Alonso-Llamazares v. Int'l Dermatology Rsch., Inc.*, 339 So.3d 385, 393 (Fla. 3d DCA 2022) (first quoting § 542.335(1)(a), F.S., then quoting *White v. Mederi Caretenders Visiting Servs. of SE Fla., LLC*, 226 So.3d 774, 779).  Section 542.335(1)(b) lists "legitimate business interests," of which Plaintiff references "confidential information and trade secrets and their substantial relationships and goodwill with customers and candidates." [ECF No. 5, p. 6.]  Defendants disagree.

### b.  The Restrictive Covenants Are Unreasonable

The restrictive covenants here seek to enjoin Defendants from conducting business in their trained and chosen career for a year not only anywhere in the State of Florida, including in their homes, but also in myriad other major markets across the country.  That is because the "Restricted Territory" is defined to include the "fifty (50) mile radius around <u>any office of the Company</u>, including the Employee's office in their personal residence, if applicable, as to which during the last twenty-four (24) months of their employment with the Company: (i) Employee was assigned, or (ii) Employee had supervisory, managerial or administrative responsibilities." [ECF No. 1, Exh. A, § 2.2(a).]  The geographic scope thus includes the remote offices of Plaintiff's homes and any other remote office, plus 50-miles out in every direction, for everyone they supervised or worked with anywhere in the country, including those employees' remote offices in their homes.

As Plaintiff aptly put it in the gpac, LLP case: "As remote work has increased to unprecedented levels in light of the COVID-19 pandemic, even more today than ever before a prohibition on an employee from working within a radius of any 'remote office' lacks any real specificity," and is therefore unreasonable.  RJN, Exh. A. Defendants could not agree more.

"The determination of whether an activity qualifies as a protected legitimate business interest under the statute is inherently a factual inquiry, which is heavily industry-and context-specific." *White*, 226 So.3d at 786. This is an internet-based industry.  Prohibiting the Defendants

from working remotely in their home offices does not advance *any* legitimate business interest of CyberCoders, because Defendants and potential customers and candidates would be interacting exclusively through the internet.  The restrictive covenants are simply arbitrary in their geographic scope in light of the manner in which the industry is conducted.

Moreover, to the best of Defendants' knowledge and belief, they do not have any remnants of the Cryus software in their possession, custody, or control; they do not want it nor need it. Defendants also do not possess any tangible or electronic customer list of the Plaintiff.  The names of the customers Defendants learned about while working for CyberCoders are publicly available information, and those companies work with a half dozen to a dozen agencies simultaneously.

Accordingly, Plaintiff has no likelihood of success on the merits of its claims under California or Florida law, and the Motion should be denied.

### c.   Plaintiff Does Not Have a Substantial Threat of Irreparable Injury

Plaintiff makes a lot of noise about what it calls "proprietary technology, Cryus, which [allegedly] includes compilations of confidential information and trade secrets." *E.g.*, ECF No. 5, p. 7.  While the Defendants maintain there is nothing proprietary about Cyrus – it is software or code that scrapes and compiles public information – the simple point is that Defendants want nothing to do with Cyrus, they are not using Cyrus, and when they left Plaintiff's employ, they ceased using Cyrus.  In short, Defendants are willing to agree not to use it.

The balance of Plaintiff's claims of irreparable injury (actual, rather than presumed), are misguided.  Specifically, the employees that left CyberCoders are not going back regardless of whether an injunction is issued, and Defendants did not solicit them.  It was a common (accurate) belief at CyberCoders that employees who signed the December 2024 Agreements were not bound by post-termination restrictive covenants.  Couple that with slap-in-the-face compensation cuts, people wanted out.  That's why more than 120 other employees have left since di Grazia took over. So when Defendants respectfully informed others that they were leaving – some of whom Defendants had worked side by side in the trenches with for upwards of nine years – people wanted to go with them.  That is not solicitation; that is a free market.

Moreover, customers and candidates are not chattels, they are people, and the recruiting industry is such that they do not sign exclusivity agreements with any one recruiting firm.  Instead,

it is industry standard for employers and candidates to *constantly* shop the recruiter market and talk to multiple recruiters from different firms *simultaneously*. Employers want the best candidates, of the intermediary connecting them.  Thus, Defendants having left CyberCoders does not diminish the freedom of customers or candidates to continue to work with CyberCoders, *if they want to*. And if the internal problems at CyberCoders that has led to employee-flight has begun to adversely affect CyberCoders' image or efficacy as recruits, the solution is not to sue good people who had the decency to look their former employer in the eye and tell them thank you and goodbye.

The Defendants saved CyberCoders when it was drowning in the pandemic.  They have not caused CyberCoders to suffer an irreparable injury amenable to injunctive relief, or otherwise.

### d.  The Threatened Injury to Plaintiff Does Not Outweigh Defendants'

CyberCoders is a $100 million company with a $7 billion parent company.  The notion that it is suffering worse hardship than this lawsuit is causing the Defendants to suffer, financially and emotionally, is preposterous.  Unlike the defendants, who rely on their livelihoods to support their families, CyberCoders has ample financial resources and corporate backing to absorb any temporary disruptions stemming from its own actions without experiencing significant hardship.

Defendants have already incurred significant hardship since their departure on February 17, 2025, including their inability to earn income and the legal fees they have incurred result of the suit CyberCoders filed against them.  This hardship is compounded by the financial and emotional strain of struggling to support their families while defending against this lawsuit.

Cooke is the sole provider for his family. His wife walked away from her career to be a full-time mom to their three young daughters—his oldest is 11 years old, and his twin girls are only 9. A significant change in his ability to work would cause serious financial and emotional hardship for his family, as they rely entirely on his income.

Benedetto is a newlywed who supports his wife and also became responsible for his mother and younger sister following the death of his father from Parkinson's disease in 2022.  Benedetto took over the mortgage payments on his mom's California house to prevent her from losing her long-time home.  When Benedetto moved to Florida in 2019 to expand CyberCoders' business operations, he missed much of his father's last years.  This lawsuit should have never been filed.

### e.  The injunction will disserve the public interest

Simply put, the public interest in both Florida and California do not support the issuance of an injunction in this case.  Clearly, California public policy is so strongly against enforcement of the restrictive covenants that they are statutorily void.  § 16600, Cal. Bus. and Prof. Code. Likewise, Plaintiff does not even have an office here, so how can a ruling in its favor benefit the Florida public, at all?  Plaintiff fled from the State of Florida when Covid struck.

The Defendants remained here.  The Defendants seek to contribute to the Florida economy that the Plaintiff abandoned.  The public of Florida and California will be disserved if this Court were to restrain the Defendants from earning livelihoods anywhere in the State of Florida, and to permit a California company to enforce a restrictive covenant that is void under its organic law.

### <u>Contractual Waiver of Bond is Invalid</u>

Finally, even if the Court rejects all the arguments above, which we respectfully submit would be err, the provision in the 2019 Agreements waiving the posting of a bond is void under Florida law.  *See* Fla. Stat. § 542.335(1)(j) ("No temporary injunction shall be entered unless the person seeking enforcement of a restrictive covenant gives a proper bond, and the court shall not enforce any contractual provision waiving the requirement of an injunction bond or limiting the amount of such bond.").  Indeed, our President Trump recently issued an executive memorandum declaring the federal government's policy is to *always* seek the posting of a bond in connection with Fed. R. Civ. P. 65,[11] and while these are private litigants, the policy remains the same: improvidently issued injunctions are ruinous.  Accordingly, it is respectfully submitted that if this Court is inclined to enter an injunction, Plaintiff should be required to post a bond in the amount that it represented the work of Defendants, and those want to work them, is worth: $11,000,000.

### <u>Conclusion</u>

For the foregoing reasons, it is respectfully submitted that the Motion should be denied.

### *** *Remainder of Page Intentionally Blank* ***

---

[11]  https://www.presidency.ucsb.edu/node/376632;  https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-ensures-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

Dated: March 21, 2025   *s/ Aaron J. Kesselman*
        NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
        3001 PGA Boulevard, Suite 305
        Palm Beach Gardens, Florida 33410
        Telephone: (561) 686 3307
        Facsimile: (561) 686-5442
        Michael H. Nullman, Esq. (FBN 17596)
        E-mail: mnullman@nasonyeager.com
        Aaron J. Kesselman, Esq. (FBN 1018107)
        E-mail: akesselman@nasonyeager.com
        Secondary Emails:
        Paralegal, Melissa Hernandez
        mhernandez@nasonyeager.com
        Legal Assistant, Cynthia Reyes
        creyes@nasonyeager.com
        *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

  *I HEREBY CERTIFY* that on this <u>21st</u> day of March, 2025, a true and accurate copy of the foregoing document was served on all counsel of record and all interested parties of record by CM/ECF electronic service to the following:  West A. Holden, Esq. (wholden@littler.com); Tyler A. Sims, Esq. (tsims@littler.com), Littler Mendelson, P.C., 111 North Orange Avenue, Suite 1750, Orlando, Florida 32801-2366, *Attorneys for Plaintiff.*

        *s/ Aaron J. Kesselman*
        NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
        3001 PGA Boulevard, Suite 305
        Palm Beach Gardens, Florida 33410
        Telephone: (561) 686 3307
        Facsimile: (561) 686-5442
        Michael H. Nullman, Esq. (FBN 17596)
        E-mail: mnullman@nasonyeager.com
        Aaron J. Kesselman, Esq. (FBN 1018107)
        E-mail: akesselman@nasonyeager.com
        Secondary Emails:
        Paralegal, Melissa Hernandez
        mhernandez@nasonyeager.com
        Legal Assistant, Cynthia Reyes
        creyes@nasonyeager.com
        *Attorneys for Defendants*