## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 25-80320-CIV-CANNON
CIVIL ACTION

CYBER CODERS, INC., a California
Corporation,

                    Plaintiff,

      v.

CHARLES COOKE, an individual, and
NICOLAS BENEDETTO, an individual;

                    Defendants.

### DEFENDANTS' REQUEST FOR TAKING OF JUDICIAL NOTICE

Defendants Charles Cooke ("Cooke") and Nicolas Benedetto ("Benedetto") through undersigned counsel and pursuant to Fed. R. Evid. 201 hereby request the Court to take judicial notice of adjudicative facts in Plaintiff Cybercoders, Inc.'s memorandum of law filed in a federal court case in the United States District Court for the District of South Dakota, Southern Division, in which the Plaintiff was a party represented by its current law firm, and another memorandum of law that Plaintiff incorporated by reference into Plaintiff's own memorandum of law in that case, and in support thereof state as follows:

1.      Rule 201 of the Federal Rules of Evidence authorizes the Court to take judicial notice of "an adjudicative fact" that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a), (b)(2); *see Blue Chip All., LLC v. Chetu, Inc.*, 2024 U.S. Dist. LEXIS 211960, *4-5 (S.D. Fla. 2024).

2.      The types of sources whose accuracy cannot reasonably be questioned include "public records within [a district court's] files relating to the particular case before it <u>or other related cases</u>." *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1243 (11th Cir. 1991) (emphasis added).

3.      The specific documents of which request for taking judicial notice is hereby made are two (2) memorandums of law that are public records in the files of the United States District Court for the District of South Dakota, Southern Division, which were retrieved by the undersigned counsel through the CM/ECF portal on uscourts.gov.

4.      The specific memoranda are:

   a.   A memorandum of law written by Plaintiff's current law firm, on behalf of Plaintiff, in support of multiple motions for judgment on the pleadings in a case in which Plaintiff was alleged to have tortiously interfered with another employer's employee(s), by soliciting the employee(s) to violate non-compete provisions of employment contracts, *gpac, LLP v. Blake Anderson and Cybercoders, Inc.*, 4:21-cv-04201-LLP, *see* Exhibit A; and

   b.   A memorandum of law written by the employee at issue in that case, which memorandum is relevant because and to the extent the Plaintiff "incorporate[d]" into its own memorandum "by reference, the arguments relating to the choice-of-law analysis as stated in [the employee's] Memorandum of Law [Doc. 20]," *see* Exhibit B.

5.      These memoranda from March and April 2022 are not submitted to prove the truth of the representations Plaintiff made in those filings.  Rather, the purpose is to establish that Plaintiff in fact represented to a Court of law certain facts the Plaintiff asserts are relevant to render

restrictive covenants, such as those at issue here, invalid, void, or unenforceable, and made those representations <u>while Plaintiff was employing the Defendants</u>, and those matters strike the heart of this case.  *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("a 'court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."'") (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)).

6.      "Pursuant to Rule 201(c)(2), the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information.'" *Blue Chip*, 2024 U.S. Dist. LEXIS 211960, *5 (quoting Fed. R. Evid. 201(c)(2)).

7.      Defendants have supplied the Court with the memoranda themselves, bearing e-filing stamps at the top, which it is respectfully submitted is sufficient for the Court to take judicial notice of the adjudicative facts therein relating to Plaintiff's position as to what is relevant in a choice-of-law analysis and when and why a restrictive covenant relating to a recruiting company's employee (or former employee) should be rendered invalid, void, or otherwise unenforceable.

**WHEREFORE**, Defendants respectfully request the Court take judicial notice of the adjudicative facts in Plaintiff's and its former co-party's memorandum of laws enclosed herewith, for purposes of the presently pending Motion for Temporary Restraining Order and Permanent Injunction, and for all other purposes in this matter.

<u>**CERTIFICATE OF SERVICE**</u>

*I HEREBY CERTIFY* that on this <u>21st</u> day of March, 2025, a true and accurate copy of the foregoing document was served on all counsel of record and all interested parties of record by CM/ECF electronic service to the following:  West A. Holden, Esq. (<u>wholden@littler.com</u>); Tyler

A. Sims, Esq. (tsims@littler.com), Littler Mendelson, P.C., 111 North Orange Avenue, Suite 1750,

Orlando, Florida 32801-2366, *Attorneys for Plaintiff.*

Respectfully submitted,

NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Telephone:     (561) 686-3307
Facsimile:      (561) 686-5442
*Attorneys for Defendants*
Aaron J. Kesselman, Esq.
E-mail:           akesselman@nasonyeager.com
Secondary Emails:
Paralegal, Melissa Hernandez
        mhernandez@nasonyeager.com
Legal Assistant, Cynthia Reyes
        creyes@nasonyeager.com

By:____   ***s/ Aaron J. Kesselman***
Aaron J. Kesselman, Esq.
Florida Bar No.:  1018107

EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
### SOUTHERN DIVISION

| | |
|---|---|
| gpac, LLP, | Court File No.: 4:21-cv-04201-LLP |
| Plaintiff, | **RESPONSE TO DEFENDANT BLAKE** |
| vs. | **ANDERSEN'S MOTION FOR** |
| | **JUDGMENT ON THE PLEADINGS** |
| Blake Andersen and CyberCoders, Inc., | **AND MOTION FOR JUDGMENT ON** |
| Defendants. | **THE PLEADINGS** |

Defendant CyberCoders, Inc. ("CyberCoders") joins in support of Defendant Blake

Andersen's ("Andersen") Motion, and moves separately for, Judgment on the Pleadings on all

claims in Plaintiff gpac's ("gpac") Complaint, including any claim of tortious interference against

CyberCoders.[1]  As established by Andersen in his Memorandum of Law in Support of the Motion

for Judgment on the Pleadings, the Account Executive Employment Agreement ("EA") between

Andersen and gpac is wholly unenforceable, and thus gpac's claims for breach of contract are

baseless.  The pleadings make clear that Colorado law most appropriately governs this dispute

based on Andersen's residence in Colorado for the majority of his employment with gpac.

Colorado law readily disposes of the EA, as public policy so strongly disfavors such restrictive

covenants that employers now potentially face criminal liability for attempting to enforce an

---

[1] gpac's filing here is part of a pattern of filing lawsuits to enforce non-competes that are bereft of any factual support.  In the last six months, gpac has had no less than 10 lawsuits pending in South Dakota against competitors in the recruiting industry to prevent former gpac employees from working (seven of which are currently pending in this Court).  Each lawsuit uses virtually the identical complaint that was filed here – in other words, a complaint that has absolutely no factually specific allegations relating to the individual defendant against whom they seek to enforce the non-compete agreement contained in the Employment Agreement.  Given the paucity of factual or legal support in each of these complaints, Defendants here can only assume that gpac has decided to bully former employees into submission as an illegitimate attempt to prevent fair competition, rather than a true attempt to stop any purported unfair competition.  The Court should reject gpac's effort to utilize this Court to further its strategy to prevent this attempt to restrain fair and legitimate trade.

invalid agreement. Colorado courts have likewise made clear that an employer cannot avoid the strict prohibitions of non-compete agreements by utilizing choice-of-law provisions that purport to apply another state's law, meaning that gpac's attempts to avoid Colorado's statutory prohibition on restrictive covenants is void and unenforceable. But even if the Court were to apply South Dakota law, the EA remains overbroad, unenforceable, and unlawful under South Dakota Codified Law § 53-9-11. Because the EA is unenforceable under either Colorado or South Dakota law, any claim that CyberCoders tortiously interfered with the EA fails as a matter of law and must be dismissed. As a result, the Court should grant judgment on the pleadings and dismiss gpac's unsupported claims against both Andersen and CyberCoders.

## **FACTUAL BACKGROUND**[2]

### I.    ANDERSEN'S EMPLOYMENT WITH GPAC

Andersen was formerly employed by Plaintiff gpac LLP ("gpac"), a company engaged in the personnel placement services and recruiting business. (Doc. 1-1[3], ¶¶ 1-2; 14; *see also* Doc. 1-1, pgs. 12-22.) Andersen worked at gpac as an Account Executive from approximately January 2019 until his resignation on or about January 4, 2021. (Doc. 1-1, ¶ 14; Doc. 4[4], ¶ 11.) gpac is based in Sioux Falls, South Dakota, but employs individuals throughout the United States and engages clients nationally. (Doc. 1-1, ¶¶ 1, 5.) For the majority of his employment with gpac,

---

[2] CyberCoders adopts and incorporates herein Defendant Blake Andersen's Factual Background as stated in his Memorandum of Law dated March 25, 2022 ("Andersen's Mem.") [Doc. No. 20]. However, CyberCoders is providing this supplemental statement of facts to clarify that gpac's allegations in the pleadings are the sole basis on which CyberCoders makes this Motion. To the extent CyberCoders, in this statement, relies on facts as alleged in the Complaint, CyberCoders is not admitting that the alleged facts are true. CyberCoders reserves the right to dispute such facts at any later date should the Court not grant this Motion.

[3] "Doc. 1-1" refers to Plaintiff gpac's Complaint dated October 20, 2021. The Complaint was subsequently removed to federal court on November 23, 2021.

[4] "Doc. 4" refers to CyberCoders' Answer to Complaint and Counterclaims dated November 30, 2021.

Andersen resided and worked in Colorado.  (Doc. 16[5], ¶¶ 2, 7, 8.)

## II.    ANDERSEN'S ACCOUNT EXECUTIVE EMPLOYMENT AGREEMENT WITH GPAC

As a condition of his employment with gpac, Andersen was required to sign an Account

Executive Employment Agreement (hereinafter, "EA").  (*See* Doc. 1-1, pgs. 12-22.)  Pursuant to

the EA, Andersen was said to be employed at gpac's "Office," which is defined as its location in

Sioux Falls, South Dakota.  (*Id*.)  Andersen, however, lived and worked for gpac in Colorado for

the majority of his employment.  (Doc. 16, ¶¶ 2, 7, 8.)

The EA entered into between gpac and Andersen provides a forum selection clause,

providing that all actions or lawsuits related to the employment relationship must be commenced

in South Dakota.  (*See* Doc. 1-1, pgs. 12-22.)  Additionally, the EA contains a choice-of-law

provision designating South Dakota law as controlling the interpretation and enforcement of the

EA and the relationship of the parties.  (*Id*.)  During the course of Andersen's employment,

however, his work activities were directed towards and involved clients physically located outside

the State of South Dakota.  (Doc. 16, ¶ 8.)

## III.    ANDERSEN'S RESIGNATION FROM GPAC AND EMPLOYMENT WITH CYBERCODERS

Andersen resigned his employment from gpac on or about January 4, 2021.  (Doc. 1-1, ¶

14.)  At the time of his resignation, Andersen remained a resident of Colorado.  (Doc. 16, ¶ 7.)  In

or about September 2021, Andersen began employment with CyberCoders as an Executive

Recruiter.  (Doc. 4, ¶¶ 18-19.)  CyberCoders, headquartered in Irvine California, is a leading

nationwide placement recruiting firm that serves a variety of industries throughout the United

States.  (*Id*., ¶¶ 8-10.)

---

[5] "Doc. 16" refers to Defendant Blake Andersen's Answer to Complaint dated February 22, 2022.

## IV.   GPAC INITIATES A BOILERPLATE LAWSUIT AGAINST ANDERSEN AND CYBERCODERS.[6]

On or about October 20, 2021, gpac filed a lawsuit against Andersen and CyberCoders, alleging Andersen is in violation of the EA, and CyberCoders is interfering with Andersen's EA by hiring and continuing to employ Andersen.  (*See* Doc. 1-1.)  gpac's Complaint, however, contains only boilerplate allegations and fails to factually set out what actions or omissions gpac is alleging as the basis for its claims against Andersen and CyberCoders specifically.[7]  gpac asserts the EA entered into by Andersen with gpac is wholly enforceable, and will not withdraw its claims against Andersen or CyberCoders unless CyberCoders terminates the employment of Andersen. (Doc. 4, ¶ 21.)

## **ARGUMENT**[8]

---

[6] Notably, even the Factual Background in Plaintiff's Memorandum in Opposition to Andersen's Motion for Judgment on the Pleadings is bare bones – exemplifying the insufficiency of its claims against Andersen and CyberCoders.  In fact, gpac merely states "Andersen began employment or a service relationship with CyberCoders, which is a breach of Section 10 of the Agreement."  *See* Pltf's Mem., p. 3. (Doc. 21.)  Because gpac has only asserted boilerplate allegations, gpac cannot even allege with any amount of specificity why Andersen's employment with CyberCoders is a breach of the EA.  The lack of specificity for what should be basic allegations clearly indicates gpac has no basis for its claims.

[7] In fact, other than replacing the name of the individual former employee (in this case, Andersen), the Complaint filed in this action against Andersen and CyberCoders is *identical* to the Complaints filed in 8 other lawsuits against former gpac employees and CyberCoders.  Like the Complaint against Andersen here, the Complaints make conclusory statements of law without virtually *any* specific factual allegations to support the claims for relief against those employees and CyberCoders.  *See gpac LLP v. Cipalla and CyberCoders, Inc.*, No. 21-cv-04203-LLP; *gpac v. Linder and CyberCoders, Inc.*, No. 21-cv-04198-LLP; *gpac v. Archer Goodwin and CyberCoders, Inc.*, No. 21-cv-04200-LLP; *gpac v. Goody and CyberCoders, Inc.*, No. 21-cv-04200-LLP; *gpac v. McCalister and CyberCoders, Inc.*, No. 21-cv-04204-LLP; *gpac v. Tyrrell and CyberCoders, Inc.*, No. 21-cv-04200-LLP; *gpac v. Emery and CyberCoders, Inc.*, No. 41CV21-000566 (Lincoln County, South Dakota); *gpac v. Rud and CyberCoders, Inc.*, No. 41CIV21-000567 (Lincoln County, South Dakota).

[8] CyberCoders adopts and incorporates herein the Arguments as stated and supported in Andersen's Mem.  (Doc. 20.)

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). For purposes of assessing a motion for judgment on the pleadings, the Court uses the same standard that it would use when addressing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

## II. THE EMPLOYMENT AGREEMENT BETWEEN ANDERSEN AND GPAC IS UNENFORCEABLE UNDER COLORADO LAW.[9]

gpac's EA plainly cannot survive Colorado law's strong public policy which disfavors covenants not to compete. Colorado statutory law provides that "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void…." C.R.S. § 8-2-113(2). Such covenants, like gpac's, are facially void *ab initio*, unless they fit within one of the narrowly defined statutory exceptions. *Mgmt Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo. Ct. App. 1988).

---

[9] Colorado law should govern the claims at issue, regardless of any superficial choice-of-law provision contained in the EA. In gpac's Memorandum of Law opposing the Motion for Judgment on the Pleadings, gpac wholly fails to acknowledge the EA is an adhesion contract presented on a "take it or leave it" basis and should be construed against gpac to determine if the terms are unreasonable, one-sided, or oppressive. *See Rozeboom v. Northwestern Bell Telephone Co.*, 358 N.W.2d 241, 245 (S.D. 1984) (Holding contract between employee and company unenforceable as contract of adhesion, as the case involved an individual versus a monopoly, the bargaining power was unequal, and that an economic disparity between the two parties existed.) As in *Rozeboom*, gpac is operating as a monopoly over Andersen by prohibiting him from seeking employment in the personnel placement services industry via the EA. Here, as evidenced by all employees entering into the same EA with gpac, Andersen was required to enter into the EA in order to work for gpac – a "take it or leave" scenario. The facts of this case make clear the EA is a contract of adhesion, and further analysis shows its terms, including the choice-of-law provision, are unreasonable.

In the interest of brevity and judicial efficiencies, CyberCoders refers the Court to, and incorporates herein by reference, the arguments relating to the choice-of-law analysis as stated in Andersen's Memorandum of Law [Doc. 20].

The permitted exceptions are specified in C.R.S. § 8-2-113(2)(a)-(d):

      a)   Any contract for the purchase and sale of a business or the assets of a business;

      b)   Any contract for the protection of trade secrets;

      c)   Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

      d)   Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

C.R.S. § 8-2-113(2). The prohibitions on covenants not to compete contained in C.R.S. § 8-2-113(2) have been interpreted to apply to customer and employee non-solicitation provisions with equal force. *See 23 LTD v. Herman*, 457 P.3d 754, ¶ 20 (Colo. Ct. App. 2019) (*citing Saturn Systems, Inc. v. Militare*, 252 P.2d 516, 526 (Colo. Ct. App. 2011) (stating an agreement not to solicit is a form of an agreement not to compete void as contrary to the public policy of Colorado with some narrow exceptions)). None of these exceptions apply to the circumstances of this case. The EA is a not a contract for the purchase and sale of a business or the assets of a business, nor is it providing for recovery of the expense of educating and training an employee. Moreover, a plain reading of the EA shows it is not merely a contract for the protection of trade secrets, and Andersen was not considered executive or management personnel.

     **A.**     **The EA is not a contract for the protection of trade secrets under Colorado law.**

For a non-compete provision to fit within the "trade secrets" exception of C.R.S. § 8-2-113(2)(b), the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets. *Gold Messenger v. McGuay*, 937 P.2d 907, 910 (Colo. Ct. App. 1997). In order to be considered for the purpose of protecting trade secrets, the non-compete provision itself must be directly related to the protection of trade secrets – indeed, its primary purpose. *Colo. Accounting Machs., Inc. v. Mergenthaler*,

609 P.2d 1125, 1126 (Colo. Ct. App. 1980); *Gold Messenger*, 937 P.2d at 910. Thus, where the agreement at issue already contains a clause for the protection of trade secrets, an unrelated non-compete provision is unenforceable. *Colo. Accounting Machs., Inc.*, 609 P.2d at 1126.

The court's decision in *Colorado Accounting Machines* is analogous to the agreement at issue here. In that case, the employment contract at issue had both a nondisclosure of trade secrets clause and a separate non-compete provision. 609 P.2d at 1126. The Colorado Court of Appeals held that the trade-secret non-disclosure provision adequately protected the employer's interests and the separate non-compete provision was not limited to enhancing this protection. *Id*. Consequently, while the trade secret provision was valid, the separate non-compete provision was not. *Id*. The employer argued that because the contract contained a clause pertaining to trade secrets, the trade secrets exception was met and thus was not void under § 8-2-113. *Id*. The court rejected this argument, noting that this interpretation of the statute "would thwart the legislative intent of protecting employees from non-competition clauses except in carefully defined circumstances." *Id*. Thus, the *Colorado Accounting Machines* court reasoned that where an agreement already has a provision related to trade secrets, a separate non-compete provision is redundant and void. *Id*.; *see also Dresser Industries, Inc. v. Sandvick*, 732 F.2d 783, 788 (10th Cir. 1984) ("A naked covenant not to compete is void under the statute and cannot be validated by the insertion of a companion clause dealing with trade secrets.").

Under the reasoning of *Colorado Accounting Machines*, gpac's EA patently fails to meet the requirements of § 8-2-113(2)(b). Indeed, Section 8 of the EA, "Non-Disclosure Covenants,"

explicitly provides protections for gpac's alleged trade secrets or proprietary information.[10] Accordingly, any non-compete provision, including the restriction contained in Section 10 of the EA, is merely redundant and thus void under Colorado law. Moreover, the plain language of Section 10 of the EA makes evident its purpose is not for the protection of trade secrets, but rather an unrelated and unlawful restriction on Andersen's right to seek employment. Accordingly, the non-compete provision of the EA does not fall within the trade secrets exception contained in § 8-2-113(2), and is thus void.

### B. Andersen was not an executive or management personnel during his employment with gpac, and thus the exception in C.R.S. § 8-2-113(2)(d) cannot apply.

Under § 8-2-113(2)(d), the "executive or management personnel" exception is intended to apply to those who supervise employees, who are at the top of the compensation scheme, and who are employed in a decision-making capacity. *DISH Network Corp. v. Altomari*, 224 P.2d 362, 368 (Colo. Ct. App. 2009) (the term includes those "at the heart of the business" and "those few executives at the highest echelons of the company"). The inquiry is not so much about job title, but about the employee's duties and responsibilities, skills, knowledge, and autonomy. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 738 (Colo. Ct. App. 2006).

No facts have been alleged in this case, nor will any evidence ever show or suggest, that Andersen was executive or management personnel at any time during his employment with gpac. Indeed, the definition of Andersen's title, "Account Executive," provides that his role consisted of "finding positions of permanent employment for persons, locating personnel for clients, and

---

[10] gpac separately asserts a claim for misappropriation of trade secrets under the Unform Trade Secrets Act based on Section 8 of the EA. As discussed below, gpac fails to allege or otherwise establish with any specificity the trade secrets at issue. Because gpac cannot specify any trade secrets subject to protection under Colorado or South Dakota law, the Court should grant judgment on the pleadings in favor of Andersen and CyberCoders on any claim for misappropriation of trade secrets.

related activities" and consists of activities such as:

> "soliciting companies to become clients of the Company, contacting clients to ascertain their personnel requirements, assisting clients in fulfilling their permanent and interim personnel requirements, seeking candidates for permanent and interim positions with clients, interviewing candidates for positions with clients, and exercising discretion in the choice of candidates to refer to clients."

(*See* Doc. 1-1, p. 12, Section 1.7.) gpac has not alleged anywhere in the Complaint that Andersen's role during employment with gpac involved management or executive decisions or other such functions. Colorado courts have been very clear that the term "management or executive personnel" is not to be interpreted broadly, but should be used only to promote the underlying purpose of the statutory exception, i.e., "to protect employers from the disruption of operations which occur upon the loss of a *key* executive or member of his staff" and "to assure[] employers that the very heart of their enterprise – business plans and high-level strategies – will not be subject to accidental (or intentional) disclosure to a competitor." *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 842 (Colo. Ct. App. 2007) (emphasis added). gpac has made no allegations suggesting Andersen was considered executive or management personnel – or otherwise critical to gpac's business. In fact, gpac's boilerplate Complaint and widespread lawsuits against its former employees only supports that gpac's non-competition agreement is not intended for a few key employees, but rather merely to stifle competition as a whole. Accordingly, the EA is unenforceable under Colorado law, and is not revived by any exception provided by C.R.S. § 8-2-113.

III.    **THE EMPLOYMENT AGREEMENT BETWEEN ANDERSEN AND GPAC IS UNENFORCEABLE UNDER SOUTH DAKOTA LAW DUE TO AN OVERBROAD GEOGRAPHIC LIMITATION.[11]**

Even if the Court determines South Dakota law is applicable, the EA remains unenforceable.  In South Dakota, any contract that restrains the exercise of a lawful profession or business is void, subject to limited exceptions.  SDCL § 53-9-8.  The exceptions "must be construed narrowly so as to promote the prohibition against contracts in restraint of trade." *Commc'n Tech. Sys., Inc. v. Densmore*, 583 N.W.2d 125, 128 (S.D. 1998).  Applicable here, SDCL § 53-9-11 provides an exception in which a non-compete covenant may be enforceable:

> An employee may agree with an employer at the time of employment. . . during his employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a **specified county, first or second class municipality, or other specified area** for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on a like business therein.  (emphasis added).

Importantly, employers must also show that they have a legitimate interest in being protected against *unfair* competition by their former employees.  *Id*. at 516 n.7.

As provided by § 53-9-11, a statutorily compliant geographic limitation is one of the "statutory parameters [that] must be present in order for the non-compete covenant to be valid." *See Franklin v. Forever Venture, Inc.*, 696 N.W.2d 545, 549 (S.D. 2005).  Though the legislature did not define "other specified area," courts have recognized that a valid geographic scope must be defined or otherwise known to the parties.  *See Centrol, Inc. v. Morrow*, 489 N.W.2d 890, 893 (S.D. 1992).

Here, the EA provides that for a period of two years, Andersen shall not "engage in the

---

[11] Colorado law should govern the claims at issue, regardless of any superficial choice-of-law provision contained in the Employment Agreement.  In the interest of brevity and efficiency, CyberCoders refers the Court to the arguments relating to the choice-of-law analysis as stated in Andersen's Memorandum of Law [Doc. 20].

activities of an Account Executive, outside sales representative, coordinator, research assistant, project coordinator, manager, or trainer in the personnel placement service business within a two hundred mile radius of the Office, any Remote Office, or any Home. . ."[12]  Despite the EA providing definitions of the "Office," "Remote Office," and "Home," Andersen cannot be reasonably expected to know the specific geographic area in which he is prohibited from taking employment in the personnel placement service business.  For example, gpac defines "Remote Office" as any location approved by gpac in which the employee is regularly doing business on behalf of the Company.  What is unclear, however, is what constitutes "regularly doing business."  The vague and boilerplate language defining the scope of the non-compete agreement inherently prevented Andersen from ascertaining the geographic scope.  In fact, gpac similarly does not appear to be certain of the restricted geographic area, as gpac fails to provide any specificity to the geographic limitations applicable to Andersen in its Complaint, but rather merely regurgitates the vague and ambiguous language of the EA.  Because it appears no party has indicated any concrete knowledge as to the geographic scope of the EA, it is clearly invalid under South Dakota law as failing to specify a reasonable geographic limitation as required by statute.  *Franklin v. Forever*

---

[12] The Non-Solicitation Covenant under Section 9 of the EA is even more expansive.  Per Section 9, Andersen shall not, for a period of two years "solicit or provide services to any client, interim employee or candidate or solicit for employment or employ any interim employee or candidate, who resides in the United States, and who contacted the Company or had been contacted by the Company for personnel placements service business and shall not assist, directly or indirectly, any other person other than the Company in so doing, provided that the Company remains in the personnel placement service business in the United States."  Accordingly, Andersen is prohibited from soliciting*, or accepting*, business from *any* client *anywhere in the United States*.  For the same reasons discussed relating to the non-compete, the non-solicit provision is invalid under South Dakota law.  *See, e.g., Simpson v. C & R Supply, Inc.*, 598 N.W.2d 914, 919 (S.D. 1999) (holding a non-compete invalid because the geographic restrictions were overbroad, stating "[t]he clause that restricts Simpson from operating in any county in the United States is overbroad" and plainly violates § 53-9-8.).

*Venture, Inc.*, 696 N.W.2d 545, 549 (S.D. 2005) (A statutorily compliant geographic limitation is one of the "statutory parameters [that] must be present in order for the non-compete covenant to be valid.")[13]

Moreover, a two-hundred-mile radius of three separate locations (i.e., "Office," "Remote Office," and "Home") is clearly more broad than necessary to protect gpac from *unfair* competition. As gpac serves clients nationwide, and Andersen may have worked with clients in a variety of states, the non-compete agreement appears to effectively prohibit Andersen from taking employment in the personnel placement service business anywhere in the United States. Such a broad restriction is hardly reasonable and does not serve to protect any legitimate interest that gpac might seek to advance by virtue of the EA. *See, e.g., Simpson v. C & R Supply, Inc.*, 598 N.W.2d 914, 919 (S.D. 1999) (holding a non-compete invalid because the geographic restrictions were overbroad, stating "[t]he clause that restricts Simpson from operating in any county in the United States is overbroad" and plainly violates § 53-9-8.)

For example, in *Simpson*, the South Dakota Supreme Court considered a noncompetition agreement that prohibited the defendant employee from competing "within a radius of twenty-five (25) miles of Sioux Falls, South Dakota; (ii) within a radius of two hundred fifty (250) miles of

_____

[13] gpac has taken the position in another lawsuit (which was likewise pending before this Court) involving the identical EA that the geographic scope of the restrictive covenants in the EA are nationwide in scope – meaning that there is *no* specified geographic scope, despite the purported definitions on which gpac will no doubt rely in responding to this Motion. *See gpac v. Anjanette Moore, Planet Technology, LLC and The Planet Group, LLC v. IT Works Recruitment, Inc.*, No. 4:21-CV-4195-LLP [Doc. No. 13, p. 2, 4]. The Court may take judicial notice of gpac's position in that lawsuit as evidence of the unlimited scope of the EA here. Fed. R. Evid. 201(b); *Fin-Ag v. Nau Country Ins. Co.*, No. CIV:08-4141-KES, 2009 WL 1850334, *3 (D.S.D. June 26, 2009) (observing that a district court can take judicial notice of court documents in other actions); *see also Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) (stating that in considering a motion to dismiss, a court is "not precluded in [its] review of the complaint from taking notice of items on the public record").

Sioux Falls, South Dakota; (iii) and within all counties within any of the United States of America." *Id*. *Simpson*, 598 N.W.2d at ¶ 4.  The plaintiff argued that the noncompetition agreement was enforceable because it abided by the statutory limits.  The court disagreed, however, finding the provision "obviously violates the statute, as it gives no specific 'county, city, or part thereof in which Simpson was to refrain from operating.'"  *Id*. at 14.  The court went on to hold that "[t]he clause that restricts Simpson from operating in any county in the United States is overbroad and plainly violates both §§ 53-9-8 and 53-9-9."  *Id*. (*citing American Rim & Brake, Inc.*, 382 N.W.2d at 424).

gpac faces a similar challenge as the plaintiff in *Simpson*.  By restricting Andersen from operating within a two-hundred-mile radius of "the Office, any Remote Office, or any Home," gpac fails to provide the "specified county, first- or second-class municipality, or other specified area" as required by § 53-9-11.  In construing the exception narrowly so as to promote the proscription against general restraints on trade, the Court can readily see the restrictive covenants fail to abide by the statutory requirements and thus are invalid.[14]  The restrictive covenants in the EA are thus unenforceable and invalid under South Dakota law.[15]

---

[14] As remote work has increased to unprecedented levels in light of the COVID-19 pandemic, even more today than ever before a prohibition on an employee from working within a radius of any "remote office" lacks any real specificity that is clearly required to qualify for the exception to the general proscription against restraints on trade.

[15] Similarly, other than boilerplate vague assertions in the Complaint, gpac has not presented to this Court any shred of evidence showing that CyberCoders has tortiously interfered with Andersen's other alleged contractual obligations in the EA, such as the non-solicitation or nondisclosure provisions.  For the same reasons the non-compete provision is invalid under South Dakota law, and as discussed in Andersen's Mem., the remaining provisions must be rendered unlawful.  In fact, the customer non-solicitation provision contained in the EA is unenforceable under Section 53-9-11 because it does not contain a geographic scope and because it purports to prevent Andersen from *accepting* business from gpac clients, where no solicitation has occurred. *See Miller v. Honkamp Krueger Fin. Servs.*, 9 F.4th 1011 (8th Cir. 2021).

Additionally, gpac cannot meet its burden of establishing a protectible interest. *See Cocona, Inc. v. Singtex Indus. Co.*, No. 14-cv-01593-MJW, 2014 WL 5072730, at *4 (D. Colo. Oct. 9, 2014) (Under Colorado law, "a noncompete agreement must be no broader than necessary to protect the promisee's legitimate interests, and it must not impose hardship on the promisor."); *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512 (8th Cir. 2007) (upholding trial court's decision the plaintiff did not demonstrate a legitimate business interest justifying its non-compete covenant, finding that it did not prevent anything more than mere competition)' *see also Modus LLC v. Encore Legal Sols., Inc.*, No. CV-12-00699-PHX-JAT, 2013 WL 6628125, at *4 (D. Ariz. Dec. 17, 2013) (finding a non-compete agreement "unenforceable because its restrictions are not limited to protecting [plaintiff]'s confidential information or relationships").

gpac fails to allege any facts justifying its non-compete covenant or other restrictive covenants for purposes of protecting any legitimate business interest. Rather, the facts as alleged merely show Andersen was one of many recruiters employed at gpac who placed candidates in specific industries and for specific clients. Aside from broadly asserting gpac is a nationwide company, gpac has not alleged any facts supporting the need to prevent Andersen from taking effectively *any* employment in the personnel placement services industry nationwide, regardless of other limitations relating to his solicitation of clients. It is evident by the overbroad and non-compliant restrictive covenants, as well as gpac's brazen litigation tactics, gpac's only interest is preventing mere lawful competition.

## IV. GPAC'S CLAIM UNDER THE UNIFORM TRADE SECRETS ACT IS FACIALLY DEFICIENT.

gpac's claim that Andersen and CyberCoders have misappropriated its purported (and unidentified) trade secrets is likewise without any factual or legal foundation. The trade secrets claim is governed by the South Dakota Uniform Trade Secrets Act, SDCL § 37-29-1, *et seq*.

Section 37-29-1 provides for relief only where there is evidence of a "trade secret," as that term is defined by the statute. Section 37-29-1(4) defines "trade secret" as

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> (i)      Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (ii)      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The determination of whether a trade secret exists is a mixed question of law and fact. The legal question is "whether the information could constitute a trade secret under the first part of the definition" under Section 37-29-1(4). *Daktronics, Inc. v. McAfee*, 599 N.W.2d 358 (S.D. 1999) (quoting *Uncle B's Bakery, Inc. v. O'Rourke*, 950 F. Supp. 1405, 1427 (N.D. Iowa 1996)). The factual inquiry involves the remaining subsections of Section 37-29-1(4), pursuant to which a plaintiff must show that the information derives independent economic value and that plaintiff has taken adequate measures to maintain the secrecy of the information. *Id.* At all times, gpac has the burden of establishing both the existence of a trade secret and that a defendant has misappropriated the trade secret. *Id.* at 361; *Aqreva, LLC v. Bailly*, 2020 SD 59.

The trade secret claim fails at the outset because gpac has not identified (much less with any modicum of specificity) exactly what information it claims to be a trade secret and to which Andersen was provided access. A claim is inappropriate if plaintiff fails to identify specific trade secrets and instead produces long lists of general areas of information which contain unidentified trade secrets. *Watkins, Inc. v. Lewis*, Civ. No. 02-3708, 2002 U.S. Dist. LEXIS 19738, 2002 WL 31319491, at *013 (D. Minn. Oct. 11, 2002) (citation omitted). The allegations contained in the Complaint are entirely devoid of any allegations that inform the Court, Andersen, or CyberCoders what trade secrets are at issue or that even nominally support a claim that the general business

information to which it claims Andersen had access (again, without any substantiation) meet the legal standard for being a trade secret. *See Weins v. Sporleder*, 569 N.W.2d 16, 2022 (rejecting trade secret claim when plaintiff failed to produce sufficient evidence to support claim that the formula for an animal feed supplement possessed independent economic value); *Int'l Acad. Of Bus. & Fin. Mgmt., Ltd. v. Mentz*, No. 12-CV-000463-CMA-BNB, 2013 WL 212640, at *9 (D. Colo. Jan. 18, 2013) (dismissing under Rule 12 a claim for misappropriation of trade secrets where a party alleged only that "trading information" was a trade secret without defining "the term 'trading information' or otherwise explain[ing] which particular trade secrets [were] alleged to have been misappropriated"). gpac's manifest failure to specify precisely what trade secrets it believes Andersen has taken, or CyberCoders otherwise misappropriated via Andersen, is fatal to its ability to prevail on the claim. *See Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1178-79 (8th Cir. 1991) (granting a judgment notwithstanding the verdict where the plaintiff "never quite specified what 'trade secrets' had been taken from it"); *see also* Victoria A. Cundiff, *How to Identify your Trade Secrets In Litigation*, 5th Ann. Inst. On Intellectual Property Law 557 (PLI, Oct. 7-9, 1999) (explaining that, in order to prevail, plaintiff must specify the information for which it seeks protection).

Moreover, gpac does not assert any allegations showing that the unidentified information that Andersen allegedly possesses derives any independent economic value, is actually secret, or what measures it took to maintain the secrecy of the information. Again, gpac's failure to merely allege any facts that the information at issue meets the legal definition of a trade secret means that gpac's claim is wholly deficient. *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1235 (8th Cir. 1994)). "Without a proven trade secret, there can be no action for misappropriation, even if [the] defendant['s] actions were wrongful." *Daktronics*, 599 N.W.2d at

361-62.

Finally, and equally important, gpac has not provided a single allegation upon which this Court, Andersen, or CyberCoders could conclude that Andersen or CyberCoders has actually misappropriated any trade secret or that there is a threat that he will do so in his new position with CyberCoders. *See Ciena Commc'ns., Inc. v. Nachazel*, No. 09-CV-02845-MSK-MJW, 2010 WL 3489915, at *4 (D. Colo. Aug. 31, 2010) (ruling that employing an individual who had access to trade secrets is not enough to state a claim for trade secret misappropriation). gpac has apparently decided that the Court, Andersen, and CyberCoders should be left in the dark as to what trade secrets have been disclosed by Andersen (or to whom) and the manner and means by which Andersen and/or CyberCoders misappropriated the trade secrets – despite the fact that gpac has the burden to establish a basis for its claim that it has trade secrets and that Andersen has violated the law by disclosing those trade secrets. The reliance on grossly generalized allegations is wholly deficient and such a claim should be dismissed.

## V. BECAUSE THE EA IS UNENFORCEABLE UNDER EITHER COLORADO OR SOUTH DAKOTA LAW, ANY CLAIM AGAINST CYBERCODERS FOR TORTIOUS INTERFERENCE IS MOOT.

To prove tortious interference with contract, gpac must show (1) the existence of a valid contractual relationship; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the relationship, and (6) damages. *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 406 (S.D. 2008). Here, gpac's tortious interference claim is readily rendered moot as the underlying EA is clearly unenforceable and invalid under either South Dakota of Colorado law as established by the arguments herein, as well as the arguments asserted by Andersen. Moreover, gpac's Complaint is wholly deficient in asserting any factual basis to support its claim of tortious interference against CyberCoders. Indeed, gpac fails to indicate any "improper

means" or an "improper purpose" in CyberCoders' employment of Andersen. As is apparent from gpac's litigation strategies, gpac's allegations merely indicate an effort to prevent *any* competition. But competition in itself is not improper. Accordingly, gpac's tortious interference claim against CyberCoders must be deemed moot as no valid contract between gpac and Andersen exists, and thus the claim should be dismissed.

## CONCLUSION

For the foregoing reasons, and those asserted in Andersen's Memorandum, CyberCoders respectfully requests the Court grant Motion for Judgment on the Pleadings in favor of Andersen and CyberCoders and dismiss all claims.

Dated: April 15, 2022

/s/ David J. Goldstein
David J. Goldstein, Bar No. SBSD #4281
dgoldstein@littler.com
Jeremy D. Sosna (*admitted pro hac vice*)
jsosna@littler.com
Lauren Clements (*admitted pro hac vice*)
lclements@littler.com

LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone:    612.630.1000
Facsimile:    612.630.9626

*Attorneys for Defendant CyberCoders, Inc.*

4891-7641-9097.2 / 100716-1006

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| gpac, LLP,<br><br>    Plaintiff,<br><br>vs.<br><br>BLAKE ANDERSEN AND<br>CYBERCODERS, INC.,<br><br>    Defendants. | 4:21-cv-04201-LLP<br><br>**DEFENDANT BLAKE ANDERSEN'S<br>MOTION FOR JUDGMENT ON THE<br>PLEADINGS AND REQUEST FOR<br>ORAL ARGUMENT** |

  Defendant Blake Andersen (hereinafter, "Blake") has moved pursuant to Federal Rule of Civil Procedure 12(c) for entry of judgment in his favor on the pleadings. He submits this Brief in support of his Motion.

**I.  INTRODUCTION.**

  To say that the Plaintiff, GPAC, has a proclivity for litigation would be an understatement. GPAC also seems to habitually use, if not require, form contracts with its customers and employees that contain choice of law and forum selection language favoring South Dakota. Public records show that, since January 1, 2021, GPAC has filed at least fifty-five lawsuits in South Dakota Circuit Court, several of which have eventually made their way to the federal docket sheet for the United States District Court for the District of South Dakota. Thirty-eight of GPAC's lawsuits were collection actions brought against former clients or customers throughout the United States for alleged non-payment for recruiting or personnel placement services. *See, e.g., GPAC, LLC v. Blew & Associates, P.A.*, 4:21-cv-04102-LLP. Venue in South Dakota was based on a forum selection clause within the form contracts that GPAC requires with its customers.

Nearly half of GPAC's South Dakota Circuit Court lawsuits since the beginning of 2021, seventeen in total, were brought against former employees and their current employers for alleged violations of noncompetition provisions within their written employment agreements.  Venue, again, was based on forum selection clauses within GPAC's standardized employment agreements. These agreements also contain language providing that South Dakota substantive law is controlling.

The seventeen lawsuits GPAC has filed against former employees and their current employers contain identical claims, causes of action, and supporting factual allegations (or lack thereof).[1]  The lawsuits have been referenced, by case number, in motions filed in at least two of the other cases seeking dismissal.  *See GPAC, LLP v. Charles Hall and Maxim Healthcare Staffing*, 4:21-cv-04185-LLP (former GPAC employee in Washington); *and GPAC, LLP v. John McNeail and Beacon Hill Staffing Group*, LLC, 4:21-cv-04225-LLP (former GPAC employee in Wisconsin). The only differences in the complaints appears to be the names of the defendants and the dates of employment.  The only mention of the defendants, by name, is within the caption and in the opening paragraph of the Complaint, but otherwise the former employee and new employer are generically identified as "Employee," "New Employer," or collectively as the "Defendants."

Of the seventeen lawsuits that GPAC filed against former employees and their new employers, nine of the lawsuits name CyberCoders as a defendant.[2]  Seven of those nine lawsuits

---

[1] Blake moves and requests pursuant to Federal Rule of Evidence 201 that the Court take judicial notice of all recent state and federal litigation activity involving GPAC and its former employees and their current employers. Consideration of these filings, and information contained therein, does not require Blake's Motion be converted to one seeking summary judgment.  *See Missouri ex. rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); 5A C. Wright, Federal Prac. & Proc. § 1357 at 299 (2nd ed. 1990*); Bird Hotel Corp. v. Super 8 Motels, Inc*., 245 F.R.D. 644, 645 (D.S.D. 2007).

[2] *GPAC LLP vs. Kelsey Tyrrell, CyberCoders, Inc.*, 41CIV21-000591*; GPAC LLP vs. Blake Archer Goodwin, CyberCoders, Inc.*, 41CIV21-000592; *GPAC LLP vs. Aaron Michael Rud, CyberCoders, Inc.*, 41CIV21-000567; *GPAC LLP vs. Michael Linder, CyberCoders, Inc.*, 41CIV21-000568; *GPAC LLP vs. Cody Cipalla, CyberCoders, Inc.*, 41CIV21-000569; *GPAC LLP vs. Sean Goody, CyberCoders, Inc.*, 41CIV21-000570; *GPAC LLP vs. Christopher McCalister, CyberCoders, Inc.*, 41CIV21-0005; *GPAC LLP vs. Blake Paul Andersen, CyberCoders, Inc.*, 41CIV21-000565*; GPAC LLP vs. Jarrad Emery, CyberCoders, Inc.*, 41CIV21-000592.

were removed to the United States District Court for the District of South Dakota. This is one of those seven lawsuits, and also one of four lawsuits where the individual former employees were at all times material to the lawsuit (and also presently) residents of the State of Colorado.

Blake Andersen moves for judgment on the pleadings in his favor on all of GPAC's claims. Based on the Complaint, CyberCoders' Answer and Counterclaim, Blake's Answer, and GPAC's Reply to Counterclaim, judgment should be entered in his favor, on the merits, and with prejudice. The Court should enter judgment in Blake's favor because: (1) Colorado law applies to GPAC's claim, Blake's and CyberCoders' defenses, and to CyberCoders' counterclaim; (2) under Colorado law Blake's EA is voidable and legally unenforceable; (3) the pleadings do not otherwise set forth plausible claims or causes of action in favor of GPAC, and against Blake and CyberCoders, under Colorado law; and (4) even if South Dakota law does apply, Blake is still entitled to entry judgment in his favor.

## II.    STANDARD OF REVIEW.

Federal Rule of Civil Procedure 12(c) provides an avenue for disposing of factually unsupported claims after the pleadings are closed. FED. R. CIV. P. 12(c). The Rule provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." *Id*. "Failure to state a claim upon which relief can be granted […] may be raised […] by a motion under Rule 12(c)." FED. R. CIV. P. 12(h)(2)(B). This Court applies the same standard to motions for judgment on the pleadings as it does to motions pursuant to Rule 12(b)(6). *See Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009).

To survive a motion to dismiss, or for judgment on the pleadings, a complaint must contain sufficient factual matters which, if accepted as true, state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a complaint need not provide detailed factual allegations, "[…] a plaintiff's obligation to provide the grounds of

her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, not all statements contained within a complaint constitute "facts" sufficient to avoid dismissal or summary adjudication. *See Akron Savings Bank v. Charlson*, 158 N.W.2d 523, 524 (1968). "While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indemnity Corp.*, 280 F.3d 868, 870 (8th Cir. 2002); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997); *Wescott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

In deciding a motion for judgment on the pleadings, trial courts are not artificially and myopically required to accept as true the allegations within the plaintiff's complaint; nor are they bound to give credence to allegations and conclusions that are legal in nature, unreasonable, transparently conclusory, or improperly argumentative. *See Gant v. Wallingford Board of Education*, 69 F.3d 669, 674 (2d Cir. 1995); *see also Foshee v. Daoust Construction Co.*, 185 F.2d 23, 25 (7th Cir. 1950); *Banco Del Estado v. Navistar International Transportation Corp.*, 942 F.Supp. 1176, 1179 (N.D. Ill. 1996). Simply stated, the Court is not forced to abandon common sense and reason in deciding Blake's motion for judgment on the pleadings. There are legal and logical limits to the "benefit of the doubt" that is extended to the non-moving party. As explained by Wright & Miller:

> The motion for judgment on the pleadings admits all facts well pleaded, but does not admit conclusions of law; facts which the court will take judicial notice are not true; legally impossible facts; facts which would be inadmissible in evidence in the event of a trial nor facts which might appear by a record or document included in the pleadings to be unfounded.

4

C. WRIGHT, 5C FEDERAL PRAC. & PRO. § 1368 at 244-45 (3rd ed. 2004) (*quoting Hargis Canneries v. United States*, 60 F.Supp. 729, 729 (D. Ark. 1945)).  In ruling on a motion for judgment on the pleadings, the Court may consider not only the pleadings, exhibits, and the matters embraced by those items, but may also take judicial notice of, and consider, public records.  *See, e.g., Stahl v. U.S. Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss").

### III.   FACTUAL BACKGROUND.

The following facts can be derived directly from the pleadings and attachments thereto. GPAC is headquartered in South Dakota, but has employees who work throughout the United States.  (*See* Doc. 1-1.)  GPAC provides recruiting and job placement services to those looking for employment, and looking to hire employees, on both a temporary and permanent basis.  (*Id.*) GPAC's clients are located throughout the United States.  (*Id.*)  Some of GPAC's employees work at its headquarters in Sioux Falls, South Dakota.  (*Id.*)  Other employees work at one of GPAC's satellite offices located outside of South Dakota.  (*Id.*)  GPAC also has employees who work from home both inside, and outside, of South Dakota.  (*Id.*)

At one time, GPAC maintained a satellite office in Colorado.  (Docs. 5, 16.)  At all times material to this lawsuit, Blake worked for GPAC in Colorado.  (*Id.*)  GPAC closed its Colorado brick-and-mortar office space in 2021.  (*Id.*)  At that time, Blake and other GPAC employees worked from their homes.  (*Id.*)  Blake is one of four former employees who GPAC has sued, and who worked for the company in Colorado.[3]

---

[3] In addition to this case, *see GPAC LLP vs. Sean Goody, CyberCoders, Inc.*, 4:21-cv-04200-LLP; *GPAC LLP vs. Michael Linder, CyberCoders, Inc.*, 4:21-cv-04198-LLP; *GPAC LLP vs. Vicki L. Archer Goodwin, CyberCoders, Inc.*, 4:21-cv-04199-LLP.

As a condition of his employment with GPAC, Blake was required to sign an Account Executive Employment Agreement (hereinafter, "EA"). (*Id*.) Blake executed his EA on or about January 7, 2017. (*Id*.) The EA specifies that Blake was being employed at "the Company's Office" which is defined as being "located at 116 West 69th Street, Sioux Falls, South Dakota." (*See* Doc. 1-1, pages 12-22, Section 2.1.) Blake, however, lived in and worked for GPAC in Colorado. (Docs. 5, 16.) Blake's EA contained a forum selection clause providing that all actions or lawsuits related to the employment relationship must be commenced in South Dakota. (Doc. 1-1.) It also contained a choice-of-law provision designating South Dakota law as controlling the interpretation and enforcement of the EA and the relationship of the parties. (*Id*.) While Blake was employed at GPAC, he was primarily assigned to work with industries and candidates outside of the States of South Dakota and Colorado. (Docs. 5, 16.)

Blake resigned from GPAC on or about January 4, 2021. (Doc. 1-1.) At the time, Blake was a Colorado resident. (Doc. 16.) Blake worked for GPAC for roughly four years. While working at GPAC, Blake was assigned to focus his recruiting efforts on regions or areas of the United States outside of Colorado or South Dakota. (Doc. 5.)

In September of 2021, Blake accepted employment with CyberCoders. (Doc. 5.) Blake continues to reside in, and work from, Colorado. (Docs. 5, 16). CyberCoders is headquartered in California. (Doc. 5.) Blake's work activities at GPAC and CyberCoders both generally involved personnel recruiting and placement. (Docs. 1-1, 5, and 16.) Blake's recruiting activities at CyberCoders involves different industries, trades, and professions versus those he worked with while employed at GPAC. (Doc. 5, 16.) His work activities at CyberCoders also involves different geographic regions of the United States compared to his work activities at GPAC. (Docs. 5, 16.) CyberCoders also utilizes its own proprietary recruiting software platform called Cyrus in providing recruiting and personnel placement services to its customers. (Doc. 5.)

6

There are no allegations in the Complaint indicating that GPAC formally, or informally, attempted to contact Blake or CyberCoders prior to filing suit. The Complaint also does not factually set out what actions or omissions GPAC is alleging as the basis for its claims against Blake and CyberCoders. After suit was filed, GPAC demanded that CyberCoders terminate Blake's employment. (Doc. 5.) The pleadings do not reflect the legal or factual grounds GPAC relied on as the basis for this demand, if any. Fortunately, however, CyberCoders has refused to capitulate to GPAC's unreasonable demand.

## IV.    DISCUSSION.

Blake moves for judgment on the pleadings in his favor on all of the claims or Counts in GPAC's Complaint. GPAC's breach of contract claim should be rejected because Colorado law, and not South Dakota law, governs this dispute. Under Colorado law the EA is void or voidable. Colorado public policy so strongly disfavors non-compete provisions that employers potentially face misdemeanor criminal liability for threatening enforcement of an invalid noncompete. Colorado case law also prohibits employers from circumventing the statutory prohibition against noncompetes through contractual choice-of-law provisions. Alternatively, and even if South Dakota law applies, Blake is still entitled to entry of judgment in his favor on the pleadings on GPAC's breach of contract claim.

With the exception of the breach of contract claim, GPAC's remaining claims or Counts do not require a conflict of law analysis because South Dakota and Colorado substantive laws are the same. Blake is entitled to judgment on the pleadings regardless of whether South Dakota or Colorado law applies. Finally, although co-Defendant CyberCoders, Inc., is represented by separate counsel, and is not directly moving for judgment on the pleadings (at least at this time), the entry of judgment in favor of Blake necessarily requires the dismissal of GPAC's claims against CyberCoders.

7

**A.  Blake's EA is void and/or judgment should be entered in his favor on GPAC's breach of contract claim.**

In Count 1 of the Complaint, GPAC asserts a breach of contract claim against Blake.  (Doc. 1-1, ¶¶ 1-21.)  To determine what substantive law applies to Count 1, this Court applies South Dakota choice-of-law rules.  *See Omega Liner Co. v. Monte Vista Grp.*, LLC, 2019 WL 4415378, *5 (D.S.D. 2019) ("[A] federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law will apply.").  South Dakota has adopted the Restatement (Second) of Conflicts of Laws for its choice-of-law analysis.  *Id.* ("South Dakota applies the provisions of the Restatement (Second) of Conflicts of Laws in order to resolve questions about which state's laws govern in particular factual situations." (quoting *Dunes Hosp., L.L.C. v. Country Kitchen Int'l, Inc.*, 623 N.W.2d 484, 488 (S.D. 2001))).

For tort claims, the Restatement uses the "most significant relationship" test.  *See* Restatement (Second) of Conflicts, § 145.  Under this test, the Court considers the following factors: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Id.*  In this case, and based on the allegations within the pleadings, the Restatement factors lean in favor of an application of Colorado substantive law to the various tort claims (Counts 2 through 4.)  Admittedly, however, and as more fully discussed later in this Brief, the outcome of the tort claims is the same regardless of whether South Dakota or Colorado law is applied.  Consequently, a conflict of laws analysis is not strictly required on the tort claims in Counts 2 through 4 of the Complaint.

This Court is presented with the issue of whether South Dakota or Colorado substantive law should apply to GPAC's breach of contract claim.  Ideologically, however, there is no true

"conflict" because South Dakota and Colorado share the same public policy interests insofar as Count 1 is concerned. Both states generally disfavor noncompete clauses in employment contracts unless a statutory exception applies. The "conflict" arises because under Colorado law Blake's EA is void or voidable, which would not be the case under South Dakota law. This Court must therefore decide which state's substantive law is controlling. Between the two states, South Dakotas has adopted broader exceptions to its general prohibition on noncompetes. Colorado, in contrast, has taken a stronger stance against the use of noncompetes concerning work activities within its borders. Colorado law treats most noncompetes as being void *ab initio*. Colorado also imposes potential criminal penalties and fines on employers or individuals who engage in certain types of misconduct related to employee noncompetes.

In this case, the EA superficially provides that South Dakota law is controlling. Contractual choice-of-law clauses, however, are not unassailable. For contract claims, the Restatement will enforce a contract's choice-of-law clause, unless the chosen state: (1) "has no substantial relationship to the parties or the transaction;" or (2) the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest [in the dispute]." Restatement (Second) Conflicts of Laws, § 187(2). South Dakota admittedly has a relationship to the subject matter of the lawsuit, so the first exception or factor does not apply. The second exception or factor, however, applies in this case, and requires the application of Colorado substantive law to Count 1. This Court should disregard the EA's choice-of-law provision and hold that Colorado law applies to the breach of contract claims because Colorado has a materially greater interest in this dispute. Enforcement of the noncompete would be repugnant to Colorado fundamental public policy interests which treat such provisions as void or voidable and as potentially giving rise to criminal prosecution and fines.

The facts of this case are slightly different from the other two cases where former GPAC employees have moved for judgment on the pleadings under Colorado law. In this case Blake executed his EA in South Dakota, and was transferred to Colorado to oversee GPAC's satellite office. Although Blake did not execute the EA in Colorado, the same public policy considerations require that the EA's choice-of-law clause be disregarded. While the EA is not void, it would still be voidable and unenforceable under Colorado law.

In one of the leading Eighth Circuit Court of Appeals cases applying Restatement (Second) of Conflicts §187 to a noncompete agreement, *DCS Sanitation Mgmt., Inc. v. Castillo*, the panel affirmed a district court's application of Nebraska law despite the agreement's Ohio choice-of-law clause. 435 F.3d at 895-896 (8th Cir. 2006). Applying §187(2)(a), the trial court reasoned Nebraska had a "substantial relationship" with the parties and transaction because the employee executed the Agreement in Nebraska, worked in Nebraska, resided in Nebraska, the agreement would be enforced in Nebraska, and the employer (through its employees) did business in Nebraska. *Id*. at 896. The only relationship to the agreement's chosen forum, Ohio, was that the employer's corporate headquarters and principal place of business was in Ohio. Under these facts, the trial court concluded Nebraska had a materially greater interest in the agreement. *Id*.

Applying and following §187(2)(b), the Eighth Circuit analyzed each respective jurisdiction's approaches to noncompete agreements. *Id*. at 897. In Nebraska, courts will not rewrite or reform an overly broad noncompete agreement to render it enforceable. *Id*. Ohio courts, on the other hand, possess discretion to reform overly broad or unreasonable noncompete agreements to render them enforceable. *Id*. The Eighth Circuit concluded that because the jurisdictions had "materially different approaches" to noncompete agreements, application of Ohio law would violate fundamental policy of the employee's home-state, Nebraska. *Id*. Because Nebraska had a greater material interest in the agreement, and the application of Ohio law violated

10

fundamental policy of Nebraska, the Eighth Circuit affirmed the district court's decision to disregard the contractual choice-of-law clause and instead apply Nebraska law. *Id*.

The *Castillo* case supports applying Colorado substantive law to Count 1 of the Complaint. Based on *Castillo*, and consistent with Restatement (Second) of Conflicts § 187, the Court should disregard the EA's South Dakota choice-of-law clause and instead apply Colorado substantive law. As established in the pleadings, Blake was at all times material to this action a resident of Colorado. Blake worked in GPAC's Colorado satellite office. After GPAC shuttered the office, Blake and other GPAC employees continued working from their homes, all in Colorado. Blake continues to live in Colorado. He currently works for CyberCoders from his home which, again, is in Colorado. Blake was also, at all times material to this case, not acting as a supervisor or manager. He was instead providing general services that are not exempt from Colorado's prohibition against noncompetes. Although GPAC is headquartered in South Dakotas, it does not allege that Blake had any customers or clients in South Dakota, either while working at GPAC or while presently working at CyberCoders.

The public policy considerations overwhelmingly favor invalidation of the EA's choice of law clause and an application of Colorado substantive law to Count 1 of the Complaint. Colorado has a "substantial interest in invalidating covenants not to compete signed within [its] borders." *Dresser Industries, Inc. v. Sandvick*, 732 F.2d 783, 786 (10th Cir. 1984) (citing Colo. Rev. Stat. § 8-2-113(2)); *see also Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007) ("The core policy underlying the unenforceability of noncompetition provisions is a prohibition on the restraint of trade or [...] the right to make a living. In order to make a living, the former employee needs to be free to solicit (actively or passively) former customers, as long as he or she does not use the employer's trade secrets to do so."). As a general matter, "[a]greements not to compete, with

11

some narrow exceptions, are contrary to the public policy of Colorado." *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011).

Colorado Revised Statute, § 8-2-113, "Unlawful to intimidate worker—agreement not to compete," provides in relevant part:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
> (a) any contract for the purchase and sale of a business or the assets of a business;
> (b) protection of trade secrets;
> (c) providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;
> (d) Executive management personnel and officers and employees who constitute professional staff to executive and management personnel.

Colo. Rev. Stat. § 8-2-113(2). This section "clearly declares that covenants not to compete are void," subject to the four identified exceptions. *Dresser Industries*, 732 F.2d at 787-88. Colorado's public policy against non-competes is so strong that its Legislature has made it "unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit." *See* Colo. Rev. Stat. § 8-2-113(4) (as of March 1, 2022); *see also* Colo. Rev. Stat. § 8-2-115 (prior to March 1, 2022).

Colorado's statutory prohibition against noncompetes does not recognize an exception allowing employers to simply have employees sign their agreements across state lines. Nor do the apposite statutes allow employers to circumvent the law through a choice-of-law clause. Colorado would treat the noncompete as void or voidable, and this Court should do the same.

The pleadings also do not reflect that any of the exceptions under Colo. Rev. Stat. § 8-2-113(2) would apply to Blake (or to any of the other Colorado Defendants). Blake is not alleged to have occupied a management position at GPAC at the time of his resignation, nor was he employed as professional staff to executive or management personnel. GPAC can't in good faith argue to the contrary. Although GPAC might try to argue that the EA falls under the exception for the

"protection of trade secrets," that would not resurrect the noncompete provision and make it enforceable. The argument would also be inconsistent with the tone and content of the EA as a whole, and the allegations being made in the lawsuit. The allegations in the Complaint are hardly nuanced. The obvious and primary purpose of the EA was to prevent Blake from working anywhere in the United States as a recruiter for two years after leaving GPAC, even though Colorado strictly prohibited such efforts by an employer through a contractual agreement.

The defects in the EA are too substantial to overcome, and Colorado law would not support enforcement of only certain provisions through judicial reformation. Although Colo. Rev. Stat. § 8-2-113(2)(b) provides a trade secret exception to the statutory prohibition on noncompete agreements, under Colorado law any such limitations must still be reasonable and narrowly drafted in order to be enforceable. *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011). Under Colorado law, trial court judges generally have the discretion to reform or blue pencil a noncompete agreement that is overly broad and unenforceable. *See In National Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984). But, as the Colorado Court of Appeals explained in *23 LTD v. Herman*, 457 P.3d 754, 759 (Colo. App. 2019), "[i]t is not the function of a court to write or rewrite contracts for parties to enable enforcement of a contract that, as written, violates the public policy of the state." When an employer enters into a contract that is contrary to Colorado public policy, courts may treat the agreement as invalid in its entirety. *See id.* Consistent with Colorado law, Blake's EA should be declared void or voidable, invalid, and unenforceable in its entirety. The Court should not do GPAC the extraordinary and undeserved favor of rewriting its EA.

In addition to shared public policy generally disfavoring non-competes in employment contracts, courts in Colorado and South Dakota have both refused to allow a party to use contractual choice-of-law provisions to circumvent local statutes designed to protect the public. In the recent

case of *LS3 Inc. v. Cherokee Federal Solutions, L.L.C.*, 2021 WL 4459053 (D. Colo 2021), Chief United States District Judge Philip A. Brimmer, was presented with a choice of law issue similar to that which is currently before this Court. The *LS3 Inc.* case involved claims for breach of contract and tortious interference related to an employment agreement that contained noncompete language. *Id.* The defendants moved for dismissal under Rule 12(b)(6) arguing that the non-compete clauses in their employment contracts were void under Colorado law. *Id.* The plaintiffs argued that the noncompete clauses were valid because the defendants' contracts provided that they were governed by Maryland law. *Id.* Judge Brimmer rejected the argument, however, and ruled that Colorado substantive law applied, rendering the noncompete provisions void. *Id*. Judge Brimmer further ruled that the non-solicitation provisions of the defendants' employment agreements were void as contrary to Colorado public policy. *Id.*

This Court should please follow and apply Judge Brimmer's decision in the *LS3 Inc.* case and rule that Blake's EA is void and unenforceable. This Court should also specifically rule that GPAC can't circumvent or avoid Colorado substantive law through a contractual choice of law provision, especially in matters of significant local concern involving the relationship between employers and their employees.

GPAC will likely resist dismissal of its breach of contract claim by arguing that this Court's focus should be on South Dakota public policy, rather than the public policy interests of Colorado, as part of the choice of law analysis. Blake makes this prediction because that is the primary argument GPAC advanced in resisting dismissal in *GPAC, LLP v. Charles Hall and Maxim Healthcare Staffing*, 4:21-cv-04185-LLP. Charles Hall moved for dismissal of GPAC's breach of contract claim on the grounds that her employment agreement was void under Washington law. *Id*. GPAC argued that Restatement (Second) Conflicts of Laws, § 187(2) does not apply, and should not be applied by this Court, in deciding the substantive law applying to the breach of contract

14

claim. In spite of GPAC's distorted views on, and biased pronouncements regarding, South Dakota law, the South Dakota Supreme Court has referred to and relied upon the Restatement (Second) of Conflicts in deciding conflict or choice of law issues. Moreover, and more importantly, the South Dakota Supreme Court has never held or suggested that the Restatement's approach was unsound or contrary to South Dakota law.

An application of Colorado law in this case, if anything, is consistent with and in furtherance of established South Dakota public policy. An application of Colorado law sends a message to GPAC that it must comply with the local laws in those states where it establishes offices, does business, and maintains employees. It also reinforces the already established principle in South Dakota that an out-of-state business or can't avoid having to comply with our local laws designed to protect its citizens through contractual choice of law provisions.

This principle of fundamental South Dakota public policy can be seen in action in the case of *State ex rel. Meierhenry v. Spiegel, Inc.*, 277 N.W.2d 298 (1979). The *Spiegel* case was brought by the South Dakota Attorney General against Spiegel, an out of state catalog retailer, to recover usurious interest that the company had charged to, and collected from, its South Dakota customers under revolving credit agreement. *Id*. The credit agreements that were signed by Spiegel's South Dakota customers contained a choice of law clause dictating that the accounts were governed by Illinois law. *Id*. The interest rate Spiegel was charging its South Dakota customers was valid under Illinois law, but illegally excessive under South Dakota law. *Id*.

In *Spiegel* the South Dakota Supreme Court ruled that South Dakota, not Illinois law, determined the maximum rate of interest chargeable under the revolving account agreements. The Supreme Court's decision, however, was not an example of protectionist, outcome determinative, decision making. Instead, it embodied the fundamental public policy principle "[…] which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the

15

public good." *State ex rel. Meierhenry*, 277 N.W.2d at 300. The test is "the evil tendency of the contract, and not its actual injury to the public in a particular instance […] The law looks to the general tendency of such agreements, and it closes the doors to temptations by refusing them recognition in any of its courts." *Schurr v. Weaver*, 74 S.D. 378, 483, 53 N.W.2d 290, 293 (1952).

In *State ex rel. Meierhenry* the South Dakota Supreme Court refused to validate a contract that was void under the law of the state with the most significant relationship. In that case, South Dakota had the most significant relationship and its local law applied. An application of Colorado law to Count 1 of the complaint is consistent with, if not compelled by *State ex rel. Meierhenry*. Colorado law prohibits GPAC from using contractual choice of law provisions to enter into otherwise void and illegal contracts. An application of Colorado law furthers, and is consistent with, strong and swell-settled principles of South Dakota public policy involving the interpretation and application of contractual choice of law provisions. Moreover, and consistent with *Schurr*, applying Colorado law promotes South Dakota public policy by discouraging GPAC and other local companies from trying to use South Dakota law as a shield to violate the local laws of other states, especially in employment-related matters where the economic and societal impacts will uniquely be felt in those other localities. For all of the foregoing reasons, this Court should please apply Colorado law to Blake's EA, rule that the noncompete clause and other provisions are void or voidable, unenforceable, and not subject to reformation under Colorado law and the equities of this case, and enter judgment on the pleadings in favor of Blake.

Under Colorado law, Blake's non-compete is void or voidable. Beyond that, his EA is otherwise unenforceable as overly broad, and the Court should decline to reform or rewrite the contract. The outcome of this case, and the effect of this Court's ruling concerning the validity and enforceability of the noncompete, will uniquely if not exclusively have an impact in Colorado. If Blake is unable to secure employment and support himself and her family, they will have to rely on

public aid and assistance provided by and through the State of Colorado. Allowing GPAC to avoid having to comply with Colorado law prohibiting noncompetes is also unfair to those employers (including employers who are headquartered outside of Colorado) who comply with Colorado law. GPAC should not be given the upper hand, especially when it gains this unfair and ineuitable advantage. Colorado has the biggest stake in the outcome of this case from a societal public policy vantage point.

The presence of CyberCoders as a defendant in this lawsuit also weighs in favor of applying Colorado law. CyberCoders is not a party to the EA, and not bound by its choice-of-law clause (assuming the clause is enforceable). The claims against CyberCoders arise in tort, not contract. Under the Restatement, Colorado law would arguably apply to GPAC's claims against CyberCoders. Judicial economy is promoted by applying Colorado law to the claims or Counts in the Complaint.

An application of Colorado law is also something that GPAC should have expected when it transferred Blake to work and reside in Colorado. GPAC voluntarily chose to open a satellite office in Colorado. It also chose to have Blake, and other employees, work from home after closing the satellite office. GPAC continues to have employees working for the company from their homes in Colorado. The price of opening and office and having employees in Colorado includes the fact that GPAC must follow Colorado law. GPAC can't avoid Colorado law by transferring employees to work there from other states, not is it exempt by virtue of contractual choice-of-law provisions in its compulsory employment agreements. The same is expected, however, of a Colorado company that choses to open an office of have employees within South Dakota. A Colorado marijuana retailer could not open a recreational dispensary in South Dakota by claiming that the venture is legitimate under Colorado law. Nor could that same business avoid having to pay the South Dakota minimum wage, pay reemployment assistance premiums, or have worker's compensation insurance in place

through a choice-of-law clause in its written employment agreements.  Nor could a Colorado

company open a South Dakota store or location and avoid having to pay our State's minimum wage

by transferring employees to work here who may earn less in other states, or even working in

foreign countries.

Alternatively, and assuming for sake of argument only that this Court decides to apply South

Dakota law to GPAC's breach of contract claim, the allegations within the Complaint still do not

state a plausible claim for breach of contract based on Blake's EA.  The EA is attached as an

Exhibit to the Complaint.  (*See* Doc. 1-1, pages 12-22.)  South Dakota law prohibits enforcement of

noncompete agreements against former employees unless the terms of that strictly meet the

requirements of SDCL § 53-9-11.  Section 53-9-11 allows enforcement of non-compete agreements

only as follows:

> An employee may agree with an employer […] not to engage directly or
> indirectly in the same business or profession as that of his employer for any
> period not exceeding two years from the date of termination of the agreement
> […] within a specified county, city, or other specified area for any period not
> exceeding two years from the date of termination of the agreement, if the
> employer continues to carry on a like business.

SDCL § 53-9-11.

The South Dakota Supreme Court has cautioned that Section 53-9-11 must be "construed

narrowly so as to promote the [general statutory] prohibition […] against contracts in restraint of

trade."  *Central Monitoring Serv., Inc. v. Zalinski*, 553 N.W.2d 513, 518 (S.D. 1996).  Important

here, employers must also show that they have a legitimate interest in being protected against unfair

competition by their former employees.  *Id*. at 516 n.7.  The key, however, is *unfair* competition.

Ordinary competition is inherent, and essential, to our free-market economy.  Employers can't use

noncompetes to obtain an unfair and unreasonable advantage in our competitive marketplace.

The EA, as written, is not enforceable under South Dakota law for several reasons.  First, the Complaint fails to allege facts reflecting, or even suggesting or implying, a violation of Section 8 of the EA, involving nondisclosure of protected information.  This aspect of GPAC's breach of contract claim dovetails with the separate trade secrets claim, which is addressed in greater detail later in this Brief.  Second, the language of Section 9, prohibiting customer solicitation, is too broad and vague to enforce.  Section 9 purports to prevent Blake from accepting business from GPAC clients, even where no solicitation has occurred.  That goes too far under South Dakota law.  *See Miller v. Honkamp Krueger Fin. Servs.*, 9 F.4th 1011 (8th Cir. 2021).  The EA also provides an absurd definition for who constitutes a "client."  According to the EA, GPAC's clients include those companies who it has merely contacted or attempted to do business with in the past, but who declined to do business.  Logically, grammatically, and consistent with common usage and understanding of the English language, companies who refuse or decline to do business with GPAC are not "clients."  They are the exact opposite.  Moreover, the EA is not limited to clients or customers who Blake worked with while employed at GPAC.  The EA improperly seeks to prohibit contact with any client or customer of each and every GPAC employee without any appreciable time limitation.  It also prohibits Blake from working with GPAC customers and clients who seek him out and initiate the contact, contrary to South Dakota law.  The EA improperly seeks to prohibit Blake from doing business or performing services for everyone and anyone.  Including companies that superficially decline, if not adamantly refuse, to do business with GPAC.[4]

The scope of the EA could not be more expansive, and it is clearly inconsistent with the requirements of South Dakota law.  In addition, and as evidenced in filings in the collection lawsuits that GPAC has filed against its former customers in South Dakota Circuit Court, GPAC's standard

---

[4] Those companies would likely now include some of the thirty-three former customers that GPAC has sued since January 1, 2021, in South Dakota Circuit Court.

form placement or recruiting contract does not establish an exclusive relationship. An employer who contracts with GPAC is not prevented, expressly or otherwise, from entering into the same general type of contract with dozens of other recruiting agencies. The restrictions GPAC imposes on its former employees are inconsistent with the usages, standards, and realities in the recruiting and personnel placement industry. The restrictions also are inconsistent with the contracts GPAC requires with its customers and clients, all of whom are free to contact with other recruiting and placement agencies. In addition, and perhaps most importantly, GPAC itself is free to provide its services to the direct competitors of its own clients and customers. When Blake's EA is examined with reference to the form contracts GPAC requires of its own customers, and standard industry customs and practices, it becomes clear that GPAC's intent through Blake's EA was to artificially restrict and prevent him from working and to indirectly suppress healthy economic competition within the industry.

Third, the language of Section 10, restrictive covenants, does not support GPAC's contention that Blake is prohibited from performing or providing recruiting services anywhere within the United States. Section 10 superficially imposes a 200-mile, two year long, zone of prohibition in which Blake is allegedly unable to provide recruiting or personnel placement services. It is a mystery, however, how GPAC is able to draw those circles to essentially cover the entire United States. If you were to take a map of the United States and sit down with a pencil and protractor, the information within the EA and Complaint would not allow you to determine the geographic areas where Blake can, or cannot, provide services. No matter how you look at Section 10, the provision is unreasonable and invalid. If the scope truly involves and covers the entire United States, then language fails because there is no geographic limitation. GPAC is advancing inherently conflicting interpretations of the geographic scope of the EA. On one hand, GPAC represents that the EA prohibits Blake from providing recruiting services anywhere in the United

States.  At the same time, they claim the restrictions are limited to defined geographic areas.  This only seems to confirm that the EA is too broad and vague to be enforced.

The Court should also refuse to reform and rewrite the EA to make it enforceable.  That is because the EA, and GPAC's interpretation of the agreement, are excessive to the point of being absurd.  GPAC takes the position that Blake, and all of its employees, are subject to 200-mile zones of prohibition surrounding the Sioux Falls office, around all of its remote offices (but without specifying where those offices were located at the time the EA was executed), and also around the residential homes of every single GPAC employee (but, again, without specifying where every employee resided at the time the EA was executed).  In Blake's case, GPAC contends that he can't work within 200 miles of the main office, every satellite office, and the residential home of each and every GPAC employee.

GPAC's position, and interpretation, are inconsistent with the plain language of the EA.  The Court should refuse to enforce Section 10 of the EA under South Dakota law because the provisions are overly broad, unreasonable, and fail to meet the strict requirements of the applicable statutes.  There is no way to resurrect the EA without completely rewriting the entire agreement.  But even in that case rewriting the agreement would require the Court to recognize the impact of Colorado law and its statutory prohibition and potential criminal penalties generally prohibiting employment noncompete agreements.

If the Court applies the EA as written, it should be construed narrowly based on the plain, express language.  Even then, Blake would still be entitled to judgment on the pleadings under South Dakota law.  The EA, which was drafted by GPAC, specifies in Section 2.1 that Blake worked "[…] at the Company's Office."  No mention is made of a "remote office" or Blake's "home."  The EA also does not state Blake was providing managerial or executive services to the

business.  On the contrary, and as alleged in the Complaint, Blake was an ordinary recruiter, a rank-and-file employee.

Section 2.1 is extremely significant because based on the plain language of the EA it determines the geographic scope of Section 10.  The 200-mile zone of prohibition is determined based on the stated location where Blake worked for GPAC.  The term "Office" is defined as GPAC's headquarters located at 116 West 69th Street in Sioux Falls, South Dakota.  The 200-mile zone of prohibition in Section 10 is determined with reference to "the Office, any Remote Office, or any Home."  The use of the word "or" suggests that only one of the three locations is applied in determine the geographic scope of Blake's noncompete.  GPAC, again, specified in Blake's EA that he worked "[…] at the Company's Office."  Section 2.1 can't be viewed as a mistake.  Regardless, GPAC can't benefit from an alleged mistake at Blake's expense.  The Court should treat Section 2.1 as a clear designation and calculated decision by GPAC to limit Blake's 200-mile zone of prohibition to extend around only its Sioux Falls, South Dakota headquarters.  GPAC can't complain about the contract terms that it created.  Nor should GPAC be allowed to pursue enforcement of a version of the EA that it wishes it had forced on Blake.

If the Court construes the EA according to its plan language, as required under South Dakota law, Blake is entitled to judgment in his favor.  That is because the Complaint does not allege that Blake engaged in recruiting services or activities within 200 miles of Sioux Falls, South Dakota.  The Court can judicially notice that Colorado's closest border is roughly 320 miles away from Sioux Falls.  The pleadings also reflect that CyberCoders is headquartered in California.  Therefore, even under South Dakota law, GPAC's claim that Blake violated Section 10 of the EA clearly fails and he is entitled to judgment in his favor.

Finally, the language in Section 10 of the EA, prohibiting Blake from inducting other GPAC employees to violate their employment contracts, is not actionable in the absence of factual

22

allegations that Blake, in fact, engaged in actions or omissions that violated this provision.  The

Complaint does not allege any facts even suggesting a violation of Section 10 of the EA.  It is

obviously not enough for GPAC to merely accuse Blake of violating Section 10.  Surviving a Rule

12(c) motion for judgment on the pleadings requires more than labels and conclusions and finger

pointing.  GPAC does not allege facts that would support a conclusion that Blake violated Section

10 of the EA.  As a consequence, the allegation does not survive Rule 12(c) dismissal.

In summary, Colorado substantive law should be applied to Count 1 and the Court should

declare the EA void and enter judgment in Blake's favor on GPAC's breach of contract claim.

Even under South Dakota law, however, Count 1 fails and judgment should be entered in favor of

Blake.

### B.     GPAC does not allege facts sufficient to state a plausible claim against Blake for misappropriation of trade secrets.

In Count 2 of the Complaint, GPAC asserts a claim for misappropriation of trade secrets

against both of the Defendants.  (Doc. 1-1, ¶¶ 22-27.)  The Complaint references SDCL Chapter

37-29 (South Dakota's version of the Uniform Trade Secrets Act) as the legal basis for Count 2.

(Doc. 1-1, ¶ 25.)  Colorado, like South Dakota, has also adopted the Uniform Trade Secrets Act

(UTSA).  *See* C.R.S. § 7-74-101, *et seq*.  Although the EA is not specifically mentioned in Count

2, the documents contain provisions referencing "propriety information," which is defined to

include "trade secrets."  (*See* Doc. 1-1, pages 12-22.)  Blake's EA also references, and purports

to provide notices pursuant to, the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

1833, *et seq*.

Superficially, the Court is presented with a potential choice of law issue to determine

whether Count 2 arises under South Dakota law, Colorado law, of the federal DTSA.  In

substance, however, there is no conflict.  The Court does not need to decide whether Count 2 of

GPAC's Complaint arises under South Dakota law, Colorado law, or the DTSA, because regardless of the substantive law that is applied Blake is entitled to judgment on the pleadings. Except for minor differences, none of which are triggered by the allegations in GPAC's Complaint, the elements under the UTSA and DTSA are essentially the same. *See, e.g., Sterling Computers Corp. v. Haskell*, No. 4:17-CV-04073-KES, 2018 WL 671210, at *2 (D.S.D. Feb. 1, 2018) (applying same legal standard to SD trade secret claims and federal DTSA claims in deciding a motion to dismiss); *Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz*, 2013 WL 212640, at *9 (D. Colo. Jan. 18, 2013) (granting motion to dismiss Colorado Uniform Trade Secret Act, which has similar pleading requirements as the DTSA) (*quoting Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011) (same)); *see also Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Group*, 2017 WL 1105648, at *7 (E.D. Pa. March 24, 2017) (noting that Congress explicitly expressed its intent to model the DTSA after the UTSA, including its damages provisions); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 2017 WL 1026025, at *5 (W.D. Wis. March 15, 2017) (stating that courts may look to UTSA in interpreting DTSA); *Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) (noting that courts had employed UTSA case law in analyzing DTSA claims because of significant overlap in the statutory schemes).

Either under the DTSA, or UTSA, a plausible trade secrets requires factual allegations from the aggrieved party (1) that it possessed an actual trade secret; (2) that the defendant misappropriated the trade secret; and (3) that it suffered damages because of the misappropriation. *See, e.g.*, *Sterling Computers Corp,* 2018 WL 671210; *Fedders Corp.v. Haier Am. Trading, LLC*, 2002 WL 519733, at *5 (S.D.N.Y. April 4, 2002) (applying Illinois law) (damages is essential element of a trade secret claim); *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F.Supp.2d 1319, 1335-36 (S.D. Fla. 2006), *aff.d*, 294 F. App'x 501 (11th Cir.

24

2008) (citations omitted) (applying provision of Florida's UTSA identical to South Dakota's and holding that damages are an essential element, and stating its holding was "consistent with decisions of other courts interpreting sister states' codifications of UTSA" including California, Connecticut, and Minnesota).

In order for Count 2 to withstand summary adjudication under Rule 12(c), GPAC's Complaint must set forth factual allegations on each essential element of its trade secrets claim. GPAC's Complaint, however, comes nowhere close. Paragraphs 23 through 27 set forth nothing more than vague and conclusory allegations of trade secret violations that essentially parrot the general legal elements for the cause of action. These allegations are exactly the type which the United States Supreme Court explained in *Ashcroft v. Iqbal* were patently insufficient to withstand summary adjudication or dismissal. 556 U.S. 662, 678 (2009). Perhaps the most memorable, and amusing, allegation under Count 2 is in Paragraph 23, where GPAC alleges that its "confidential information is highly confidential." GPAC is stacking conclusions on top of other conclusions. The allegation in Paragraph 23 is absurdly, almost comically, superficial and vague.

In order to survive a motion for judgment on the pleadings, a party asserting a claim for misappropriation of trade secrets is required describe the subject of the trade secret with enough detail to determine if it is truly different from matters of general or specialized knowledge of people skilled in the trade. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998); *see also Fox Sports Net North, LLC v. Minnesota Twins P'Ship*, 319 F.3d 329, 335 (8th Cir. 2003) ("[i]n a suit for misappropriation of trade secrets, the plaintiff must specify what information it seeks to protect"); *ECT Intern., Inc. v. Zwerlein*, 597 N.W.2d 479, 482-83 (Wis. Ct. App. 1999) (collecting cases); *Weins v. Sporleder*, 1997 SD 111, ¶ 18, 569 N.W.2d 16, 20 (noting that plaintiff had failed to provide a clear definition of trade secret). For example, in

25

*Medafor, Inc. v. Starch Med., Inc*, the description "business methodologies, formulas, devices, and compilations of information, including suppliers and customers" was insufficient to survive a motion to dismiss. 2009 WL 2163580, at *1 (D. Minn. July 16, 2009) (emphasis added). Likewise, in *Kuryakyn Holdings, LLC*, the description "contact information for 'customers and purchasers of motorcycle parts and accessories'" was insufficient to identify a trade secret. 2017 WL 1026025, at *5. In addition, a party must also explain how the alleged misappropriator took or is "using" the trade secret. *See, Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F.Supp.2d 1369, 1377 (M.D. Fla. 2008) (dismissing claim because plaintiffs simply alleged that defendants were using or disclosing trade secrets without further detail).

Conclusory allegations of "trade secrets" consisting of only undescribed "information regarding potential and actual […] customers and vendors" or conclusory claims of "information regarding [plaintiff's] processes and technology," are insufficient to state a claim upon relief can be granted. *Hauschild GMBH & CO. KG v. FlackTek, Inc.*, 2022 WL 392501, at *9 (D. Colo. Feb. 9, 2022). Instead, a plaintiff must offer descriptive information concerning the sort of information that was allegedly misappropriated. *Id.* At the pleadings stage, a plaintiff "alleging misappropriation of a trade secret" must plausibly allege "'the specific types of confidential information […] with sufficient particularity to identify the existence of its claimed trade secrets.'" *Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz*, 2013 WL 212640, at *9 (D. Colo. Jan. 18, 2013) (granting motion to dismiss Colorado Uniform Trade Secret Act, which has similar pleading requirements as the DTSA) (*quoting Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011) (same)); *see also Animal Care Sys., Inc. v. Hydropac/Lab Prod., Inc.*, 2015 WL 1469513, at *5 (D. Colo. Mar. 26, 2015) (on motion to dismiss, plaintiff "must explain, with sufficient particularity, the information allegedly misappropriated that constitutes a cognizable trade secret; otherwise, [defendant] cannot adequately prepare its defense.").

26

The vague and conclusory allegations in GPAC's Complaint are similar to those involved in *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F.Supp.3d 1163 (D. Colo. 2018).  In the *Remax* case, the trial court dismissed a trade secret misappropriation claim that "lack[ed] any specific factual allegations of disclosure of trade secrets […] and also lack[ed] any specific factual allegations of how" the defendant had allegedly used those trade secrets.  *Id*. at 1175.  According to the trial court, the plaintiff's complaint had "simply allege[d] in conclusory fashion" the defendant had "used ... confidential information (including … trade secrets) to launch its operations."  *Id*. at 1176.  The trial court rules that such allegations were insufficient to state a claim of trade secret misappropriation.  *Id*.

Consistent with, but prior to, the ruling in the *Remax* case, the trial court in *Ciena Commc'ns, Inc. v. Nachazel,* 2010 WL 3489915 (D. Colo. Aug. 31, 2010), ruled that an allegation the defendant had misappropriated, or threatened to misappropriate, trade secrets "for the purpose of using and exploiting such information" was improperly conclusory and failed to provide a sufficient factual basis to withstand dismissal Rule 12(b)(6).  *Id*. at *4.  The trial court dismissed the plaintiff's trade secrets claim because the complaint "[did] not explain what specific facts [had] led [the plaintiff] to the conclusion that [the defendant] ha[d] misappropriated or threaten[ed] to misappropriate the trade secrets."  *Id*.

Extensive research only turned up one case involving a claim under South Dakota's version of the UTSA and federal DTSA where dismissal was sought under Rule 12(b)(6) or Rule 12(c), and that case is *Sterling Computers Corp. v. Haskell*, 2018 WL 671210 (D.S.D. Feb. 1, 2018).  *Sterling Computers* is apposite in the sense that it provides a benchmark or standard in evaluating whether the allegations within GPAC's Complaint are sufficient to survive a motion to dismiss or for judgment on the pleadings.  It provides a reference point or point of comparison with the *Remax* and *Ciena Communications* cases cited previously.

27

The outcome in *Sterling* is, overall, consistent with the Colorado decisions in the *Ciena Communications* and *Remax* cases. *Sterling,* however, shows us what type of allegations are required in order for a trade secrets claim to overcome a Rule 12(b)(6) or Rule 12(c) motion. The complaint in *Sterling Computers* is nowhere comparable to GPAC's Complaint in this case. *See Sterling Computers Corporation v. Haskell,* 4:17-cv-04073-KES. The complaint in *Sterling Computers* was verified, or signed under oath, was twenty pages in length, and contained eighty-eight separately numbered paragraphs. *Id.* Several exhibits also accompanied the complaint. *Id*. Unlike GPAC's Complaint, the complaint in *Sterling* tells a story. *Id.* A person (even a lay person) reading the complaint in *Sterling* would have a basic understanding of the factual basis for the plaintiff's various claims and requests for relief.

GPAC's Complaint against Blake contains few, if any, actual factual allegations. It consists only of empty labels, conclusions, accusations, and parroting of the basic legal elements for the various claims. The Complaint in this case is identical in substance to the complaints that GPAC has filed against sixteen other former employees since January 1, 2021. Other than a few name and date changes, it is impossible to differentiate the complaints. A person reading these complaints would have no idea of what allegedly happened or what the various defendants allegedly did wrong. The use of a standardized form or template by GPAC suggests a fundamental lack of due diligence in investigating whether a genuine factual basis existed for the claims in the complaint before litigation was commenced. *See Pessini v. Nationstar Mortg. LLC*, No. 117CV01058SCJWEJ, 2017 WL 2197136, at *4 (N.D. Ga. Apr. 25, 2017*), report and recommendation adopted*, No. 1:17-CV-1058-SCJ, 2017 WL 2180696 (N.D. Ga. May 18, 2017) (commenting that a party's use of the same boilerplate complaint as many other litigants suggests that her claims were not brought in good faith); *see E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 676 (8th Cir. 2012) (noting that the Equal Employment Opportunity Commission "did

not investigate the specific allegations of any of the 67 allegedly aggrieved persons [, i.e., the class members,] until after the Complaint was filed." and was "us[ing] discovery in the resulting lawsuit as a fishing expedition to uncover more violations.").

The Complaint in this action, and in the other lawsuits, contain very few, if any, factual allegations. Instead, the lawsuits seem to reflect a concerted effort on the part of GPAC to quickly manufacture, file, and serve, a large number of lawsuits within a short period of time. It is like GPAC was lashing out angrily at anyone who quit and went to work for CyberCoders or other recruiting agencies. GPAC's actions and activities appear to have been more for show than a genuine effort to protects its rights through the litigation process. Logically, the facts of each case would have to be different. But you'd never know that from reviewing the complaints in the various cases. Reviewing the complaints only leads to the conclusion that GPAC is making unfounded and unsupported conclusory allegations of misconduct to threaten and harass former employees and their new employers.

The Court has been treated to a spectacle of litigation on the part of GPAC. GPAC sued seventeen former employees within a short period of time to send a misguided message, and to grab the attention of the industry and its former and current employees. GPAC's actions, like its lawsuits, are all show and no substance. This lawsuit, and the other nearly identical lawsuits, are artificial, abusive, and devoid of real factual support. This Court should not allow GPAC to use our state and federal courts to threaten, intimidate, and harass its former employees and their current employers.

Evidence of GPAC's improper motives comes from the volume of lawsuits filed, the use of boilerplate form complaints lacking supporting factual averments and allegations, and also from the practical fact that GPAC's complaints were accompanied by separate motions for immediate preliminary injunctions, but there has been no sense, or even suggestion, of urgency

as it involves the request for injunctive relief.  In addition, in this case and in several others GPAC has not insisted on a protective order to protect the alleged trade secrets or propriety information.  Further evidence of GPAC's improper motives can be inferred from its inactions or omissions after the deficiencies in the complaints was raised in the other lawsuits.  Many of the former employees and their new employers have filed briefs seeking dismissal or resisting preliminary injunctive relief, and have pointed out that the complaints are identical in substance, set forth formulaic and conclusory recitations, and lack factual allegations and averments sufficient to survive dismissal or judgment on the pleadings.  GPAC has long been aware of the significant deficiencies in the complaints that it has filed.  GPAC, however, has never attempted to amend the complaints to add the missing, and necessary, factual allegations to state plausible claims for relief.  The fact GPAC has not taken this logical, and reasonable step, suggests that it has no facts to add, and no facts supporting its claims against Blake, or any of the other parties it has sued.

The defects in the complaints are significant and obvious.  GPAC may try to argue, as it did in resisting dismissal in the separate lawsuit involving Charles Hall (which has been settled and dismissed), that its alleged trade secrets are too special to be dismissed or explained in the complaint without giving away the competitive benefits that they provide.  GPAC's subjective and unreasonably inflated sense of self-importance, however, does not trump the Federal Rules of Civil Procedure and well-settled case law interpreting and applying Rule 12(b)(6) and Rule 12(c).  Nothing in the Federal Rules of Civil Procedure mentions an exception for GPAC.

There is no comparison between the *Sterling* complaint and the Complaint that GPAC filed in this case.  GPAC's Complaint in this case (and in all the lawsuits it has recently filed against former employees and their new employers) stands on the same shaky ground as the

30

complaints in the *Remax* and *Ciena Communications* cases. Consistent with those decisions, and the other cases cited above, the Court should enter judgment in favor of Blake on Count 2.

### C.     GPAC does not assert a claim for tortious interference against Blake.

In Count 3 of the Complaint, GPAC asserts a claim for tortious interference against CyberCoders. (Doc. 1-1, ¶ 28-33.) Because there is no claim directly against Blake as it involves Count 3, the Court need not consider or address this claim for purposes of the pending Motion.

### D.     GPAC's "unfair competition" claim merely duplicates its' other claims or Counts, and should be summarily dismissed.

In Count 4 of the Complaint, GPAC asserts a claim for "unfair competition" against both of the Defendants. (Doc. 1-1, ¶ 34-37.) In support of Count 4, GPAC alleges only that Blake's "employment or service relationship with [CyberCoders] in violation of the Agreement constitutes unfair competition." (Doc. 1-1, ¶ 35.) As with Count 2, there is no conflict or choice of law issue to resolve in considering Blake's entitlement to judgment on the pleadings concerning GPAC's "unfair competition" claim. Neither Colorado, nor South Dakota, recognizes a separate, and independent, cause of action for "unfair competition" as alleged in the Complaint. Instead, "unfair competition" is more of a label used to generally describe more specific claims or causes of action. *See Venture Commc'ns Coop., Inc. v. James Valley Coop. Tel. Co.*, 492 F.Supp.3d 946, 964 (D.S.D. 2020) (granting motion to dismiss a claim for "unfair competition" as "coterminous with and subsumed within the tortious interference with business expectancy claim; there is no separate unfair competition claim."); *Digital Satellite Connections, LLC v. Dish Network Corp.*, 2014 WL 5335807, at *5 (D. Colo. Oct. 20, 2014) (analyzing counterclaim for trademark infringement and unfair competition as being one in the same). The dismissal or summary adjudication of the more specific claims against Blake in the Complaint necessarily eliminates GPAC's more generalized claim for "unfair competition." *See id.*

### E. There is no claim for punitive damages, nor does the Complaint set forth a plausible underlying claim needed in order to support an award of punitive damages.

In Count 5 of the Complaint, GPAC requests an award of punitive damages against both of the Defendants. Judgment should be entered in favor of Blake on Count 5. As with Counts 2 and 4, there is no conflict of law or choice of law issue to resolve. Neither Colorado, nor South Dakota, recognize an independent, stand-alone claim for "punitive damages." *See McKie v. Huntley*, 620 N.W.2d 599, 601 (S.D. 2000) (South Dakota law); *Mortgage Finance, Inc. v. Podleski*, 742 P.2d 900, 902–04 (Colo. 1987) (Colorado law). Instead, punitive damages are a measure of recovery that is connected to, and purely derivative of, a separate legal claim that supports this extraordinary measure of recovery. *Id.* The entry of judgment in Blake's favor on Counts 1-4 requires the dismissal of Count 5. Without underlying claims against Blake, there are not damages to award, especially punitive damages.

### F. The natural and unavoidable consequence of entering judgment on the pleadings in favor of Blake is that GPAC's claims against CyberCoders also fail.

Blake moves separately for judgment on the pleadings. Neither he, nor his attorneys, are authorized to speak on behalf of CyberCoders. Assuming, however, that the Court enters judgment on the pleadings in favor of Blake, GPAC's claims against CyberCoders also fail on the merits.

### G. The Court should please rule on Blake's Motion for Judgment on the Pleadings before hearing GPAC's Motion for Preliminary Injunction.

As part of the GPAC's initial spectacle of litigation, a separate, and also completely identical, motion for preliminary injunction, accompanied each form complaint filed against the various former employee defendants. There is, however, no true sense of urgency on the part of GPAC. That is because there is no harm, let alone irreparable harm, occurring, and no legitimate need for the extraordinary relief provided through a preliminary injunction. There is presently a

32

hearing scheduled for May 17, 2022, before the Court on GPAC's form request for a preliminary injunction against Blake. From a due process and notice standpoint, there are no factual grounds in the record that would support injunctive relief. A preliminary injunction can't enter based on allegations that are clearly inadequate to withstand Rule 12(b)(6) or Rule 12(c) summary dismissal. Blake respectfully requests that the Court suspend or delay any hearing on GPAC's form motion seeking a preliminary injunction pending ruling on his Motion for Judgment on the Pleadings. The legal issues raised in Blake's Motion are inextricably intertwined with GPAC's alleged entitlement to a preliminary injunction. To state the obvious, GPAC would not be entitled to an injunction enforcing a void or voidable contract. Entry of judgment in favor of Blake on the pleadings would also obviate the need for a preliminary injunction hearing. At the very least GPAC should be required to disclose all of its evidence and testimony prior to the hearing. This is not asking much, because GPAC would have needed to collect this same evidence consistent with its Rule 11 obligations in filing a lawsuit seeking punitive damages against its former employees.

## IV.     CONCLUSION.

GPAC's spectacle of litigation against former employees is all show, and no substance. Blake's EA is void under Colorado law, and the Complaint fails to allege facts stating a plausible breach of contract claim even if South Dakota law is applied. The remaining claims fail regardless of whether Colorado or South Dakota law applies. For all of the foregoing reasons, Blake Andersen requests that the Court enter judgment on the pleadings in favor of the Defendants.

Dated this 25th day of March, 2022.

BANGS, MCCULLEN, BUTLER, FOYE & SIMMONS, LLP

By: /s/ Jeff Bratkiewicz
 Jeff Bratkiewicz
 jeffb@bangsmccullen.com
 6340 S. Western Avenue, Suite 160
 Sioux Falls, SD 57108-3414
 Telephone: (605) 339-6800
 Facsimile: (605) 339-6801
 *Attorneys for Defendant Blake Andersen*

CERTIFICATION

Undersigned counsel hereby certifies that this Brief complies with the type-volume limitation provided under D.S.D. Civ. LR 7.1(B)(1) and contains 11,125 words. Undersigned counsel relies on the word count feature in the software program used to prepare this Brief.

/s/ Jeff Bratkiewicz
*One of the Attorneys for Defendant Blake Andersen*

CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.

/s/ Jeff Bratkiewicz
*One of the Attorneys for Defendant Blake Andersen*