UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-80320-CIV-CANNON

**CYBERCODERS, INC.**,

      Plaintiff,
v.

**CHARLES COOKE** and
**NICOLAS BENEDETTO**,

      Defendants.
_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** comes before the Court upon Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and to Conduct Expedited Discovery (the "Motion"), filed on March 7, 2025 [ECF No. 5]. Defendants filed a combined Opposition to the Motion on March 21, 2025, Plaintiff filed a Reply on March 23, 2025 [ECF Nos. 13, 14], and the Court held a hearing on the Motion on March 24, 2025 [ECF No. 22 (Transcript of Hearing)]. After the hearing, the parties filed a Joint Status Report indicating ongoing discussions regarding certain written evidence [ECF No. 16]. The Court also permitted the evidentiary record on the Motion to remain open for the submission of any additional material, which both parties submitted through the deadline of April 4, 2025 [ECF Nos. 24, 26–27]. The Motion is now ripe for adjudication. Upon review of the Motion, Response, Reply, and the full evidentiary record, the Motion is **GRANTED**.[1]

---

[1] As both parties agree, adjudication of this Motion does not run afoul of what the parties describe in a separate motion to be an agreement to arbitrate all disputes with the exception of motions for temporary or injunctive relief [ECF No. 25 p. 2; ECF No. 28 p. 2].

\* \* \*

This case arises from Defendants' alleged breach of their non-compete and non-solicit agreements with Plaintiff that occurred when Defendants started a competing business upon their resignation from Plaintiff and poached ten other employees to go with them. Plaintiff seeks injunctive relief on four of the six counts in its Complaint [ECF No. 1 pp. 25–31; ECF No. 5 p. 4]: Count I: Breach of Contract (Non-Solicit) against Defendant Cooke; Count II: Breach of Contract (Non-Compete) against Defendant Cooke; Count IV: Breach of Contract (Non-Solicit) against Defendant Benedetto; Count V: Breach of Contract (Non-Compete) against Defendant Benedetto.[2]

Plaintiff seeks injunctive relief in the form of: (1) enjoining Defendants from working in their newly created competing business in violation of their non-compete agreement; (2) enjoining Defendants from soliciting Plaintiff's employees and customers/clients in violation of their non-solicit agreements; and (3) requiring Defendants to return all documents and information in their possession that they obtained in conjunction with their employment with Plaintiff [ECF No. 5 p. 2; ECF No. 5-1 pp. 3–4].[3] Defendants oppose the Motion, challenging the effectiveness and enforceability of the contracts upon which Counts I, II, IV, and V are based [ECF No. 13]. Defendants also argue that, even if the contracts remain in effect and are enforceable, Plaintiff has not met the standard for injunctive relief [ECF No. 13].

---

[2] Plaintiff does not seek injunctive relief on Counts III or VI, which allege breaches of fiduciary duty against Defendants Cooke and Benedetto, respectively [ECF No. 1; ECF No. 22 p. 248].

[3] Plaintiff originally sought an order requiring Defendants to undergo a forensic protocol of their personal devices to retrieve any of Plaintiff's potential confidential or proprietary information [ECF No. 5 p. 2; ECF No. 5-1 pp. 4–5]. After the hearing, the parties filed a Joint Status Report noting that if they could not "agree to the terms of a forensic inspection protocol," they would file a status report by April 4, 2025 [ECF No. 16 p. 2]. No such status report was ever filed, nor does Plaintiff include a forensic protocol in its revised proposed order [ECF No. 19-1]. The Court therefore does not address the forensic protocol in this Order, although nothing in this Order should be construed as a ruling on Plaintiff's ability to seek such relief in the context of discovery.

Four witnesses testified at the evidentiary hearing on the Motion: Plaintiff's President, Ben di Grazia; Defendants Charles Cooke and Nicolas Benedetto; and Plaintiff's VP of Technology, KC Brotherton [ECF No. 22]. The parties also admitted various exhibits at the hearing [ECF Nos. 18, 21].[4]

After the evidentiary hearing, the Court ordered the parties to confer regarding specific items of discoverable information and file a Joint Status Report [ECF No. 15]. On March 26, 2025, the parties complied, indicating that they conferred and were engaging each other regarding the forensic inspection and additional "Company records" pertaining to Defendants' primary office as contained in their 2019 employment agreements [ECF No. 16]. The parties also filed proposed orders [ECF Nos. 19, 20]. The Court ordered the evidentiary record to remain upon until April 4, 2025 [ECF No. 24], when each side filed a declaration and accompanying exhibits in support of their respective positions [ECF Nos. 26, 27].

Upon full review of the record, the Court finds as follows.

## FACTUAL FINDINGS

1. Plaintiff is a permanent staffing company that works across all industries to place candidates with company clients for a fee. Plaintiff has been in operation for approximately 25 years [ECF No. 22 pp. 24, 27]. As of the date of the hearing, Plaintiff had approximately 320 total employees, with 280 working in recruiting [ECF No. 22 pp. 27, 64]. The recruiting industry is a "people business" that depends on relationships and goodwill between the recruiters,

---

[4] Plaintiff originally sought expedited discovery in aid of its request for a preliminary injunction [ECF No. 5 pp. 15–19]. But after the evidentiary hearing, Plaintiff asserted that the factual record as developed was sufficient for the Court to consider its motion as one seeking a preliminary injunction rather than a temporary restraining order [ECF No. 22 pp. 265–266]. Defendants do not oppose proceeding in that fashion [ECF No. 22 pp. 22–23; *see* ECF No. 20-1]. The Court previously announced its intention to proceed under Fed. R. Civ. P. 65(a) and allowed additional time to supplement the record on the motion [ECF No. 24].

clients, and candidates [ECF No. 22 pp. 24–25 (testifying that they are "vital")].

2. Plaintiff created an applicant-tracking software called Cyrus that stores candidate and client information [ECF No. 22 pp. 29, 208]. The full proprietary nature of Cyrus is not entirely clear, but it contains AI features built in-house and a mixture of historical information, transaction details, contact and client information and activity, and financial data [ECF No. 22 pp. 29–30, 58–60, 99–100, 208, 212–214, 238, 240–241]. As Plaintiff's president Ben di Grazia testified, Cyrus assists Plaintiff's recruiters with maintaining repeat customers and clients [ECF No. 22 pp. 99–100].

3. Defendant Cooke started working for Plaintiff in 2009 as an Operations Manager and ultimately reached the senior position of Vice President of Recruiting in 2019, where he oversaw 6 recruiting divisions, managing and supervising 39 employees [ECF No. 22 pp. 26, 28, 37–39, 139]. Defendant Benedetto was one of those employees, who first began working for Plaintiff as an Executive Recruiter in 2016 and ultimately reached the title of Director of Recruiting in 2021 [ECF No. 1 pp. 8–9; ECF No. 22 pp. 37–38, 189].

4. Defendants were top-level recruiters and producers within Plaintiff's organization [ECF No. 22 pp. 25–26, 34–39]. Defendant Cooke was integral in establishing long-standing client relationships and repeat business [ECF No. 22 pp. 25–26]. Defendant Benedetto, for his part, characterized himself as a top performer, in part due to the relationships that he built with customers throughout his time with Plaintiff [ECF No. 22 p. 172].

5. In July 2019, Defendants relocated from California to Plaintiff's newly created Florida office [ECF No. 22 pp. 40–41]. In conjunction with their relocation, Defendants Cooke and Benedetto entered Confidentiality, Non-Solicitation, and Non-Competition Agreements with Plaintiff dated July 6, 2019, and July 8, 2019, respectively [ECF No. 1-1 pp. 2–12; ECF No. 1-

2 pp. 2–12] (collectively, the "2019 Agreements"); [ECF No. 22 pp. 40–42, 203–204; ECF No. 26 p. 16].

6. Per the terms of the 2019 Agreements, they are "governed by the laws of the state shown in the Company records as the Employee's current primary office location, without giving effect to the state's conflict of law rules" [ECF No. 1-1 p. 10; ECF No. 1-2 p. 10].

7. The Court finds that, at the time of execution of the 2019 Agreements, Defendants' primary office location was in Florida. This is reflected by several pieces of evidence introduced at the hearing and filed thereafter [ECF No. 18-1 p. 323 (Cooke's W-4 from June 2019 listing Florida address); ECF No. 18-1 pp. 310–318 (emails between Cooke and Plaintiff's HR director in late June/early July 2019 in which Cooke voluntarily updated address to reflect Florida address); ECF No. 18-1 p. 261 (Benedetto's offer letter signed on July 2, 2019, indicating "relocat[ion] to Palm Beach Garden area"); ECF No. 26 p. 6 (HR documents reflecting Defendants' "New Location" as Florida effective 7/1/2019); ECF No. 26 p. 16 (email from former president announcing Florida office is "live" on July 1, 2019, with Defendants "heading [it] up")].[5]

8. A few provisions in the 2019 Agreements are particularly relevant:

   a. <u>Non-compete</u>: Defendants are prohibited from working "in a Competing Position for a Competing Business within the Restricted Territory" during their employment with Plaintiff and "for a period of twelve months after the termination of [their] employment for any reason" [ECF No. 1-1 p. 6; ECF No. 1-2 p. 6]. The "Restricted Territory" is a 50-mile radius around any office (including employee home offices) to which the employee was assigned or over which he had

---

[5] Defendant Cooke's reliance on evidence indicating that he physically signed his agreement while in California does not provide a basis to change the Court's factual finding with respect to Cooke's primary office location [ECF No. 22 p. 170; ECF No. 27 p. 5].

responsibility [ECF No. 1-1 p. 4].

   b. <u>Non-solicit</u>: Defendants are prohibited from (i) soliciting, seeking to employ, or seeking to retain the services "of any person whose identity [they] learned while employed by the Company"; and (ii) soliciting or seeking to provide services to any customer or potential customer of the Company with whom [Defendants] had Material Contact, during their employment and for a period of twelve months after termination [ECF No. 1-1 pp. 6–7; *see* ECF No. 1-1 p. 4 (defining "Material Contact" as "contact between Employee and any Company customer or potential customer within 24 months prior to Employee's termination or resignation in which Employee" communicated directly with the customer, obtained confidential information about the customer, or received compensation, commissions, or earnings based on the customer's receipt of products or services)].

9. Defendants worked in a physical office in Florida until about December 2020 or January 2021, when the entire company switched to a fully remote work model following the covid-19 pandemic [ECF No. 22 pp. 44–45, 154]. Defendants continued working for Plaintiff from their homes in Florida until they resigned in February 2025 [ECF No. 22 pp. 46–48, 51].

10. At some point towards the end of 2024, Defendants made the decision that they would resign from Plaintiff and start a new boutique recruiting firm called Levelociti from their homes in Florida [ECF No. 22 pp. 104–105, 136]. As reason for their decision, Defendants Cooke and Benedetto cited compensation cuts and lack of promotion opportunities [ECF No. 22 pp. 139–140, 189–190].

11. On February 17, 2025, Defendant Cooke contacted di Grazia informing him that Cooke was resigning and starting a boutique recruiting agency (Levelociti) with Defendant Benedetto

[ECF No. 22 pp. 46–47, 103–104]. Defendant Benedetto later emailed his resignation to di Grazia that same day [ECF No. 22 pp. 48, 51, 55].

12. Levelociti is "in the same recruiting space competing" with Plaintiff [ECF No. 22 p. 108]. Levelociti has not generated any revenue or placed any candidates in jobs as of the date of the hearing [ECF No. 22 p. 116]. Defendant Cooke testified that at least two companies with which he worked at CyberCoders reached out to him after he left, and that after he left, he proactively emailed other companies that he was leaving Plaintiff [ECF No. 22 pp. 111–115, 135]. Defendant Benedetto testified that some companies with whom he worked while at Plaintiff—one company named GreyStar and other companies that he could not remember—have entered into contingency-fee agreements with Levelociti for recruiting business [ECF No. 22 pp. 177–179, 184].

13. Before leaving their employment with Plaintiff, Defendants discussed their departure and new venture with then-current employees of Plaintiff. It is not entirely clear who began all of these conversations, but it is clear that Defendants sent offer letters to various employees who worked under them while still employed with Plaintiff [ECF No. 22 pp. 116–118]. And some of those offers were made before the employees resigned [ECF No. 22 pp. 188].

14. In total, ten employees left Plaintiff to go work for Defendants: Belle Arriaga, Kyle Westhorpe, Sean Westhorpe, Delano Williams, Ricky Miranda, Alex Acevedo, Alex Higgins, Keith Schuler, John O'Grady, and Jimmy Rowland [ECF No. 22 pp. 108–110]. All ten resigned within 36 hours of Defendants' resignations [ECF No. 22 pp. 54–55]. And all ten were top-level performers who worked for Defendants, in Defendant Cooke's division, with Plaintiff [ECF No. 22 pp. 126–28; ECF No. 18-1 p. 321 (organizational chart)].

15. To the extent that Cooke testified that his conversations with some of these employees arose

"organically" and did not rise to the level of solicitation, the Court does not find his testimony credible [ECF No. 22 pp. 118–120 (Cooke describing conversation "organically" coming up at a dinner with Belle Arriaga and Ricky Miranda); ECF No. 22 p. 120–124 (same with Kyle Westhorpe and Alex Higgins)]. The Court also finds it difficult to credit Cooke's purported lack of knowledge—as the managing partner of a startup he founded approximately two months ago—regarding any clients with which Levelociti has currently signed contracts [ECF No. 22 pp. 161–163]. Benedetto displayed similar questionable uncertainty in response to inquiries about whom Levelociti has contracts with, despite conceding that "[t]here is some overlap" between clients of CyberCoders and clients of Levelociti" [ECF No. 22 pp. 178–179].

16. Throughout the course of their employment, Defendants received various offer letters altering their compensation and benefits [ECF No. 14-1 p. 2; ECF No. 14-1 pp. 55–96 (four offer letters to Cooke and seven to Benedetto over six-year period)]. One letter that Cooke received in June 2024 contains the following language on which Defendants rely in their attempt to invalidate the restrictive covenants contained in the 2019 Agreements:

> To the extent you have continuing obligations to prior employer(s), we also want you to know that, should such prior employer challenge your hire or employment with CyberCoders based on those obligations, we would not provide your defense (because that is an agreement between you and them), and we might have to terminate your employment.
>
> This offer letter contains CyberCoders and your entire understanding regarding the at-will nature of your employment, your compensation, benefits, and other terms as referenced herein, and supersedes any and all prior representations regarding such matters [ECF No. 14-1 p. 65].

17. Defendants have returned their company equipment to Plaintiff, but they acknowledge that they used their personal devices (iPads, iPhones, laptops) for work with Plaintiff given the web-based nature of the platform [ECF No. 22 pp. 128–129, 180–181]. Defendants

acknowledged that their devices could still retain company records from Plaintiff [ECF No. 22 p. 182], though Plaintiff admitted that there was no evidence that Defendants accessed Cyrus since they resigned [ECF No. 22 pp. 72–73].

18. On Sunday, February 16, 2025, the day before resigning, Cooke repeatedly (and within a compressed period) accessed company applications that require authentication, although Plaintiff could not prove what he specifically accessed without further forensic review of Cooke's devices [ECF No. 22 pp. 220–228; ECF No. 18-1 p. 325].

19. In at least one instance during Defendants' employment in 2023, Defendants were reported for retaining resumes from Cyrus on their personal devices [ECF No. 22 pp. 36, 79–80].

20. Defendants live in Florida and would have to relocate to a jurisdiction not covered by the non-compete for the remainder of its 12-month duration should they wish to continue engaging in a competing business [ECF No. 22 pp. 150–152, 200].

21. The parties agree that the map that Defendant Cooke created and that is admitted into evidence accurately reflects the 50-mile radiuses to which the non-complete agreements apply [ECF No. 22 pp. 152–155, 251, 256–257; ECF No. 21-2].  Consistent with the defined "Restrictive Territory" in the 2019 Agreements, the 50-mile radiuses on the map reflect Defendants' offices and any offices of employees over whom Defendants had supervisory, managerial, or administrative responsibilities   [ECF No. 1-1 p. 4;   ECF No. 1-2 p. 4; ECF No. 22 pp. 153–154].

## LEGAL STANDARDS

"For preliminary injunctive relief to be warranted, the district court must find that the party seeking it has satisfied four prerequisites by showing that: (1) there is 'a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the

threatened injury to the movant is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest.'" *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1293 (11th Cir. 2024) (quoting *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997)).

## CONCLUSIONS OF LAW

1. **Plaintiff has demonstrated a likelihood of success on the merits of its breach-of-contract claims against Defendants (Counts I, II, IV, and V).**

The elements for breach of contract under Florida law are (1) a valid contract, (2) a material breach, and (3) damages. *Grand Harbor Cmty. Ass'n, Inc. v. GH Vero Beach Dev., LLC*, 395 So. 3d 168 (Fla. Dist. Ct. App. 2024). Florida Statute § 542.335 "contains a comprehensive framework for analyzing, evaluating, and enforcing restrictive covenants contained in employment contracts." *Env't. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1262 (Fla. Dist. Ct. App. 2009). For a restrictive covenant to be valid, an employer must: (1) "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant," (2) demonstrate that it is "reasonably necessary to protect the legitimate business interest," and (3) demonstrate that it is "reasonable with regard to time, area, and line of business." Fla. Stat. § 542.335(1)(b). If an employer makes this prima facie showing, the burden shifts to the employee to show that "the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest." Fla. Stat. § 542.335(1)(c).

Plaintiff has shown a substantial likelihood that the 2019 Agreements contain valid restrictive covenants. The restrictive covenants are reasonably necessary to protect Plaintiff's legitimate business interests in its "[s]ubstantial relationships with specific prospective or existing customers . . . or clients," its "[c]ustomer . . . or client goodwill," and its Cyrus software, which is proprietary at least in part. Fla. Stat. § 542.335(1)(b). Plaintiff's president and Defendants

10

testified as to the importance of client relations and goodwill in the recruiting industry, which the Court determines qualify as legitimate business interests within the meaning of Fla. Stat. § 542.335(1)(b) [ECF No. 22 pp. 69–70, 163, 172]. *See, e.g.*, *DePuy Orthopaedics, Inc. v. Waxman*, 95 So. 3d 928, 938–39 (Fla. Dist. Ct. App. 2012) (finding legitimate business interest in company's "substantial relationships with existing customers"). The restrictive covenants are also reasonable in time, area, and line of business because they apply to defined "Competing businesses" for a modest 12-month duration and in defined 50-mile radiuses. *See* Fla. Stat. § 542.335(d)(1) (presume reasonable 6 months or less and unreasonable 2 years or more); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1238–39 (11th Cir. 2009) (collecting Florida cases of reasonable geographic scopes analogous to the geographic areas implicated here).

Defendants' counterarguments are unpersuasive. First, the 2024 offer letters signed by Defendants did not invalidate the restrictive covenants in the 2019 Agreements. *See supra* ¶ 16 (pertinent text of 2024 offer letters); ECF No. 14-1 pp. 64–66. The provision on which Defendants rely expressly refers to "obligations to *prior employer(s)*" who may challenge their employment "*with CyberCoders*." *Id.* (emphases added). And while the merger clause indicates that it supersedes prior representations regarding "employment, compensation, benefits, and other terms as referenced herein"—nowhere in that list or in the balance of the 2024 letters do restrictive covenants appear. *See id.* In sum, neither provision can plausibly be read to wipe out the validly entered restrictive covenants in the 2019 Agreement. At bottom, the 2024 offer letters are simply "paperwork [that] outlines the changes made to [Defendants'] title and commission structure as of July 1, 2024" [ECF No. 14-1 p. 64]. On the record presented, there was no agreement—express or implied—that replaces the 2019 Agreements [*see* ECF No. 14 p. 7 (Plaintiff arguing that four elements of novation are not met)].

Second, Defendants insist that the Court engage in a choice-of-law analysis between California and Florida law, apply California law, and conclude that the restrictive covenants are void. But as Plaintiff correctly points out, Defendants misstate the standard for a choice-of-law analysis. A party seeking to avoid enforcement of a choice-of-law provision must show that "the law of the *chosen* forum contravenes strong public policy" of the *forum* jurisdiction. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000) (emphasis added); *Kuber v. Prudential Ins. Co. of Am.*, 819 F. App'x 754, 755 (11th Cir. 2020) ("Florida law respects a contractual choice-of-law provision unless the chosen jurisdiction's law conflicts with Florida's public policy."). Consistent with the Factual Findings above, the choice-of-law provision here says Florida law governs. *See supra* ¶¶ 6–7 & n.3. And this is a Florida court. There is thus no public-policy analysis to undertake.[6]

Finally, Defendants argue that, even if Florida law applies and the 2019 Agreements are enforceable, they are unduly broad in length and geographic scope given the virtual nature of the recruiting industry, especially post covid-19. The Court disagrees. Courts have upheld 12-month non-competes, *see Grant v. Robert Half Int'l, Inc.*, 597 So. 2d 801, 801 (Fla. Dist. Ct. App. 1992) (affirming 12-month non-compete within 50 miles of any office where plaintiff had worked), and

---

[6] Defendants argue that California law should still apply because Plaintiff is a California corporation, and California law prohibits "an employer [from] enter[ing] into a contract that is void under this chapter." *See* Cal. Bus. & Prof. Code § 16600.5(d). Defendants do not cite any court to have addressed this novel argument—which would require the Court to hinge a choice-of-law analysis on the Plaintiff's *state of incorporation*, not the forum selected by the parties or the forum jurisdiction [ECF No. 22 p. 281 (defense counsel arguing that "a California corporation does not have the authority under its organic law to enter into a void contract provision"); ECF No. 17]. At this stage, the Court is not persuaded by Defendants' bare-bones argument that California law could in effect do away with a validly entered choice-of-law provision applicable to out-of-California employees. *See generally DraftKings Inc. v. Hermalyn*, 118 F.4th 416 (1st Cir. 2024) (applying Massachusetts law over Cal. Bus & Prof. Code § 16600 when an employee signed non-compete agreement with Massachusetts choice-of-law proviso but worked in California for competitor in violation of agreement).

12 months is only half of the statutory threshold of reasonableness, Fla. Stat. § 542.335(d)(1) (two years presumptively unreasonable). While the geographic scope appears to prohibit Defendants from working in a competing business in most of Florida and certain parts of seven other states [ECF No. 21-2 (map with radiuses)], there is no dispute that large swaths of the country remain available to Defendants if they insist upon direct competition for the remainder of the 12-month prohibition after their voluntary resignation. In fact, Plaintiff's president and Defendants themselves testified to the virtual landscape of the recruiting industry—meaning recruiters can "work with candidates and clients across the nation" [ECF No. 22 pp. 96, 147, 200]. This is not a reason to *invalidate* the covenants, especially considering that even a "nationwide restriction is not invalid per se." *Auto Club Affiliates, Inc. v. Donahey*, 281 So. 2d 239, 241 (Fla. Dist. Ct. App. 1973).[7]

### 2. Plaintiff has demonstrated that it will suffer irreparable harm.

A "violation of an enforceable restrictive covenant creates a presumption of irreparable injury." Fla. Stat. § 542.335(1)(j); *see TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) (explaining that Fla. Stat. § 542.335(1)(j) is "the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake"). "This presumption, however, is rebuttable." *Proudfoot Consulting Co.*, 576 F.3d at 1231. In support of its irreparable-harm showing, Plaintiff points to Defendants' active competition with CyberCoders, along with Defendants' solicitation of customers and clients [ECF No. 5 pp. 12–13; ECF No. 19-1 p. 5]. Plaintiff also emphasizes that Defendants poached ten employees—some of whom received offer letters from Defendants while still employed with Plaintiff—characterizing

---

[7] The parties agree on the meaning and application of the restrictive territory as defined in the 2019 Agreements [ECF No. 22 pp. 152–153, 249–250; ECF No. 21-2]. *Supra* ¶ 21.

such evidence as a clear indication of an ongoing threat to Plaintiff [ECF No. 22 pp. 245–246]. Defendants push back, arguing that in the high-turnover, non-exclusive recruiting industry, Plaintiff's loss of employees, clients, and money after Defendants' departure does not equate to irreparable harm [ECF No. 13 pp. 19–20; ECF No. 22 pp. 282–283].

Upon review of the full evidentiary record, the Court determines that Defendants have not rebutted Plaintiff's showing of irreparable injury, which is apparent in three ways. First, Plaintiff has been in business for 25 years, and its president testified about its good will, client relationships, and Cyrus platform, which is proprietary at least in part [ECF No. 22 pp. 24–25, 29–30, 95–96; *see also* ECF No. 26 p. 10 (news release from July 2019 in which Cooke himself says that "[CyberCoders'] successful approach to recruiting [] is fueled by our proprietary technologies")]. Second, Defendants were long-time, top-level employees for Plaintiff, who were integral in establishing long-standing client relationships and repeat business. *See supra* ¶¶ 3–4. Defendants oversaw dozens of employees while employed at Plaintiff (with Defendant Cooke supervising an entire recruiting division), and many of those employees departed Plaintiff to work for Defendants' competing business within an approximate 36-hour time frame. *See supra* ¶¶ 3, 14. And third, Defendants openly admitted that they violated at least portions of their restrictive covenants— which Plaintiff has in place to protect its legitimate business interests in client relations and goodwill. Defendants' argument that the non-exclusive nature of the recruiting industry means that Plaintiff has not suffered irreparable harm [ECF No. 22 pp. 93–94, 283] is unpersuasive on this factual record. And, taken to its logical end, adopting Defendants' categorical view of irreparable injury in this context would appear to mean that no such irreparable injury could exist in the recruiting space—a contention not supported by the record or Florida law. Accordingly, Plaintiff's showing of irreparable harm is sufficient to justify the injunctive relief sought—

enforcement of the covenants to which Defendants knowingly agreed—and Defendants have not rebutted that showing.

### 3. The balance of harms and public interests weigh in favor of an injunction.

Plaintiff asks the Court to "not consider any individualized economic or other hardship" that Defendants may suffer in accordance with Fla. Sat. § 542.335(1)(g). But the Eleventh Circuit had made clear that § 542.335(1)(g) "should not be applied when determining the appropriate remedy" because it does not govern "the *enforcement* of an already enforceable restrictive covenant." *TransUnion Risk*, 625 F. App'x at 407. Even so, the Court concludes that the balance of harms weighs in Plaintiff's favor. Plaintiff has already suffered harm by the fact that 12 employees left within 36 hours as noted above, all led by Defendants' soliciting and poaching, and Defendants' new business has already entered contracts with at least one company with which Defendants worked while at CyberCoders. *See supra* ¶¶ 12–14. Plaintiff sought to prevent this very harm through the covenants. On the other hand, Defendants are harmed in that they are prohibited from engaging in covenant-violative work for the remainder of the 12-month period that began when they resigned. That carries some temporary concern about the location of their work and livelihoods in general, but Defendants' sweeping arguments about "constitutionally protected liberty interests" do not overcome the reality that the Court cannot ignore Florida law that plainly permits reasonable restrictive covenants as presented here [ECF No. 22 pp. 275–276, 287–288]. Finally, Defendants make much of the fact that Plaintiff has not sued other former employees [ECF No. 22 pp. 72, 98, 149, 157; ECF No. 27]. Noticeably absent, however, is any evidence about any of those individuals' restrictive covenants or locations. And more fundamentally, even if Plaintiff has not consistently sued every employee who violated a restrictive covenant, this action presents markedly more problematic conduct by two high-level and long-term employees running a recruiting division who elected to poach numerous employees within a

short time span while still employed for Plaintiff; initiated a directly competing business; and actively engaged with Plaintiff's clients as part of the new business venture. *See supra* ¶¶ 10–14.

As for the public interest, Florida favors enforcement of reasonable covenants not to compete. Fla. Stat. § 542.335; *see Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004) (holding that non-compete "will further the public interest by assisting [plaintiff] in protecting its investment in confidential and proprietary business information that it uses to become a more profitable and efficient business enterprise"). Defendants have not provided a sufficient basis to minimize that interest.

In sum, the balance of harms and interests points substantially in Plaintiff's favor.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Preliminary Injunction [ECF No. 5] is **GRANTED**.
2. In accordance with the terms of the subject restrictive covenants, Defendants are **ENJOINED** for a 12-month period starting on February 17, 2025 (date of resignation), from:

    a. Directly or indirectly owning, maintaining, operating, or working for any recruiting or staffing firm, including Levelociti, within fifty (50) miles of Defendants' personal residences and any personal residences of employees over which Defendants had supervisory responsibilities from February 17, 2023, through February 17, 2025. Plaintiff shall provide Defendants with a list of all such addresses within 7 days of this Order;

    b. Directly or indirectly soliciting, seeking to employ, seeking to retain the services of, persuading, inducing, or attempting to persuade or induce any person whose

      identity Defendants learned while employed by CyberCoders, who is at that time or was within the previous twelve (12) months providing services to CyberCoders as an employee or independent contractor, for the purpose of providing services to any recruiting or staffing firm;

    c. Directly or indirectly soliciting, seeking to place, persuading, inducing, or attempting to persuade or induce any temporary employee, candidate for employment, or independent contractor candidate, who, in the twelve (12) months prior to Defendants' separation of employment with CyberCoders, was directly or indirectly placed by Defendants or sought to be placed by Defendants or whose identity Defendants learned in carrying out Defendants' job duties, which placement is for or on behalf of any recruiting or staffing firm; and

    d. Directly or indirectly (i) soliciting or seeking to provide services to any customer or potential customer of CyberCoders with whom Defendants had Material Contact (as defined in the Agreements [*supra* ¶ 8]) for or on behalf of any recruiting or staffing firm, including Levelociti, or (ii) persuading, inducing, or attempting to persuade or induce any such customer or potential customer to alter or reduce its use of services from CyberCoders.

3. Under Fed. R. Civ. P. 65(c), Plaintiff shall deposit with the Clerk of the Court security in the amount of $10,000 within 14 days of this Order.

4. Defendants' Motion to Compel Arbitration [ECF No. 25] remains pending before the Court.

**ORDERED** in Chambers at Fort Pierce, Florida, this 15th day of April 2025.

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　**AILEEN M. CANNON**
　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

cc:　　counsel of record